IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

JOHN ANCTIL,

LEE BABB,                                           **COMPLAINT**

CHARLES and CONSUELO FERRIS,

MARTIN and JANICE HOGAN,                            **JURY TRIAL**

JOHN LOPES,                                         **DEMANDED**

JAMES and PRISCILLA MCGOUGH,

MARK and LISA PERRY,

REBECCA RALSTON,

JONATHAN THURROTT,

NANCY TROSKE,

INGRID WEBER

and MATTHEW ZICARO,

          Plaintiffs,


     - against —


ALLY FINANCIAL, INC.,
AURORA LOAN SERVICES,
BANK OF AMERICA,
CAPITALSOURCE, INC.,
CITIGROUP, INC.,
CITIMORTGAGE, INC.,
COUNTRYWIDE HOME LOANS, INC.,
CROSS COUNTRY MORTGAGE,
DEUTSCHE BANK,
FIRST FRANKLIN INVESTMENT & LOAN,
FLAGSTAR BANK, FSB,
FREMONT INVESTMENT AND LOAN CORP.,
GMAC MORTGAGE,

MERRILL LYNCH,
MONEY WAREHOUSE,
MORTGAGEIT,
PNC FINANCIAL SERVICES,
U.S. BANK NATIONAL ASSOCIATION,
and WELLS FARGO,

                         Defendants.

-----------------------------------------------------------------X

1.     Plaintiffs allege as follows based on personal knowledge and on information and belief based on investigations of counsel.

## I. Nature of the Action

2.     Plaintiffs are former mortgagors whose homes were foreclosed upon. Acting in their capacity as some of the largest banks and home and commercial loan lenders in the nation, defendants engaged in a pattern of fraudulent acts to procure foreclosure judgments against plaintiffs. Defendants' actions included seeking foreclosures on plaintiffs' homes based on misrepresentations and documents with false information, in violation of state and federal statutes. As a result, plaintiffs suffered the loss of their mortgages and the deprivation of legal protections intended to ensure that property interest and the public interest in property laws.

3.     Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Because

defendants' fraud extends beyond any one foreclosure, plaintiffs seek disgorgement of defendants' profits, treble damages, damages under state statutes, and damages for unjust enrichment.

## II.  Jurisdiction And Venue

4.  This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964(c) (person injured in their business or property by reason of a RICO violation).  Jurisdiction in this Court is further proper because the defendants' scheme comprises a pattern of fraudulent activity beyond any individual foreclosure judgment.

5.  Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) because many of the defendants reside, are found, have an agent and/or transact their affairs within this District, and a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred here.  Further, two properties foreclosed upon are located in Dutchess County, New York.

## III.  The Parties

### *Plaintiffs*

6.  John Anctil is the former mortgagor of a home in Franklin County, Massachusetts.

7.      Lee Babb is the former mortgagor of a home in Plymouth County, Massachusetts.

8.      Charles and Consuelo Ferris are the former mortgagors of a home in Hampden County, Massachusetts.

9.      Martin and Janice Hogan are the former mortgagors of a home in Dutchess County, New York.

10.     John Lopes is the former mortgagor of a home in Bristol County, Massachusetts.

11.     James and Priscilla McGough are the former mortgagors of a home in Worcester County, Massachusetts.

12.     Mark and Lisa Perry are the former mortgagors of a home in Barnstable County, Massachusetts.

13.     Rebecca Ralston is the former mortgagor of a home in Worcester County, Massachusetts.

14.     Jonathan Thurrott is the former mortgagor of a home in Norfolk County, Massachusetts.

15.     Nancy Troske is the former mortgagor of a home in Dutchess County, New York.

16.     Ingrid Weber is the former mortgagor of a home in Essex County, Massachusetts.  The Southern Essex District Registry of Deeds website

indicates that documents relating to the foreclosure of Ms. Weber's home are potential "robosigned" documents – i.e., signed by people who did not review or have personal knowledge of such documents.

17.  Matthew Zicaro is the former mortgagor of a home in Worcester County, Massachusetts.

*Defendants*

18.  Ally Financial, with offices located at 1185 6th Avenue, New York, New York 10036, is the parent company of GMAC Mortgage, *infra.*

19.  Aurora Loan Services LLC ("Aurora") is a limited liability corporation with offices located at 10350 Park Meadows Drive, Littleton, Colorado 80124.  Aurora was involved in a mortgage or foreclosure proceedings relating to Rebecca Ralston in 2010.  Aurora's website states: "Mortgage customers who were part of a foreclosure action between January 1, 2009 and December 31, 2010 may be eligible for an Independent Foreclosure Review of their loan. . . ."

20.  Bank of America is a bank with headquarters located at 100 North Tryon Street, Charlotte, North Carolina, 28255, and offices located at 115 West 42nd Street, New York, New York 10036.  Bank of America was involved in a mortgage or foreclosure process relating to plaintiffs Mark and Lisa Perry.  Bank of America acquired Merrill Lynch, *infra.*  Bank of America

also acquired BAC Home Loans Servicing ("BAC") by acquisition or merger.  BAC was involved in a mortgage or foreclosure proceedings relating to Charles Ferris (by successor to BAC), Mark and Lisa Perry, and Ingrid Weber (by successor to BAC).

21.     CapitalSource, Inc., a financial services enterprise, is headquartered at 633 West 5th Street, Suite 3300, Los Angeles, California, 90071. CapitalSource acquired mortgage portfolio business from Fremont Investment and Loan Corp. ("Fremont")., *infra*.

22.     Citigroup, Inc. is the parent company of CitiMortgage, Inc., *infra*, with world headquarters located at 399 Park Avenue, New York, New York 10022.

23.     CitiMortgage, Inc. is a subsidiary of Citigroup, Inc., *supra*, with offices located at 100 Technology Drive, O'Fallon, Missouri 63368. CitiMortgage, Inc. was involved in a mortgage or foreclosure proceedings relating to John Anctil.

24.     Countrywide Home Loans, Inc. ("Countrywide") is a corporation under the laws of New York, with offices located at 4500 Park Granada, Calabasas, California 91302 and 7105 Corporate Drive, Plano, Texas 75024.  Countrywide was involved in a mortgage or foreclosure proceedings relating to Charles Ferris and Ingrid Weber.

25. Cross Country Mortgage, Inc. is a corporation under the laws of Ohio, with offices located at 12000 Snow Road 9, Cleveland, Ohio 44130. Cross Country Mortgage, Inc. was involved in a mortgage or foreclosure proceedings relating to Lee Babb.

26. Deutsche Bank is the parent company of MortgageIT, *infra*, with offices located at 60 Wall Street, New York, New York 10005.

27. First Franklin Investment and Loan, a division of First Franklin Financial Corporation, has offices located at 2150 North First Street, San Jose, California 95131. First Franklin Investment and Loan was previously owned by National City Corporation – now PNC Financial Services, *infra* – and Merrill Lynch, *infra*. First Franklin was involved in a mortgage or foreclosure proceeding relating to Martin and Janice Hogan.

28. Flagstar Bank, FSB ("Flagstar") is a mortgage lender and wholesaler with offices located at 5151 Corporate Drive, Troy, Missouri 48098. Flagstar was involved in a mortgage or foreclosure proceedings relating to Lee Babb.

29. Fremont Investment and Loan Corp. is a subsidiary of Fremont General Corporation, with headquarters located at 2727 East Imperial Highway, Brea, California 92821. Fremont Investment and Loan Corp. sold its mortgage servicing portfolio to Litton Loan Servicing, *infra*, and

CapitalSource, Inc., *supra*.  Fremont was involved in a mortgage or foreclosure proceedings relating to Martin and Janice Hogan, and Matthew Zicaro.

30.   GMAC Mortgage ("GMAC") a wholly owned subsidiary of Ally Financial, Inc., with headquarters located at 1100 Virginia Drive, Fort Washington, PA 19034.  GMAC was involved in a mortgage or foreclosure proceedings relating to Jonathan Thurrott.

31.   MortgageIT Inc., a mortgage company, is a wholly owned subsidiary of Deutsche Bank AG, *supra*.  MortgageIT is headquartered at 33 Maiden Lane, New York, New York 10038.  MortgageIT was involved in a mortgage or foreclosure proceedings relating to John Lopes.

32.   Merrill Lynch is a financial services company with offices located at 2 World Financial Center, New York, New York 10281.  Merrill Lynch is the wealth management division of Bank of America.

33.   Money Warehouse is a Pennsylvania corporation with an address of 615 Second Street Pike, Southampton, Pennsylvania 18966.  Money Warehouse was involved in a mortgage or foreclosure proceedings relating to John Anctil.

34.   PNC Financial Services ("PNC") is a financial services company headquartered at One PNC Plaza, 249 Fifth Avenue, Pittsburgh, PA

15222.  PNC is the successor to National City Corporation, which owned

First Franklin Investment and Loan, *supra*.

35.    U.S. Bank National Association ("U.S. Bank"), with offices located at

180 East 5th Street, St. Paul, Minnesota 55101, was involved in a

mortgage or foreclosure proceedings relating to Nancy Troske.

36.    Wells Fargo Bank ("Wells Fargo") is a bank active in the mortgage

industry, with headquarters located at 420 Montgomery Street, San

Francisco, California 94104, and offices located at 530 Fifth Avenue,

New York, New York 10036.  Wells Fargo was involved in a mortgage

or foreclosure proceedings relating to John Lopes, James and Priscilla

McGough, and Matthew Zicaro.

### IV. Defendants' Fraudulent Scheme

37.    Defendants profited through a pattern of fraud in seeking foreclosure

judgments against plaintiffs.  In essence, defendants designed a scheme

that enabled them to benefit as mortgagees when in fact they were not, as

they reaped profits by expediting foreclosures that were actually nullities.

These actions harmed plaintiffs and subverted state property and

recording statutes that legislatures had intended to protect the public.

Defendants' scheme revolved around their association-in-fact, as

exemplified through the Mortgage Electronic Registration System ("MERS").

## MERS

38.    MERS is a privately maintained electronic warehouse for mortgage-related data.  It was created in 1993 "by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages." *Matter of MERSCORP v. Romaine*, 8 NY3d 90, 96 (2006).  MERS shareholders and members include most of the largest companies involved in the mortgage industry, including defendants in this action, which originate, service, buy or invest in loans.

39.    The purpose of MERS is to allow its members to bypass the public recording system for mortgages and replace it with a private electronic registry of loans to track the beneficial interests in the loans and changes in loan servicers.

40.    The MERS mechanism exists outside the public recording system.  *See MERSCORP, supra.*

41.    Historically, when a lender issued a mortgage, it recorded its identity and interest in the county clerk's office (or its equivalent) pursuant to state and local law.  If an assignment of the original loan was made by the

lender, then the assignee would also record its identity and interest with the county clerk's office.

42.     In contrast, members of MERS typically name MERS as the lender's nominal assignee, mortgagee or beneficiary. When an assignment or transfer occurs between or among MERS members, MERS privately tracks that assignment or transfer but customarily does not record it in public records. This private tracking system avoids any fees or filings associated with public recording of mortgages and assignments.

43.     Countless such transfers or assignments have been run through MERS since its inception.

44.     MERS is the mortgagee for property in a conventional sense only to the extent that may be named as the mortgagee in a mortgage. MERS does not hold the underlying note for the mortgage, and it does not receive any payments from homeowners under the note.

45.     MERS has enabled defendants to function in an organization as a continuing unit for a shared purpose: until recently, information in MERS was made available by subscription. "Mortgage lenders and other entities, known as MERS members, subscribe[d] to the MERS system and pa[id] annual fees for the electronic process and tracking of ownership and transfers of mortgages." *Id.* During the relevant time

period, a typical mortgage involving MERS contained language to the effect that "MERS is a separate corporation that is acting solely as a nominee for [or beneficiary] of [the] Lender and [the] Lender's successors and assigns."

### *The Fraudulent Scheme*

46.     Behind the veil of MERS, purported assignments or transfers of interest in mortgages inured to the benefit of defendants. Meanwhile, defendants accelerated foreclosures with filings containing misrepresentations designed to cover up deficiencies inherent in the MERS scheme.

47.     For example, in order to have standing to foreclose on a property in New York, the foreclosing party must be the holder or assignee of the mortgage and the note. Under New York law, the note must be indorsed and must predate the foreclosure action. However, members of MERS have filed mortgage foreclosures without having been assigned the mortgage or holding the note.

48.     Each of the defendants engaged in, knew about or should have known about, misrepresentations with respect to facts relating to foreclosures on plaintiffs. Defendants filed false and misleading documents in public records concerning mortgages and MERS' alleged role in the process. Transfers and assignments underlying such falsifications rendered

foreclosures null under state law, thus exacerbating the damage created by the defendants' fraudulent scheme.

### The Defendants' Pattern Of Racketeering Activity

49.     Apart from utilizing MERS as a data warehouse, defendants used their association-in-fact to engage in foreclosures that proceeded based on materially false representations, in violation of applicable state law. These acts were interrelated yet occurred independently within the methods employed by defendants to further their scheme.

50.     Plaintiffs suffered injury because defendants' scheme resulted in foreclosures that were nullities under state law. Two examples illustrate the means by which defendants exploited their association-in-fact to the detriment of plaintiffs' property interests.

### Example One

51.     Plaintiff Nancy Troske was the mortgagor of a property located in, Fishkill, New York, pursuant to a mortgage executed on January 14, 2006. The mortgage was in the amount of certain sum of money and it defined MERS as the mortgagee. The lender was BNC Mortgage, Inc. ("BNC"), a former subprime subsidiary business of now defunct Lehman Brothers Holdings, Inc. An adjustable rate balloon rider secured the note to BNC.

52. On or about May 7, 2008, a document purporting to assign the mortgage was filed in the Dutchess County Clerk's Office. The document stated that MERS – as the "nominee" for BNC – assigned the mortgage to U.S. Bank National Association, as Trustee for the Structured Asset Investment Loan Trust 2006-2 ("U.S. Bank, as Trustee"). There was no indication of how or when MERS became the "nominee" rather that the mortgagee. Nor did the document assign the note. U.S. Bank, as Trustee subsequently brought an action for foreclosure.

53. New York Real Property Law Article 9 establishes a public recording system to "furnish potential purchasers with actual or at least constructive notice of previous conveyances and encumbrances that might affect their interests and uses." *Witter v. Taggart*, 78 N.Y.2d 234, 238 (1991). A conveyance of real property that has not been recorded with the clerk of the county where the property is located is "void as against any person who subsequently purchases or acquires by exchange or contracts to purchase or acquire by exchange…" New York Real Prop. Law § 291.

54. To foreclose on property, the foreclosing party must hold or have been assigned both the note and the mortgage at the commencement of the foreclosure action. *U.S. Bank Nat'l Ass'n v. Madero*, 80 A.D.3d 751, 752-53 (2d Dep't 2011); *Countrywide Home Loans, Inc. v. Gress*, 68

14

A.D.3d 709, 709 (2d Dep't 2009). "An assignment of a mortgage without assignment of the underlying note or bond is a nullity, and no interest is acquired by it." *Deutsche Bank Nat'l Trust Co. v. Barnett*, 88 A.D.3d 636, 637 (2d Dep't 2011). The right to assign a mortgage does *not* necessarily confer the right to assign the note. *Bank of NY v. Silverberg*, 86 A.D. 3d 274, 280 (2d Dep't 2011).

55.   Since the note was never assigned to U.S. Bank, the foreclosure proceeded in violation of New York law.

56.   US Bank failed to disclose that it did not hold the note, and it used the mails to promulgate this subterfuge.

57.   The judgment was a nullity obtained through fraud, yet U.S. Bank profited from it.

<u>*Example Two*</u>

58.   Plaintiff Matthew Zicaro was the mortgagor, along with Juola Stefani, of a property located in Princeton, Massachusetts, pursuant to a mortgage executed on December 30, 2005. The mortgage was in the amount of a certain sum of money and it defined MERS as the mortgagee. The lender was Fremont Investment and Loan. On December 29, 2006, "Wells Fargo Bank, NA as Trustee" initiated a complaint in a foreclosure action.

59.   However, the mortgage was not assigned until October 11, 2007, with a "date of transfer" of August 21, 2007.  In this "assignment," MERS – now as a "nominee" – purported to assign its interest in the mortgage to Wells Fargo, as Trustee.

60.   In Massachusetts, the holder of a mortgage may foreclose the mortgagee's right of redemption by exercising a power of sale, if that power is granted by the mortgage.  The power of sale is codified in Mass. G. L. c. 183, § 21, as regulated by Mass. G. L. c. 244 §§ 11-17C and 35A.  Massachusetts law limits the power of foreclosure to "the mortgagee or his executors, administrators, successors or assigns."  Mass. G. L. c. 183 § 21.  Under § 21, the mortgage holder may sell defaulted property at a public auction and convey the property in fee simple. Courts in Massachusetts require that "one who sells under a power [of sale] must follow strictly its terms . . . [and i]f he fails to do so there is no valid execution of the power, and the sale is wholly void." *Moore v. Dick*, 187 Mass. 207, 211 (1905).

61.   The statutory power of sale system in Massachusetts comprises an array of requirements.  Among other things, a foreclosing party must file an affidavit in the Land Court stating that the foreclosing party is the mortgagee or is authorized to act as the mortgagee.  Mass. G.L. c. 244 §

35A.  The party must also provide notice at least fourteen days prior to the proposed date of sale stating the redemption amount as of thirty days prior to the date of sale and identifying the present holder of the mortgage.  Mass. G.L. c. 244 § 14.  In addition, the party is required to record an affidavit that "fully and particularly" states the acts taken in the course of conducting the foreclosure, along with published notices of the sale.  Mass G.L. 244 § 15.

62.    Further, G.L. 244 § 14 authorizes only "[t]he mortgagee or person having his estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal, or the legal guardian or conservator of such mortgage or a person acting in the name of such mortgagee or person" to exercise the statutory power of sale.

63.    Here, because Wells Fargo initiated the foreclosure action before holding the mortgage, the foreclosure violated Massachusetts law.  Again, the judgment was a nullity obtained through fraud, but Wells Fargo made money from it.

64.    Wells Fargo used the mails to promulgate this subterfuge.

### *Use of Mail and Wires*

65.    Defendants have executed their scheme to defraud by posting or causing to be posted misleading statements and fraudulent material on the MERS

website.  These misleading statements include statements that "any loan registered on the MERS system is inoculated against future assignments because MERS remains the nominal mortgagee no matter how many times servicing is traded."  *See* Floyd Norris, *Some Sand in the Gears of Securitizing*, N.Y. Times, Oct. 19, 2010, at B1.

66.    Defendants have mailed or caused to be mailed mailings in furtherance of the scheme to deceive borrowers in order to unlawfully foreclose on their homes.  Such deceptions include making misrepresentations or filing false documents concerning parties seeking foreclosure against plaintiffs.

*Fraudulent Concealment*

67.    Defendants wrongfully concealed material facts relating to their wrongdoing by concealing misrepresentations and false information in court documents relating to foreclosures against plaintiffs.

68.    Defendants' concealment of their wrongdoing has prevented discovery of their wrongdoing, and their actions have included concealing the nature and extent of their wrongdoing.

69.    Plaintiffs have exercised diligence in pursuing the discovery of defendants' wrongdoing; however, defendants' misrepresentations and false information they provided have prevented plaintiffs from doing so.

70.  Defendants' omissions include misrepresenting the true holder of plaintiffs' mortgages or the corresponding notes, and failing to disclose material information necessary to establish standing to initiate foreclosure actions against plaintiffs.

71.  Defendants, and counsel acting on their behalf in foreclosure actions, failed to make disclosures required to evaluate the propriety of foreclosure actions against plaintiffs.

72.  Defendants' omissions misled plaintiffs and courts by leading them to believe that defendants had standing to foreclose.

73.  Through their fraud, defendants obtained foreclosures and related profits generated before and after such foreclosures.

## V. Claims for Relief

### FIRST CLAIM
### Violation of Racketeer Influenced and Corrupt Organization Act
### 18 U.S.C. § 1961, *et seq.*

74.  Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

75.  At all relevant times, each defendant was a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

76.  The defendants, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  The defendants are, and

have been, associated in fact, including through their participation in the MERS scheme.

77.   The enterprise engages in, and the activities of it affect, interstate commerce. Defendants participating in the enterprise, and MERS members in general, include national banks with branches throughout the country.

78.   Defendants' scheme is an entity separate and apart from the pattern of racketeering in which the defendants engaged.

79.   MERS was involved as a nominee, beneficiary or mortgagee, at some time during the life of a mortgage or a foreclosure involving each plaintiff. Defendants received a financial benefit for their participation in MERS, including, but not limited to, moneys or other fiscal benefits they have obtained through foreclosures.

80.   Documents filed by defendants in the course of foreclosure proceedings against plaintiffs were fraudulent. Defendants repeatedly misrepresented their status as mortgagees and MERS' role in foreclosure proceedings.

81.   Defendants used their scheme to expedite foreclosures by glossing over deficiencies in underlying transfers of property or assignments. This scheme enabled defendants to hide violations of state property and

recording laws, while defendants' acts extinguished plaintiffs' property interests and legal protections intended to protect those interests.

82.    Accordingly, plaintiffs suffered injury from defendants' pattern of racketeering activity.

## SECOND CLAIM
### Violation of New York General Business Law, Section 349
### Deceptive Acts and Practices

83.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

84.    New York General Business Law ("GBL") § 349 prohibits deceptive acts and practices in the conduct of any business, trade or commerce.  As discussed above, the defendants' scheme comprised a means and method by which they perpetrated fraud in the foreclosure process.  This fraud occurred in the conduct of the defendants' business as a matter of course, throughout foreclosure proceedings.  The pattern of fraudulent acts represented a status quo for the defendants.

85.    Plaintiffs Hogan and Troske (the "New York Plaintiffs") are "consumers" as defined in § 349.

86.    Defendants First Franklin, PNC, Fremont, CapitalSource and U.S. Bank (the "New York Defendants") conducted trade and commerce in New York and elsewhere within the meaning of § 349.

87. The New York Defendants' acts include making misrepresentations and filing documents with false information in foreclosure proceedings against plaintiffs.

88. The New York Defendants' statements had the capacity, likelihood and tendency to deceive and confuse consumers and courts in which the New York Defendants filed documents.

89. The New York Defendants' acts materially misled consumers, the public and the courts.

90. The deceptive acts and practices of the New York Defendants have directly, foreseeably and proximately harmed the New York Plaintiffs. Damages include monetary damages and the loss of property interests and legal protections intended for plaintiffs and the public.

## THIRD CLAIM
### Violation of the Consumer Protection Act,
### Massachusetts General Laws, Chapter 93A

91. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

92. Massachusetts G. L. c. 93A § 2 provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." As discussed throughout this complaint, the defendants participated in a scheme through MERS to profit from expediting foreclosures through a pattern of fraud. These

business practices were structured to deceive and unfairly deprive the plaintiffs of their property interests and legal protections intended to ensure those interests, in violation of applicable laws.

93. Defendants Ally Financial, Aurora, Bank of America, CapitalSource, CitiGroup, CitiMortgage, Countrywide, Cross Country, Deutsche Bank, Flagstar, Fremont, GMAC, Merrill Lynch, Money Warehouse, MorgageIt and Wells Fargo (the "Massachusetts Defendants") were engaged in trade or commerce within the meaning of M.G.L. c. 93A § 1.

94. The Massachusetts Defendants' actions alleged herein constitute unfair and/or deceptive acts or practices in the conduct of trade or commerce within the meaning of, and in violation of, M.G.L. c. 93A §§ 2 and 9.

95. The Massachusetts Defendants' actions described above occurred within the Commonwealth of Massachusetts, in connection with foreclosures in that state.

96. Plaintiffs Anctil, Babb, Ferris, Lopes, McGough, Perry, Ralston, Thurrott, Weber and Zicaro (the "Massachusetts Plaintiffs") suffered monetary damages and the loss of legal protections as a result of the Massachusetts Defendants' actions alleged above.

## FOURTH CLAIM
### Unjust Enrichment

97. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

98.   By fraudulently procuring foreclosure judgments against plaintiffs, defendants wrongfully took property and property interests belonging to plaintiffs.

99.   Defendants acted deliberated and knowingly and derived substantial financial benefits from their fraudulent acts.

100.  It would be inequitable for defendants to retain these benefits without restoring plaintiffs to wholeness because the benefits were acquired through deception and conduct in violation of state and federal laws.

101.  Under the principles of equity and good conscience, defendants should not be permitted to retain the benefits and revenue they acquired through unlawful conduct.  All funds, revenues and benefits received by defendants in relation to plaintiffs' mortgages were unjustly obtained and rightfully belong to plaintiffs.

## VI.  Prayer For Relief

WHEREFORE, plaintiffs request judgment against defendants, jointly and severally, and for relief as follows:

(a)  Disgorgement of all profits connected to each plaintiff's mortgage;

(b)  Treble damages;

(c)  Prejudgment interest as permitted by law;

(d)  Reasonable attorneys' fees and costs;

(e)   Interest on the judgment as provided by law; and

(f)   Such other relief as the Court deems just and proper.

## VII.   **Jury Request**

Plaintiffs demand a trial by a jury of all triable issues.


Dated:

Submitted,

Scott A. Kamber
KAMBERLAW, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Tel: (212) 920-3072
Fax: (212) 202-6364
skamber@kamberlaw.com


Of Counsel:
Zoe Dolan, Esq.


*Attorneys For Plaintiffs*