UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

| | |
|---|---|
| JOHN ANCTIL, LEE BABB, GISELE BARBOSA, CHRISTINE BERNAT, GEORGE BRANCH, GARY CROFOOT, PAUL DEMERS, CHARLES and CONSUELO FERRIS, JULIO GRILLO, MARTIN and JANICE HOGAN, MARY JONES, KARL and OKSANA JORGENSEN, DONALD KADLEC, SANDRA LAPIDEZ, JOHN LOPES, JAMES and PRISCILLA MCGOUGH, FRANCIS PARISEAU, MARK and LISA PERRY, REBECCA RALSTON, DOROTHY CARPENTER-REID, MICHAEL RYAN, BENITA and WILLIAM SCHRIEFER, MICHAEL SILVER, FLAVIO TERZIS, JONATHAN THURROTT, NANCY TROSKE, INGRID WEBER, KELLY WILLIAMS, and MATTHEW ZICARO, | FIRST AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED<br>12 Civ. 8572 (CS) |

Plaintiffs,

                              -against-

ALLY FINANCIAL, INC., AURORA LOAN
SERVICES, BANK OF AMERICA,
CINCINNATI FEDERAL SAVINGS AND LOAN,
CITIGROUP, INC., CITIMORTGAGE, INC.,
COUNTRYWIDE HOME LOANS, INC., CROSS
COUNTRY MORTGAGE, DEUTSCHE BANK,
FIRST FRANKLIN INVESTMENT & LOAN,
FLAGSTAR BANK, FSB, FREMONT
INVESTMENT AND LOAN CORP., GMAC
MORTGAGE, HOMEWARD RESIDENTIAL,
JPMORGAN CHASE & CO., MERRILL LYNCH,
MONEY WAREHOUSE, MORTGAGEIT,
OCWEN FINANCIAL CORPORATION, PHH
MORTGAGE, PNC FINANCIAL SERVICES,
PROVIDENT FUNDING GROUP, INC.
SIGNATURE GROUP HOLDINGS, INC., U.S.
BANK NATIONAL ASS'N, WELLS FARGO, and

1

WILBER ROSS & CO. L.L.C.,

Defendants.

------------------------------------------------------------------X

1.    Plaintiffs allege as follows based on personal knowledge and on information and belief based on investigations of counsel.

## I.  Nature of the Action

2.    Plaintiffs are former mortgagors whose homes were foreclosed upon. Acting in their capacity as some of the largest banks and home and commercial loan lenders in the nation, defendants engaged in a pattern of fraudulent acts to generate mortgages or refinancing loans and procure foreclosure judgments against plaintiffs.  Defendants' actions included obtaining mortgages from plaintiffs and then expediting foreclosures on their homes based on misrepresentations and documents with false information, in violation of state and federal statutes. Defendants presented fraudulent, false or misleading documentation to public agencies and courts throughout this process.  Plaintiffs suffered the loss of their mortgages and the deprivation of legal protections intended to ensure that property interest and the public interest in property laws.

3.    Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq*.  Because defendants' fraud extends beyond any one foreclosure, plaintiffs seek

disgorgement of defendants' profits, treble damages, damages under state statutes, and damages for unjust enrichment.

## II.  Jurisdiction And Venue

4.      This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964(c) (person injured in their business or property by reason of a RICO violation).  Jurisdiction in this Court is further proper because the defendants' scheme comprises a pattern of fraudulent activity beyond any individual foreclosure judgment.

5.      Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) because many of the defendants reside, are found, have an agent and/or transact their affairs within this District, and a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred here.  Further, two properties foreclosed upon are located in Dutchess County, New York.

## III.  The Parties

### *Plaintiffs*

6.      John Anctil is the former mortgagor of a home in Franklin County, Massachusetts.

7.      Lee Babb is the former mortgagor of a home in Plymouth County, Massachusetts.

3

8.    Gisele Barbosa is the former mortgagor of a home in Bristol County, Massachusetts.

9.    Christine Bernat and Paul Demers are the former mortgagors of a home in Bristol County, Massachusetts.

10.    George Branch is the former mortgagor of a home in the City of Baltimore, Baltimore County, Maryland.

11.    Gary Crofoot is the former mortgagor of a home in Anne Arundel County, Maryland.

12.    Charles and Consuelo Ferris are the former mortgagors of a home in Hampden County, Massachusetts.

13.    Julio Grillo is the former mortgagor of a home in Essex County, Massachusetts.

14.    Martin and Janice Hogan are the former mortgagors of a home in Dutchess County, New York.

15.    Mary Jones is the former mortgagor of a home in Suffolk County, Massachusetts.

16.    Donald Kadlec is the former mortgagor as a joint tenant of a home in Bristol County, Massachusetts.

17.    Sandra Lapidez, along with her husband James Lapidez, is the former mortgagor of a home in Norfolk County, Massachusetts.

18.     John Lopes is the former mortgagor of a home in Bristol County, Massachusetts.

19.     James and Priscilla McGough are the former mortgagors of a home in Worcester County, Massachusetts.

20.     Francis Pariseau is the former mortgagor of a home in Bristol County, Massachusetts.

21.     Mark and Lisa Perry are the former mortgagors of a home in Barnstable County, Massachusetts.

22.     Rebecca Ralston is the former mortgagor of a home in Worcester County, Massachusetts.

23.     Dorothy Carpenter-Reid, or, simply, Dorothy Reid, is the former mortgagor of a home in Norfolk County, Massachusetts.

24.     Michael Ryan is the former mortgagor of a home in Middlesex County, Massachusetts.

25.     Benita and William Schriefer are the former mortgagors of a home in Anne Arundel County, Maryland.

26.     Michael Silver is the former mortgagor of a home in Essex County, Massachusetts.

27.     Flavio Terzis is the former mortgagor of a home in Plymouth County, Massachusetts.

28.     Jonathan Thurrott is the former mortgagor of a home in Norfolk County, Massachusetts.

29.     Nancy Troske is the former mortgagor of a home in Dutchess County, New York.

30.     Ingrid Weber is the former mortgagor of a home in Essex County, Massachusetts.  The Southern Essex District Registry of Deeds website indicates that documents relating to the foreclosure of Ms. Weber's home are potential "robosigned" documents – i.e., signed by people who did not review or have personal knowledge of such documents, as described further in paragraphs 77 and 105(c) below.

31.     Kelly Williams is the former mortgagor of a home in Plymouth County, Massachusetts.

32.     Matthew Zicaro is the former mortgagor of a home in Worcester County, Massachusetts.

<u>*Defendants*</u>

33.     Ally Financial, with offices located at 1185 6th Avenue, New York, New York 10036, is the parent company of GMAC Mortgage, *infra.*

34.     Aurora Loan Services LLC ("Aurora") is a limited liability corporation with offices located at 10350 Park Meadows Drive, Littleton, Colorado 80124.  Aurora was involved in a mortgage or foreclosure proceedings relating to

Rebecca Ralston in 2010.  Aurora's website states: "Mortgage customers who were part of a foreclosure action between January 1, 2009 and December 31, 2010 may be eligible for an Independent Foreclosure Review of their loan. . . ."  Aurora was also involved in a mortgage or foreclosure proceedings relating to Flavio Terzis.

35.    Bank of America is a bank with headquarters located at 100 North Tryon Street, Charlotte, North Carolina, 28255, and offices located at 115 West 42nd Street, New York, New York 10036.  Bank of America was involved in a mortgage or foreclosure process relating to plaintiffs Mark and Lisa Perry.  Bank of America acquired Merrill Lynch, *infra*.  Bank of America also acquired BAC Home Loans Servicing ("BAC") by acquisition or merger.  Bank of America was involved in a mortgage or foreclosure proceedings relating to Charles Ferris (by successor to BAC), Francis Pariseau (by successor to BAC), Mark and Lisa Perry, William and Benita Schriefer, Ingrid Weber (by successor to BAC) and Kelly Williams (by successor to BAC).  Additionally, Bank of America is the successor to FleetBoston Financial or Fleet Financial Group, either of which were the parent company of Fleet National Bank, which was involved in a mortgage or foreclosure proceedings relating to Dorothy Reid.

36.    Capital One Financial Corp. ("Capital One") is a "diversified bank" headquartered at 1680 Capital One Drive, McLean, Virginia 22102.  In 2009,

Capital One acquired Chevy Chase Bank, which was involved in a mortgage or foreclosure proceedings relating to plaintiff Gary Crofoot.

37.     Cincinnati Federal Savings and Loan is a federally chartered "mutual" savings and loan, with offices located at 6581 Harrison Avenue, Cincinnati, Ohio 45247.  It was involved in a mortgage or foreclosure proceedings relating to Michael Silver.

38.     Citigroup, Inc. is the parent company of CitiMortgage, Inc., *infra*, with world headquarters located at 399 Park Avenue, New York, New York 10022.

39.     CitiMortgage, Inc. is a subsidiary of Citigroup, Inc., *supra*, with offices located at 100 Technology Drive, O'Fallon, Missouri 63368. CitiMortgage, Inc. was involved in a mortgage or foreclosure proceedings relating to John Anctil and Michael Silver (as s/b/m to ABN AMRO Mortgage Group, Inc.).

40.     Countrywide Home Loans, Inc. ("Countrywide") is a corporation under the laws of New York, with offices located at 4500 Park Granada, Calabasas, California 91302 and 7105 Corporate Drive, Plano, Texas 75024. Countrywide was involved in a mortgage or foreclosure proceedings relating to Charles Ferris, Francis Pariseau Ingrid Weber and Kelly Williams.

41.     Cross Country Mortgage, Inc. ("Cross Country") is a corporation under the laws of Ohio, with offices located at 12000 Snow Road 9, Cleveland,

Ohio 44130.  Cross Country was involved in a mortgage or foreclosure proceedings relating to Lee Babb.

42.     Deutsche Bank is the parent company of MortgageIT, *infra*, with offices located at 60 Wall Street, New York, New York 10005.   As discussed below, MortgageIt was involved in a mortgage or foreclosure proceedings relating to Sandra Lapidez and John Lopes.  Additionally, Deutsche Bank's North American subsidiary is Taunus Corporation, which is the parent company of Deutsche Bank Trust Corporation, which, in turn, is the parent company of Deutsche Bank National Trust Company ("DBNTC").  DBNTC was involved in a mortgage or foreclosure proceedings relating to Martin and Janice Hogan and Mary Jones.

43.     First Franklin Investment and Loan, a division of First Franklin Financial Corporation, has offices located at 2150 North First Street, San Jose, California 95131.  First Franklin Investment and Loan was previously owned by National City Corporation – now PNC Financial Services, *infra* – and Merrill Lynch, *infra*.  First Franklin was involved in a mortgage or foreclosure proceeding relating to Martin and Janice Hogan.

44.     Flagstar Bank, FSB ("Flagstar") is a mortgage lender and wholesaler with offices located at 5151 Corporate Drive, Troy, Missouri 48098.  Flagstar was involved in a mortgage or foreclosure proceedings relating to Lee Babb.

45.    Fremont Investment and Loan Corp. was a subsidiary of Fremont General Corporation (collectively, "Fremont"), with headquarters previously located at 2727 East Imperial Highway, Brea, California 92821.  Fremont sold its mortgage servicing portfolio to Litton Loan Servicing ("Litton").  In May of 2008, Litton's residential home loan portfolio was acquired by Goldman Sachs, which later sold it to Ocwen Financial Corporation, *infra*.  Meanwhile, Fremont filed for bankruptcy in June 2008 and was reorganized into Signature Group Holdings, Inc., *infra*.  Fremont was involved in a mortgage or foreclosure proceedings relating to Gisele Barbosa, Martin and Janice Hogan, and Matthew Zicaro.

46.    GMAC Mortgage ("GMAC") a wholly owned subsidiary of Ally Financial, Inc., with headquarters located at 1100 Virginia Drive, Fort Washington, PA 19034.  GMAC was involved in a mortgage or foreclosure proceedings relating to Jonathan Thurrott.

47.    Homeward Residential, with offices located at 1525 S. Belt Line Road, Coppell, Texas 75019, is the current name of American Home Mortgage Servicing, Inc. ("AHMSI"), which previously went into bankruptcy proceedings. AHMSI was involved in a mortgage or foreclosure proceedings relating to Donald Kadlec.

48.    JPMorgan Chase & Co. is a global banking corporation, with headquarters at 270 Park Avenue, New York, New York 10017.  Through a current

or prior subsidiary known as Chase Home Finance, JPMorgan Chase was involved in a mortgage or foreclosure proceedings relating to Karl and Oksana Jorgensen and Michael Ryan.

49.     Merrill Lynch is a financial services company with offices located at 2 World Financial Center, New York, New York 10281.  Merrill Lynch is the wealth management division of Bank of America.

50.     Money Warehouse is a Pennsylvania corporation with an address of 615 Second Street Pike, Southampton, Pennsylvania 18966.  Money Warehouse was involved in a mortgage or foreclosure proceedings relating to John Anctil.

51.     MortgageIT Inc., a mortgage company, is a wholly owned subsidiary of Deutsche Bank AG, *supra*.  MortgageIT is headquartered at 33 Maiden Lane, New York, New York 10038.  MortgageIT was involved in a mortgage or foreclosure proceedings relating to Sandra Lapidez and John Lopes.

52.     Ocwen Financial Corporation ("Ocwen") maintains offices at 2002 Summit Boulevard, 6th Floor, Atlanta, GA 30346.  According to information publicly available through the Mortgage Electronic Registration System website, discussed *infra*, Ocwen was involved in a mortgage or foreclosure proceedings relating to Matthew Zicaro (as successor to HomeEq Servicing), Gisele Barbosa (as successor to HomeEq Servicing) and George Branch (by transfer from prior servicer Saxon MortgageServices, Inc.).

53.     PHH Mortgage is a "mortgage services provider" with offices located at 1 Mortgage Way, Mount Laurel, New Jersey 08054.  PHH Mortgage was involved in a mortgage or foreclosure proceedings relating to Dorothy Reid.

54.     PNC Financial Services ("PNC") is a financial services company headquartered at One PNC Plaza, 249 Fifth Avenue, Pittsburgh, PA 15222.  PNC is the successor to National City Corporation, which owned First Franklin Investment and Loan, *supra*.  Additionally, PNC is the successor to National City Bank, the parent company of an entity known as "FNMC" which was involved in a mortgage or foreclosure proceedings relating to Benita and William Schriefer.

55.     Provident Funding Group, Inc. ("Provident") is a "national direct lender" offering home mortgages.  According to the California Secretary of State website, Provident has offices at 851 Traeger Avenue, Suite 100, San Bruno, California 94066, and it maintains as an agent Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.  Provident was involved in a mortgage or foreclosure proceedings relating to Christine Bernat and Paul Demers.

56.     Signature Group Holdings, Inc. ("Signature") is a "diversified business and financial services enterprise" located at 15303 Ventura Boulevard, Suite 1600, Sherman Oaks, California 91403.  Signature is the reorganization of Fremont, *supra*.

57.    U.S. Bank National Association ("U.S. Bank"), with offices located at 180 East 5th Street, St. Paul, Minnesota 55101, was involved in a mortgage or foreclosure proceedings relating to Julio Grillo and Nancy Troske.

58.    Wells Fargo Bank ("Wells Fargo") is a bank active in the mortgage industry, with headquarters located at 420 Montgomery Street, San Francisco, California 94104, and offices located at 530 Fifth Avenue, New York, New York 10036.  Wells Fargo was involved in a mortgage or foreclosure proceedings relating to Gisele Barbosa, Christine Bernat and Paul Demers, Julio Grillo, Sandra Lapidez, John Lopes, James and Priscilla McGough, Nancy Troske and Matthew Zicaro.

59.    Wilbur Ross & Co. LLC, which maintains offices at 1166 Avenue of the Americas, New York, New York 10036, is a "turnaround group" that "invests in and restructures financially distressed companies."  Wilbur Ross & Co. LLC purchased AHMSI and is currently the parent company of AHMSI's successor, defendant Homeward Residential, *supra*.

## IV.  Defendants' Fraudulent Scheme

60.    Defendants profited through a pattern of fraud in facilitating mortgages or refinancing loans and then seeking foreclosure judgments against plaintiffs.  In essence, defendants designed a scheme that allowed banks to benefit as mortgagees when in fact they were not, as defendants reaped profits by

generating mortgages or refinancing terms designed to be brief and then expediting foreclosures that were actually nullities or were in violation of state laws.  These actions harmed plaintiffs and subverted state property and recording statutes that legislatures had intended to protect the public.  Defendants' scheme revolved around their association-in-fact, as exemplified through the Mortgage Electronic Registration System ("MERS").

*MERS*

61.     MERS is a privately maintained electronic warehouse for mortgage-related data.  It was created in 1993 "by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages."  *Matter of MERSCORP v. Romaine*, 8 NY3d 90, 96 (2006).  MERS shareholders and members include most of the largest companies involved in the mortgage industry, including defendants in this action, which originate, service, buy or invest in loans.

62.     The purpose of MERS is to allow its members to bypass the public recording system for mortgages and replace it with a private electronic registry of loans, ostensibly to track the beneficial interests in the loans and changes in loan servicers.

63.     The MERS mechanism exists outside the public recording system. *See MERSCORP*, *supra.*

64.     Historically, when a lender issued a mortgage, it recorded its identity and interest in the county clerk's office (or its equivalent) pursuant to state and local law.  If an assignment of the original loan was made by the lender, then the assignee would also record its identity and interest with the county clerk's office.

65.     In contrast, members of MERS typically name MERS as the lender's nominal assignee, mortgagee or beneficiary.  When an assignment or transfer occurs between or among MERS members, MERS privately tracks that assignment or transfer but customarily does not record it in public records.  This private tracking system avoids any fees or filings associated with public recording of mortgages and assignments.

66.     Countless such transfers or assignments have been run through MERS since its inception.

67.     MERS is the mortgagee for property in a conventional sense only to the extent that it may be named as the mortgagee in a mortgage.  MERS does not hold the underlying note for the mortgage, and it does not receive any payments from homeowners under the note.

68.     MERS certifying officers, including defendants' employees and agents, often failed to verify the chain of title before foreclosure proceedings were filed.  In an effort to cure the defects when they became known, they executed questionable paperwork.  MERS assignments have numerous defects, including

15

affirmative misrepresentations of fact, which render them false, deceptive and/or invalid.

69.    MERS has enabled defendants to function in an organization as a continuing unit for a shared purpose.  Until recently, information in MERS was made available by subscription.  "Mortgage lenders and other entities, known as MERS members, subscribe[d] to the MERS system and pa[id] annual fees for the electronic process and tracking of ownership and transfers of mortgages."  *Id.* During the relevant time period, a typical mortgage involving MERS contained language to the effect that "MERS is a separate corporation that is acting solely as a nominee for [or beneficiary] of [the] Lender and [the] Lender's successors and assigns."

<u>*The Fraudulent Scheme*</u>

70.    To understand the nature and scope of defendants' scheme, it is helpful to begin with a snapshot of the mortgage industry during the foreclosure crisis in the United States in recent years.

71.    Beginning in the 1990's, it became routine for mortgages to be "securitized."  Initially, a bank or home loan lender would acquire a mortgage from a homebuyer or a refinancing or "refi" mortgage from a homeowner.  After the mortgage closed, it was sold to a purchaser of mortgages or assigned to another entity.  At some point the mortgage was "pooled" into a group of other mortgages,

16

and this pool was securitized in a trust that became available to investors.  Such trusts were formed subject to "pooling service agreements," which set forth a variety of terms and conditions relating to securitization and the underlying mortgages, including procedures for foreclosure.

72.     Banks and home loan lenders benefitted financially throughout this process, from the inception of mortgages or refinancing loans, to the sale of mortgages to trusts, to the securitization process, to foreclosures.

73.     MERS was created to facilitate this scheme by serving as a master database for mortgages outside of county land records.  Behind the veil of MERS, purported assignments or transfers of interest in mortgages inured to the benefit of defendants.  Meanwhile, defendants accelerated foreclosures with filings containing misrepresentations designed to cover up deficiencies inherent in the defendants' scheme.

74.     For example, in order to have standing to foreclose on a property in New York, the foreclosing party must be the holder or assignee of the mortgage and the note.  Under New York law, the note must be indorsed and must predate the foreclosure action.  However, members of MERS have filed mortgage foreclosure complaints without having been assigned the mortgage or holding the note.

75.     Each of the defendants engaged in, knew about or should have known about, misrepresentations with respect to facts regarding mortgages and foreclosures relating to plaintiffs.  Defendants filed false and misleading documents in public records concerning mortgages and foreclosures and MERS' alleged role in the process.  Invalid transfers and assignments underlying such falsifications rendered foreclosures null under state law, thus exacerbating the damage created by the defendants' fraudulent scheme.

*Defendants' Pattern Of Racketeering And Fraudulent Activity*

76.     Apart from utilizing MERS as a data warehouse, defendants used their association-in-fact to obtain and transfer or assign mortgages and engage in foreclosures that proceeded based on materially false representations, in violation of applicable state law.  These acts were interrelated yet occurred independently within the methods employed by defendants to further their scheme.

77.     One feature of defendants' scheme involved "robo-signing."  This term refers colloquially to preparing, executing, or filing affidavits without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits.

78.     Plaintiffs suffered injury because defendants' scheme ultimately resulted in expedited foreclosures that violated state laws, even to the point where the foreclosures were nullities.  Two examples illustrate the means by which

defendants exploited their association-in-fact to the detriment of plaintiffs' property interests.

## *Example One (New York)*

79.     Plaintiff Nancy Troske was the mortgagor of a property located in Fishkill, New York, pursuant to a mortgage executed on January 14, 2006.  The mortgage was in the amount of certain sum of money and it defined MERS as the mortgagee.  The lender was BNC Mortgage, Inc. ("BNC"), a former subprime subsidiary business of now defunct Lehman Brothers Holdings, Inc.  An adjustable rate balloon rider secured the note to BNC.

80.     On or about May 7, 2008, a document purporting to assign the mortgage was filed in the Dutchess County Clerk's Office.  The document stated that MERS – as the "nominee" for BNC – assigned the mortgage to U.S. Bank National Association, as Trustee for the Structured Asset Investment Loan Trust 2006-2 ("U.S. Bank, as Trustee").  There was no indication of how or when MERS became the "nominee" rather that the mortgagee.  Nor did the document assign the note.  U.S. Bank, as Trustee subsequently brought an action for foreclosure.

81.     The assignment was purportedly effected by Elpinki Bechakas, ostensibly acting in the capacity of Assistant Secretary and Vice President of MERS.  Elpinki Bechakas was a "robo-signer" working as an attorney with Steven J. Baum, P.C. ("Baum"), a former New York law firm involved with

approximately 40% of foreclosures in the state at one point.  On October 6, 2011,

Baum entered into a settlement with the United States Attorney for the Southern

District of New York which prohibited Baum from engaging in certain practices

relating to MERS, required an overhaul of Baum's practice in connection with

foreclosure actions, and incorporated a $2 million dollar fine to the United States.

See http://www.justice.gov/usao/nys/pressreleases/October11/

stevenbaumpcagreementpr.pdf (last visited January 25, 2013).

82.    New York Real Property Law Article 9 establishes a public recording

system to "furnish potential purchasers with actual or at least constructive notice of

previous conveyances and encumbrances that might affect their interests and uses."

*Witter v. Taggart*, 78 N.Y.2d 234, 238 (1991).  A conveyance of real property that

has not been recorded with the clerk of the county where the property is located is

"void as against any person who subsequently purchases or acquires by exchange

or contracts to purchase or acquire by exchange…"  New York Real Prop. Law §

291.

83.    To foreclose on property, the foreclosing party must hold or have been

assigned both the note and the mortgage at the commencement of the foreclosure

action.  *U.S. Bank Nat'l Ass'n v. Madero*, 80 A.D.3d 751, 752-53 (2d Dep't 2011);

*Countrywide Home Loans, Inc. v. Gress*, 68 A.D.3d 709, 709 (2d Dep't 2009).

"An assignment of a mortgage without assignment of the underlying note or bond

is a nullity, and no interest is acquired by it." *Deutsche Bank Nat'l Trust Co. v. Barnett*, 88 A.D.3d 636, 637 (2d Dep't 2011)**.**  The right to assign a mortgage does *not* necessarily confer the right to assign the note.  *Bank of NY v. Silverberg*, 86 A.D. 3d 274, 280 (2d Dep't 2011).

84.     Since the note was never assigned to U.S. Bank, the foreclosure proceeded in violation of New York law.

85.      US Bank failed to disclose that it did not hold the note, and it used the mails to promulgate this subterfuge.

86.     The judgment was a nullity obtained through fraud, yet U.S. Bank profited from it.

### *Example Two (Massachusetts)*

87.     Plaintiff Matthew Zicaro was the mortgagor, along with Juola Stefani, of a property located in Princeton, Massachusetts, pursuant to a mortgage executed on December 30, 2005 (the "Zicaro Mortgage").  The mortgage was in the amount of a certain sum of money and it defined MERS as the mortgagee.  The lender was Fremont Investment and Loan.

88.     The Zicaro Mortgage was apparently pooled into a group of mortgages which were securitized in a trust known as Fremont Home Trust 2006-1 (the "2006-1 Trust").  Fremont Investment and Loan was the servicer of the mortgages in the trust until June 30, 2006, and Wells Fargo was the servicer

effective July 1, 2006.  Pursuant to the trust prospectus, the mortgage and the note were to be held by the trust itself.  The prospectus required the servicer to act on delinquent mortgage loans to secure the highest net value of the proceeds for recovery by the trust.

89.     Fremont filed for bankruptcy in 2008 and reorganized into Signature Group Holdings, Inc.

90.     Meanwhile, it appears that the Zicaro Mortgage was pooled into another group of securitized mortgages in a trust known as Securitized Asset Backed Receivables LLC Trust 2006-FR3 (the "2006-FR3 Trust").  HomeEq Servicing Corporation, which was purchased in 2010 by defendant Ocwen, was designated as the servicer, subject to the same requirements with respect to delinquent mortgages that were set forth in the 2006-1 Trust.

91.     On December 29, 2006, "Wells Fargo Bank, NA as Trustee" initiated a complaint in a foreclosure action as to the Zicaro Mortgage.

92.     Three months later, Wells Fargo submitted a Certification Regarding Compliance with Applicable Serving Criteria to the United States Securities Exchange Commission in connection with the 2006-FR3 Trust.  The submission included an acknowledgement by Wells Fargo that it had not provided trust investors with prior notification of intent to foreclose, as required by certain servicing agreements.

93.     The notices of sale published in connection with foreclosure indicated that Wells Fargo, NA as Trustee was the holder of the mortgage.

94.     In Massachusetts, the holder of a mortgage may foreclose the mortgagee's right of redemption by exercising a power of sale, if that power is granted by the mortgage.  The power of sale is codified in Mass. G. L. c. 183, § 21, as regulated by Mass. G. L. c. 244 §§ 11-17C and 35A.  Massachusetts law limits the power of foreclosure to "the mortgagee or his executors, administrators, successors or assigns."  Mass. G. L. c. 183 § 21.  Under § 21, the mortgage holder may sell defaulted property at a public auction and convey the property in fee simple.  Courts in Massachusetts require that "one who sells under a power [of sale] must follow strictly its terms . . . [and i]f he fails to do so there is no valid execution of the power, and the sale is wholly void." *Moore v. Dick*, 187 Mass. 207, 211 (1905).

95.     The statutory power of sale system in Massachusetts comprises an array of requirements.  Among other things, a foreclosing party must file an affidavit in the Land Court stating that the foreclosing party is the mortgagee or is authorized to act as the mortgagee.  Mass. G.L. c. 244 § 35A.  The party must also provide notice at least fourteen days prior to the proposed date of sale stating the redemption amount as of thirty days prior to the date of sale and identifying the present holder of the mortgage.  Mass. G.L. c. 244 § 14.  In addition, the party is

required to record an affidavit that "fully and particularly" states the acts taken in the course of conducting the foreclosure, along with published notices of the sale. Mass. G.L. 244 § 15.

96.     Further, G.L. 244 § 14 authorizes only "[t]he mortgagee or person having his estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal, or the legal guardian or conservator of such mortgage or a person acting in the name of such mortgagee or person" to exercise the statutory power of sale.

97.     Here, the Zicaro Mortgage appears to have remained the 2006-1 Trust. As a result, the foreclosure was invalid because Wells Fargo NA as Trustee was not the actual holder of the mortgage by way of assignment at the time of notice and sale.   *See Lacey v. BAC Home Loans Servicing, LP (In re Lacey)*, 480 B.R. 13, 35-38 (Bankr. D. Mass. 2012).

98.     The foreclosure proceeded on the premise that MERS had assigned the mortgage to Wells Fargo, NA as Trustee, on October 11, 2007, with a "date of transfer" of August 21, 2007.  Purportedly executed by "robo-signer" Tonya Blechinger, this post-foreclosure complaint "assignment" was invalid because the chain of title had been broken by the 2006-1 Trust.

99.     Since Wells Fargo, NA as Trustee completed the foreclosure action without holding the mortgage by valid assignment, the foreclosure violated

Massachusetts law. Again, the judgment was a nullity obtained through fraud, but Wells Fargo made money from it, while Fremont, succeeded by Signature, profited from the initial securitization, and Ocwen profited in the period, or during the course, of the subsequent securitization.

100. Wells Fargo, Fremont/Signature and Ocwen used the mails to promulgate this subterfuge.

*A Pattern Of Brevity In Mortgages*

101. To understand defendants' pattern of racketeering and fraudulent activity, it is useful to analyze the lives plaintiffs' mortgages until foreclosure proceedings commenced. Plaintiffs have obtained the following information to date.

| Plaintiff | Defendant(s) | Mortgage Date | Date of Foreclosure Complaint | Approx. Life of Mortgage |
|---|---|---|---|---|
| | | | | |
| Anctil | Money Warehouse, Citimortgage | 4/22/08 | 8/6/10 | 27.5 |
| Babb, Jr. | Cross Country Mortgage, Flagstar | 8/31/07 | 3/27/08 | 7 |
| Barbosa | Fremont/Signature, Wells Fargo, Ocwen | 1/10/06 | 1/8/08 | 24 |
| Bernat | Provident Funding Group, Wells Fargo | 3/9/07 | 5/11/10 | 38 |
| Branch | Ocwen | 5/22/07 | 1/21/10 | 32 |

| | | | | |
|---|---|---|---|---|
| Crofoot | Capital One | 10/12/06 | 11/5/09 | 37 |
| Ferris | Countrywide, Bank of America | 11/7/07 | 9/9/10 | 34 |
| Grillo | Wells Fargo, US Bank | 2/15/07 | 4/8/08 | 14 |
| Hogan | Fremont/Signature, First Franklin & PNC by successor, Deutsche Bank | 10/25/05 | 3/25/08 | 29 |
| Jones | Deutsche Bank | 1/7/05 | 1/11/08 | 36 |
| Jorgensen | JP Morgan Chase | 5/11/05 | TBV | TBV |
| Kadlec | Homeward Residential, Wilbur Ross & Co. (as successor to American Home Mortgage Servicing, Inc.) | 7/20/07 | TBV | TBV |
| Lapidez | MortgageIt, Wells Fargo | 8/29/07 | 2/3/09 | 17 |
| Lopes | MortgageIt, Wells Fargo | 10/27/06 | 12/2/08 | 25 |
| McGough | Wells Fargo | 2/25/05 | 4/2/09 | 49 |
| Pariseau | Bank of America (successor to Countrywide) | 8/30/05 | 11/5/08 | 38 |
| Perry | Bank of America (successor to BAC) | TBV | 12/10/09 (TBV) | TBV |
| Ralston | Aurora | 5/3/07 | 11/3/09 | 30 |
| Reid | Bank of America (as successor to FleetBoston or Fleet Financial Group affiliate or parent), PHH Mortgage | 4/18/03 | 11/17/10 | 91 |
| Ryan | JP Morgan Chase | 7/13/05 | 12/3/07 | 29 |

| | | | | |
|---|---|---|---|---|
| Schriefer | Bank of America, PNC (successor to National City Bank subsidiary FNMC) | 3/15/06 | 5/7/10 | 50 |
| Silver | Cincinnati Federal Savings and Loan, CitiMortgage s/b/m ABN AMRO Mortgage Group, Inc. | 9/12/07 | 7/15/10 | 34 |
| Terzis | Aurora | 3/16/06 | 12/18/06 | 9 |
| Thurott | GMAC | 10/1/03 | 4/28/09 | 67 |
| Troske | US Bank | 1/14/06 | 8/26/08 | 31.5 |
| Weber | Bank of America (successor to BAC) | 2/5/07 | 12/5/08 | 22 |
| Williams | Countrywide, Bank of America (successor to BAC) | 10/11/05 | 5/12/09 | 43 |
| Zicaro | Fremont, Wells Fargo | 12/30/05 | 12/28/06 | 12 |
| | | | | |
| | TBV = To Be Verified | | Average | 33 |

102.   The brevity of these mortgages comprises a pattern of related and continued activity designed to further defendants' scheme.  Defendants engaged in this conduct in furtherance of the objectives of the racketeering enterprise and the objectives of defendants' fraud, as discussed throughout this amended complaint.

### *Defendants' Participation*

103.   Each defendant participated in the pattern of racketeering or fraudulent activity described in this amended complaint, whether at the phase of

mortgage origination or refinancing, in connection with the securitization process, at the foreclosure stage, or otherwise during the life of a mortgage, including but not limited to participation by transfer or assignment.

104.   Each defendant engaged in at least two racketeering acts as to each plaintiff or a combination of plaintiffs, including through the conduct reflected throughout this complaint and, without limitation, in the following paragraph 105.

105.   Defendants engaged in unfair and deceptive practices, acts in furtherance of the racketeering scheme, and activities for fraudulent purposes. This conduct included the following:

    a.  Failing to properly identify the foreclosing party;

    b.  Preparing, executing, notarizing or presenting false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

    c.  Engaging in "robo-signing," *supra*, which involved presenting false or legally infirm affidavits in connection with foreclosure proceedings. Where third parties engaged in robo-signing on behalf of defendants, they did so with the knowledge and approval of defendants;

d.  Misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents; and

e.  Inappropriately dual-tracking foreclosures and loan modifications, and failing to communicate with borrowers with respect to foreclosure activities.

### *The Maryland Plaintiffs*

106.   Counsel for the plaintiffs have endeavored to obtain documents and necessary information relating to plaintiffs from Maryland, however, the relevant materials located to date are limited.

107.   The Maryland plaintiffs are George Branch, Gary Crofoot, and Benita and William Schriefer.  Pending further documentation, their causes of action are brought as the federal RICO and unjust enrichment claims set forth below.

### *Use of Mail and Wires*

108.   Defendants have executed their scheme to defraud by posting or causing to be posted misleading statements and fraudulent material on the MERS website.  These misleading statements include statements that "any loan registered on the MERS system is inoculated against future assignments because MERS remains the nominal mortgagee no matter how many times servicing is traded." *See* Floyd Norris, *Some Sand in the Gears of Securitizing*, N.Y. Times, Oct. 19, 2010, at B1.  As explained above, this statement was false and misleading because

purported MERS assignments were invalid due to a break in the chain of title or another infirmity that rendered the assignment null or void.  The statement, located on the internet where homeowners were likely to and did read it, is deceptive: it falsely indicates MERS' status, particularly in instances where, as reflected above, a chain of title was broken.

109.   Defendants have mailed or caused to be mailed mailings in furtherance of the scheme to deceive borrowers in relation to the status of their mortgages and in order to unlawfully foreclose on their homes.  Such deceptions include making misrepresentations or filing or presenting false documents concerning mortgages and parties seeking foreclosure against plaintiffs. Defendants promulgated their racketeering enterprise and fraud through mailings involving false representations, including without limitation mailings in connection with the examples above.

*Fraudulent Concealment*

110.   Defendants wrongfully concealed material facts relating to their wrongdoing by concealing misrepresentations and false information in documents relating to mortgages and foreclosures relating to plaintiffs.

111.   Defendants' concealment of their wrongdoing has prevented discovery of their wrongdoing, and their actions have included concealing the nature and extent of their wrongdoing.

112.   Plaintiffs have exercised diligence in pursuing the discovery of defendants' wrongdoing; however, defendants' misrepresentations and false information they provided have prevented plaintiffs from doing so.

113.   Defendants' omissions include misrepresenting the true holder of plaintiffs' mortgages or the corresponding notes, failing to disclose material information necessary to establish standing to initiate foreclosure actions against plaintiffs, and concealing the nature and scope of their fraud.

114.   Defendants, and counsel acting on their behalf in foreclosure actions, failed to make disclosures required to evaluate the propriety of mortgages and foreclosure actions concerning plaintiffs.

115.   Defendants' omissions misled plaintiffs, public agencies and courts by leading them to believe that defendants held mortgages or had standing to foreclose when they did not, and by concealing the identity of mortgage holders

116.   Through their fraud, defendants obtained mortgages and foreclosures and related profits generated before and after such foreclosures.

## V. Claims for Relief

### FIRST CLAIM
### Violation of Racketeer Influenced and Corrupt Organization Act
### 18 U.S.C. § 1961, *et seq.*

117.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

31

118.    At all relevant times, each defendant was a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

119.    The defendants, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  The defendants are, and have been, associated in fact, including through their participation in the MERS scheme.

120.    The enterprise engages in, and the activities of it affect, interstate commerce.  Defendants participating in the enterprise, and MERS members in general, include national banks with branches throughout the country.

121.    Defendants' scheme is an entity separate and apart from the pattern of racketeering in which the defendants engaged.

122.    MERS was involved as a nominee, beneficiary or mortgagee at some time during the life of a mortgage or a foreclosure involving each plaintiff except Julio Grillo, Mary Jones, Karl and Oksana Jorgensen, Michael Ryan, Benita and William Schriefer and Michael Silver, though, upon information and belief, each plaintiff's mortgage was included in the MERS database.  Defendants received a financial benefit for their participation in MERS, including, but not limited to, moneys or other fiscal benefits they have obtained through mortgages and foreclosures.

123.    Documents filed by defendants in relation to mortgages or during the course of foreclosure proceedings against plaintiffs were fraudulent.  Among other

32

things, in foreclosure proceedings, defendants repeatedly misrepresented their status as mortgagees and MERS' role.

124.   Defendants used their scheme to originate mortgages and expedite foreclosures by glossing over deficiencies in underlying transfers of property or assignments, or by filing or presenting fraudulent, false or misleading documents in public offices or courts.  This scheme enabled defendants to hide violations of state property and recording laws, while defendants' acts extinguished plaintiffs' property interests and legal protections intended to protect those interests.

125.   Accordingly, plaintiffs suffered injury from defendants' pattern of racketeering activity.

**SECOND CLAIM**
**Violation of New York General Business Law, Section 349**
**Deceptive Acts and Practices**

126.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

127.   New York General Business Law ("GBL") § 349 prohibits deceptive acts and practices in the conduct of any business, trade or commerce.  As discussed above, the defendants' scheme comprised a means and method by which they perpetrated fraud in connection with mortgages and the foreclosure process.  This fraud occurred in the conduct of the defendants' business as a matter of course, throughout mortgage origination, subsequent acts including the transfer or

assignment of mortgages, and foreclosure proceedings.  The pattern of fraudulent acts represented a status quo for the defendants.

128.    Plaintiffs Hogan and Troske (the "New York Plaintiffs") are "consumers" as defined in § 349.

129.    Defendants First Franklin, Fremont/Signature, PNC and U.S. Bank (the "New York Defendants") conducted trade and commerce in New York and elsewhere within the meaning of § 349.

130.   The New York Defendants' acts include making misrepresentations and filing documents with false information in relation to mortgages, assignments and foreclosure proceedings against plaintiffs.  Robo-signers executed documents without bothering to read them or verify their accuracy.  Such fraudulent or false documents, whether in relation to mortgages, assignments or foreclosure proceedings, led to the eviction of plaintiffs.

131.   The New York Defendants' statements had the capacity, likelihood and tendency to deceive and confuse consumers and public offices or agencies and courts in which the New York Defendants filed or presented documents.

132.   The New York Defendants' acts materially misled consumers, the public and the courts.

133.   The deceptive acts and practices of the New York Defendants have directly, foreseeably and proximately harmed the New York Plaintiffs.  Damages

include monetary damages and the loss of property interests and legal protections intended for plaintiffs and the public.

## THIRD CLAIM
### Violation of the Consumer Protection Act, Massachusetts General Laws, Chapter 93A

134.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

135.   Massachusetts G. L. c. 93A § 2 provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  In the power of sale context, Massachusetts law requires that an entity wishing to foreclose must file an affidavit demonstrating compliance with G. L. c. §§ 15 and 35A, *supra.*

136.   The failure of banks seeking foreclosure to comply with applicable Massachusetts law has become well known.  There was widespread use of robo-signers who purportedly executed hundreds if not thousands of documents without personal knowledge as to the substance of the affidavits they signed.  This practice included, without limitation, assignments and documents submitted in connection with mortgages and foreclosure proceedings.

137.   As discussed throughout this complaint, defendants participated in a scheme through MERS to profit from generating mortgages and expediting foreclosures through a pattern of fraud.  These business practices were structured

35

to deceive and unfairly deprive plaintiffs of their property interests and legal

protections intended to ensure those interests, in violation of applicable laws.

138.   Defendants Ally Financial, Aurora, Bank of America, Cincinnati

Federal Savings and Loan, CitiGroup, CitiMortgage, Countrywide, Cross Country,

Deutsche Bank, Flagstar, Fremont/Signature, GMAC, Homeward Residential,

JPMorgan Chase, Merrill Lynch, Money Warehouse, MorgageIt, Ocwen, PHH

Mortgage, PNC Financial Services, Provident Funding Group, U.S. Bank, Wells

Fargo and Wilbur Ross & Co. (the "Massachusetts Defendants") were engaged in

trade or commerce within the meaning of M.G.L. c. 93A § 1.  Defendants knew or

should have known that failing to comply with applicable Massachusetts

foreclosure statutes was unfair and deceptive.

139.   The Massachusetts Defendants' actions alleged herein constitute

unfair and/or deceptive acts or practices in the conduct of trade or commerce

within the meaning of, and in violation of, M.G.L. c. 93A §§ 2 and 9.

140.   The Massachusetts Defendants' actions described above occurred

within the Commonwealth of Massachusetts, in connection with mortgages or

related foreclosures in that state.

141.   Plaintiffs Anctil, Babb, Barbosa, Bernat and Demers, Ferris, Grillo,

Jones, Kadlec, Lapidez, Lopes, McGough, Pariseau, Perry, Ralston, Reid, Ryan,

Silver, Terzis, Thurrott, Weber, Williams and Zicaro (the "Massachusetts

Plaintiffs") suffered monetary damages and the loss of legal protections as a result of the Massachusetts Defendants' actions alleged above.

## FOURTH CLAIM
## Unjust Enrichment

142.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

143.   By engaging in the conduct described above, defendants wrongfully took property and property interests belonging to plaintiffs or otherwise wrongfully benefitted to the detriment of plaintiffs.

144.   Defendants acted deliberately and knowingly and derived substantial financial benefits from their fraudulent acts.

145.   It would be inequitable for defendants to retain these benefits without restoring plaintiffs to wholeness because the benefits were acquired through deception and conduct in violation of state and federal laws.

146.   Under the principles of equity and good conscience, defendants should not be permitted to retain the benefits and revenue they acquired through unlawful conduct.  All funds, revenues and benefits received by defendants in relation to plaintiffs' mortgages were unjustly obtained and rightfully belong to plaintiffs.

147.   Any agreement or contract among any plaintiff and any defendant did not cover the conduct in which defendants engaged, as detailed above.

## VI.  Prayer For Relief

WHEREFORE, plaintiffs request judgment against defendants, jointly and severally, and for relief as follows:

(a)     Disgorgement of all profits connected to each plaintiff's mortgage;

(b)     Treble damages;

(c)      Prejudgment interest as permitted by law;

(d)      Reasonable attorneys' fees and costs;

(e)      Interest on the judgment as provided by law; and

(f)      Such other relief as the Court deems just and proper.

## VII.  Jury Request

Plaintiffs demand a trial by a jury of all triable issues.

Dated: January 28, 2013

Respectfully submitted,

Zoe Dolan
One of the attorneys for Plaintiffs

Scott A. Kamber, SK-5794
KAMBERLAW, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Tel: (212) 920-3072
skamber@kamberlaw.com

Zoe Dolan, ZD-3025
Law Offices of Zoe Dolan
154 Grand Street
New York, New York 10013
Tel: (347) 301-5180
zdolan@gmail.com

Shawn Lieberman (not admitted)
KAMBERLAW, LLP
1180 South Beverly Drive Suite 610
Los Angeles, CA 90035
Tel: (310) 400-1050
slieberman@kamberlaw.com