UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| JOHN ANCTIL, LEE BABB, GISELE BARBOSA, CHRISTINE BERNAT, GEORGE BRANCH, GARY CROFOOT, PAUL DEMERS, CHARLES and CONSUELO FERRIS, JULIO GRILLO, MARTIN and JANICE HOGAN, MARY JONES, KARL and OKSANA JORGENSEN, DONALD KADLEC, SANDRA LAPIDEZ, JOHN LOPES, JAMES and PRISCILLA MCGOUGH, FRANCIS PARISEAU, MARK and LISA PERRY, REBECCA RALSTON, DOROTHY CARPENTER-REID, MICHAEL RYAN, BENITA and WILLIAM SCHRIEFER, MICHAEL SILVER, FLAVIO TERZIS, JONATHAN THURROTT, NANCY TROSKE, INGRID WEBER, KELLY WILLIAMS, and MATTHEW ZICARO, | SECOND AMENDED COMPLAINT JURY TRIAL DEMANDED 12 Civ. 8572 (CS) |

Plaintiffs,

-against-

ALLY FINANCIAL, INC., AURORA LOAN SERVICES, LLC, BANK OF AMERICA, N.A., CHASE HOME FINANCE, LLC, CINCINNATI FEDERAL SAVINGS AND LOAN, CITIBANK, N.A., CITIGROUP, INC., CITIMORTGAGE, INC., COUNTRYWIDE HOME LOANS, INC., DEUTSCHE BANK, AG, DEUTSCHE BANK NATIONAL TRUST CO., DEUTSCHE BANK TRUST CO., FIRST FRANKLIN LOAN SERVICES, FLAGSTAR BANK, FSB, FREMONT INVESTMENT AND LOAN CORP., HOMEWARD RESIDENTIAL, JPMORGAN CHASE & CO., MONEY WAREHOUSE, MORTGAGEIT, INC., OCWEN FINANCIAL CORPORATION, PHH MORTGAGE, THE PNC FINANCIAL SERVICES GROUP, INC., PROVIDENT FUNDING GROUP, INC., SIGNATURE GROUP HOLDINGS, INC., U.S. BANK, N.A., and WELLS FARGO, N.A.,

Defendants.

-----------------------------------------------------------------X

1.      Plaintiffs allege as follows based on personal knowledge and on information and belief in connection with investigations of counsel.

## I.  Nature of the Action

2.      Plaintiffs are former mortgagors whose homes were foreclosed upon.  Acting in their capacity as some of the largest mortgage banking institutions in the nation, defendants engaged in a coordinated pattern of acts to generate mortgages or refinance loans, expedite foreclosures, and procure fraudulent foreclosure judgments against plaintiffs.  In furtherance of their scheme, defendants presented documents containing fraudulent, false or misleading information to public agencies and courts, and engaged in dual-tracking loan modifications and foreclosures.  Defendants financed their scheme with income derived from racketeering conduct, which included submitting quarterly income statements to the Federal Deposit Insurance Company ("FDIC") to facilitate the fraud.

3.      Injuries to plaintiffs include loss of their mortgages and the deprivation of legal protections intended to ensure that property interest and the public interest in property laws.

4.      Defendants' fraud comprises a pattern of coordinated and related conduct that extends beyond any individual foreclosure or the illegality, impropriety or infirmity of any foreclosure judgment.

5.      Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(a) and (c), New York General Business Law § 349, Massachusetts General Law, Chapter 93A §§ 2 and 9, and Maryland Code Ann., Com. Law II § 13-303, and for common law fraud under New York, Massachusetts and Maryland state law.

6.      Plaintiffs seek disgorgement of defendants' profits, treble damages, and actual and statutory damages.

2

## II.  Jurisdiction And Venue

7.      This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1964(c) (person injured in their business or property by reason of a RICO violation) and 18 U.S.C. § 1962(a) (investment of racketeering income).  Jurisdiction in this Court is further proper because the defendants' scheme comprises a pattern of fraudulent activity beyond any individual foreclosure judgment.

8.      Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) because many of the defendants reside, are found, have an agent and/or transact their affairs within this District, and a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred here.  Further, two properties foreclosed upon are located in Dutchess County, New York.

## III.  The Parties

### *Plaintiffs*

9.      John Anctil is the former mortgagor of a home in Franklin County, Massachusetts.

10.     Lee Babb is the former mortgagor of a home in Plymouth County, Massachusetts.

11.     Gisele Barbosa is the former mortgagor of a home in Bristol County, Massachusetts.

12.     Christine Bernat and Paul Demers are the former mortgagors of a home in Bristol County, Massachusetts.

13.     George Branch is the former mortgagor of a home in the City of Baltimore, Baltimore County, Maryland.

14.     Gary Crofoot is the former mortgagor of a home in Anne Arundel County, Maryland.

15.     Charles and Consuelo Ferris are the former mortgagors of a home in Hampden County, Massachusetts.

16.     Julio Grillo is the former mortgagor of a home in Essex County, Massachusetts.

17.     Martin and Janice Hogan are the former mortgagors of a home in Dutchess County, New York.

18.     Mary Jones is the former mortgagor of a home in Suffolk County, Massachusetts.

19.     Donald Kadlec is the former mortgagor as a joint tenant of a home in Bristol County, Massachusetts.

20.     Sandra Lapidez, along with her husband James Lapidez, is the former mortgagor of a home in Norfolk County, Massachusetts.

21.     John Lopes is the former mortgagor of a home in Bristol County, Massachusetts.

22.     James and Priscilla McGough are the former mortgagors of a home in Worcester County, Massachusetts.

23.     Francis Pariseau is the former mortgagor of a home in Bristol County, Massachusetts.

24.     Mark and Lisa Perry are the former mortgagors of a home in Barnstable County, Massachusetts.

25.     Rebecca Ralston is the former mortgagor of a home in Worcester County, Massachusetts.

26.     Dorothy Carpenter-Reid, ("Dorothy Reid"), is the former mortgagor of a home in Norfolk County, Massachusetts.

27.     Michael Ryan is the former mortgagor of a home in Middlesex County, Massachusetts.

28.     Benita and William Schriefer are the former mortgagors of a home in Anne Arundel County, Maryland.

29.     Michael Silver is the former mortgagor of a home in Essex County, Massachusetts.

30.     Flavio Terzis is the former mortgagor of a home in Plymouth County, Massachusetts.

31.     Jonathan Thurrott is the former mortgagor of a home in Norfolk County, Massachusetts.

32.     Nancy Troske is the former mortgagor of a home in Dutchess County, New York.

33.     Ingrid Weber is the former mortgagor of a home in Essex County, Massachusetts. The Southern Essex District Registry of Deeds website indicates that documents relating to the foreclosure of Ms. Weber's home are potentially "robo-signed" – i.e., improperly executed, as described further below.

34.     Kelly Williams is the former mortgagor of a home in Plymouth County, Massachusetts.

35.     Matthew Zicaro is the former mortgagor of a home in Worcester County, Massachusetts.

36.     Each plaintiff was individually harmed by fraud perpetrated in furtherance of defendants' scheme.  The harm included expedited foreclosure on plaintiffs' homes and procurement fraudulent foreclosure judgments against them.

*Defendants*

37.     Ally Financial, Inc. ("Ally"), with offices located at 1185 6th Avenue, New York, New York 10036, is a bank holding company.  It was previously known as GMAC Mortgage, which was involved in a mortgage or foreclosure proceedings relating to Jonathan Thurrott.

38.     Aurora Loan Services LLC ("Aurora") is a limited liability corporation with offices located at 10350 Park Meadows Drive, Littleton, Colorado 80124.  Aurora was involved in a mortgage or foreclosure proceedings relating to Rebecca Ralston in 2010.  Aurora's website states: "Mortgage customers who were part of a foreclosure action between January 1, 2009 and December 31, 2010 may be eligible for an Independent Foreclosure Review of their loan. . . ."  Aurora was also involved in a mortgage or foreclosure proceedings relating to Flavio Terzis.

39.     Bank of America, N.A. ("Bank of America") is a bank with headquarters located at 100 North Tryon Street, Charlotte, North Carolina, 28255, and offices located at 115 West 42nd Street, New York, New York 10036.  Bank of America was involved in a mortgage or foreclosure process relating to plaintiffs Mark and Lisa Perry.  Bank of America acquired Merrill Lynch.  Bank of America also acquired BAC Home Loans Servicing ("BAC") by acquisition or merger.  Bank of America was involved in a mortgage or foreclosure proceedings relating to Charles Ferris (by successor to BAC), Francis Pariseau (by successor to BAC), Mark and Lisa Perry, William and Benita Schriefer, Ingrid Weber (by successor to BAC) and Kelly Williams (by successor to BAC).  Additionally, Bank of America is the successor to FleetBoston Financial or Fleet Financial Group, either of which was the parent company of Fleet National Bank, which was involved in a mortgage or foreclosure proceedings relating to Dorothy Reid.

40.     Capital One Financial Corp. ("Capital One") is a "diversified bank" headquartered at 1680 Capital One Drive, McLean, Virginia 22102.  In 2009, Capital One

acquired Chevy Chase Bank, which was involved in a mortgage or foreclosure proceedings relating to plaintiff Gary Crofoot.

41.     Chase Home Finance LLC ("Chase Home Finance") is an arm of JPMorgan Chase, *infra*, with offices at 270 Park Avenue, New York, New York 10017.

42.     Cincinnati Federal Savings and Loan ("Cincinnati Federal") is a federally chartered "mutual" savings and loan, with offices located at 6581 Harrison Avenue, Cincinnati, Ohio 45247.  It was involved in a mortgage or foreclosure proceedings relating to Michael Silver.

43.     Citibank, N.A. ("Citibank"), with offices located at 701 East 60th Street North, Sioux Falls, South Dakota 57104, is a banking subsidiary of Citigroup, Inc., *infra*, and is affiliated with CitiMortgage, Inc., *infra.*

44.     Citigroup, Inc. ("Citigroup") is the parent company of Citibank, *supra*, and CitiMortgage, Inc., *infra*, with world headquarters located at 399 Park Avenue, New York, New York 10022.

45.     CitiMortgage, Inc. ("CitiMortgage") is a subsidiary of Citigroup, Inc., *supra*, with offices located at 100 Technology Drive, O'Fallon, Missouri 63368.  CitiMortgage, Inc. was involved in a mortgage or foreclosure proceedings relating to John Anctil and Michael Silver (as s/b/m to ABN AMRO Mortgage Group, Inc.).

46.     Countrywide Home Loans, Inc. ("Countrywide") is a corporation under the laws of New York, with offices located at 4500 Park Granada, Calabasas, California 91302 and 7105 Corporate Drive, Plano, Texas 75024.  Countrywide was involved in a mortgage or foreclosure proceedings relating to Charles Ferris, Francis Pariseau, Ingrid Weber and Kelly Williams.

47.     Deutsche Bank, AG ("Deutsche Bank"), with offices located at 60 Wall Street, New York, New York 10005, is the ultimate parent company of MortgageIT, *infra*, and Deutsche Bank National Trust Company, *infra*.   As discussed below, MortgageIt was involved in a mortgage or foreclosure proceedings relating to Sandra Lapidez and John Lopes.  Additionally, Deutsche Bank's North American subsidiary is Taunus Corporation, which is the parent company of Deutsche Bank Trust Corporation, which, in turn, is the parent company of Deutsche Bank National Trust Company, *infra*..

48.     Deutsche Bank National Trust Company ("DBNTC"), which has offices at 1761 East St. Andrew Place, Santa Ana, California, 92705, was involved in a mortgage or foreclosure proceedings relating to Martin and Janice Hogan and Mary Jones.  DBNTC is a subsidiary of Deutsche Bank Holdings, Inc., which is a subsidiary of Deutsche Bank Trust Company, *infra*.

49.     Deutsche Bank Trust Company ("DBTC"), with offices located at 60 Wall Street, New York, New York 10005, is a subsidiary of Deutsche Bank Trust Corporation, which is a subsidiary of Taunus Corporation, the North American subsidiary of Deutsche Bank, AG, *supra*.

50.     First Franklin Loan Services, a division of First Franklin Financial Corporation, (collectively, "First Franklin") has offices located at 2150 North First Street, San Jose, California 95131.  First Franklin Loan Services was previously owned by National City Corporation (now PNC Financial Services, *infra*) and Merrill Lynch.  First Franklin was involved in a mortgage or foreclosure proceeding relating to Martin and Janice Hogan.

51.     Flagstar Bank, FSB ("Flagstar") is a mortgage lender and wholesaler with offices located at 5151 Corporate Drive, Troy, Missouri 48098.  Flagstar was involved in a mortgage or foreclosure proceedings relating to Lee Babb.

52.     Fremont Investment and Loan Corp. was a subsidiary of Fremont General Corporation (collectively, "Fremont"), with headquarters previously located at 2727 East Imperial Highway, Brea, California 92821.  Fremont sold its mortgage servicing portfolio to Litton Loan Servicing ("Litton")*.  In May of 2008, Litton's residential home loan portfolio was acquired by Goldman Sachs, which later sold it to Ocwen Financial Corporation, *infra*. Meanwhile, Fremont filed for bankruptcy in June 2008 and was reorganized into Signature Group Holdings, Inc., *infra*.  Fremont was involved in a mortgage or foreclosure proceedings relating to Gisele Barbosa and Matthew Zicaro.

53.     Homeward Residential ("Homeward"), with offices located at 1525 S. Belt Line Road, Coppell, Texas 75019, is the current name of American Home Mortgage Servicing, Inc. ("AHMSI"), which previously went into bankruptcy proceedings.  AHMSI was involved in a mortgage or foreclosure proceedings relating to Donald Kadlec.

54.     JPMorgan Chase & Co. ("JP Morgan Chase") is a global banking corporation, with headquarters at 270 Park Avenue, New York, New York 10017.  Through a current or prior subsidiary or business arm known as Chase Home Finance, *supra*, JPMorgan Chase was involved in a mortgage or foreclosure proceedings relating to Karl and Oksana Jorgensen and Michael Ryan.

55.     Money Warehouse is a Pennsylvania corporation with an address of 615 Second Street Pike, Southampton, Pennsylvania 18966.  Money Warehouse was involved in a mortgage or foreclosure proceedings relating to John Anctil.

56.     MortgageIT Inc. ("MortgageIt"), a mortgage company, is a wholly owned subsidiary of DB Structured Products, Inc., which is a wholly owned subsidiary of DB U.S. Financial Markets Holding Corporation, which is a wholly owned subsidiary of Taunus

Corporation, which is a wholly owned subsidiary of Deutsche Bank AG, *supra*.  MortgageIT is headquartered at 33 Maiden Lane, New York, New York 10038.  MortgageIT was involved in a mortgage or foreclosure proceedings relating to Sandra Lapidez and John Lopes.

57.    Ocwen Financial Corporation ("Ocwen") maintains offices at 2002 Summit Boulevard, 6th Floor, Atlanta, GA 30346.  According to information publicly available through the Mortgage Electronic Registration System website, discussed *infra*, Ocwen was involved in a mortgage or foreclosure proceedings relating to Matthew Zicaro (as successor to HomeEq Servicing), Gisele Barbosa (as successor to HomeEq Servicing) and George Branch (by transfer from prior servicer Saxon MortgageServices, Inc.).

58.    PHH Mortgage ("PHH") is a "mortgage services provider" with offices located at 1 Mortgage Way, Mount Laurel, New Jersey 08054.  PHH Mortgage was involved in a mortgage or foreclosure proceedings relating to Dorothy Reid.

59.    The PNC Financial Services Group, Inc. ("PNC") is a financial services company headquartered at One PNC Plaza, 249 Fifth Avenue, Pittsburgh, PA 15222.  PNC is the successor to National City Corporation, which owned First Franklin Investment and Loan, *supra*. Additionally, PNC is the successor to National City Bank, a division of which known as "FNMC" was involved in a mortgage or foreclosure proceedings relating to Benita and William Schriefer.

60.    Provident Funding Group, Inc. ("Provident") is a "national direct lender" offering home mortgages.  According to the California Secretary of State website, Provident has offices at 851 Traeger Avenue, Suite 100, San Bruno, California 94066, and it maintains as an agent Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California

95833.  Provident was involved in a mortgage or foreclosure proceedings relating to Christine Bernat and Paul Demers.

61.     Signature Group Holdings, Inc. ("Signature") is a "diversified business and financial services enterprise" located at 15303 Ventura Boulevard, Suite 1600, Sherman Oaks, California 91403.  Signature is the reorganization of Fremont, *supra*.

62.     U.S. Bank National Association ("U.S. Bank"), with offices located at 180 East 5th Street, St. Paul, Minnesota 55101, was involved in a mortgage or foreclosure proceedings relating to Julio Grillo and Nancy Troske.

63.     Wells Fargo Bank ("Wells Fargo") is a bank active in the mortgage industry, with headquarters located at 420 Montgomery Street, San Francisco, California 94104, and offices located at 530 Fifth Avenue, New York, New York 10036.  Wells Fargo was involved in a mortgage or foreclosure proceedings relating to Gisele Barbosa, Christine Bernat and Paul Demers, Julio Grillo, Sandra Lapidez, John Lopes, James and Priscilla McGough, Nancy Troske and Matthew Zicaro.

### IV.  Defendants' Fraudulent Scheme

64.     Defendants' scheme consists of originating mortgages of short duration and then accelerating foreclosures for profit.  The scheme includes buying and selling the loans or interests in them; securitizing mortgages into trusts to be sold to investors; transferring interests in mortgages utilizing various methods designed to avoid transparency in ownership; servicing loans prior to foreclosure and, in some instances, dual-tracking home loan modifications and foreclosures; and, employing fraudulent practices during foreclosure to expedite the process.

65.     Three aspects of the process are necessary to understand the scheme: mortgage backed securities; a mechanism known as the Mortgage Electronic Registration System

("MERS"); and, financial accounting standards pertaining to the sale and transfer of assets, including mortgage-related interests.

*Securitization*

66.     Securitization of mortgages began in the late 1960's and the 1970's.  The term refers to "bundling" home mortgage loans into a pool that is sold to investors.  Returns on the investment comprise a portion of income derived from mortgage payments throughout the life of the trust, and financial risks relating to foreclosure are largely borne by investors.

67.     Various parties are involved throughout the securitization process.  Initially, a bank, home loan lender or mortgage broker acquires a mortgage from a homebuyer or a refinancing or "refi" mortgage from a homeowner.  After the mortgage closes, it is sold to a purchaser of mortgages or assigned to another entity.  At some point the mortgage is pooled into a group of other mortgages, and this pool is securitized in a trust.  Such trusts are formed subject to "pooling service agreements," which set forth a variety of terms and conditions relating to securitization and the underlying mortgages, including procedures for foreclosure.

68.     By the 1990's, securitization became routine, with millions of mortgages being securitized annually.

69.     Historically, changes of ownership or interest in real property were recorded in county clerks' land records.  As mortgage securitization increased, the mortgage industry sought a way to transfer mortgages among parties without generating paperwork or recording fees.  Toward this end, the industry created a mechanism known as the Mortgage Electronic Registration System ("MERS").

70.     MERS is designed to facilitate the tracking of mortgages as ownership changes hands.

71.     As MERS was being created, the mortgage industry mounted a campaign to obtain changes in accounting methods standards that pertained to mortgage-related assets.

72.     Prior to 1998, certain restrictions applied in accounting standards that governed the sale and transfer of mortgage-related assets.  In tandem with the development of MERS, the mortgage industry pursued changes in these standards for the benefit of mortgage bankers including defendants.

73.     Both MERS and accounting methods were utilized to facilitate defendants' fraudulent scheme, so each are addressed in turn.

*MERS*

74.     MERS is a privately maintained electronic warehouse for mortgage-related data.

75.     MERS shareholders and members include most of the largest companies involved in the mortgage industry, including defendants in this action.

76.     Initially a research project led by government-sponsored entities, MERS was created in the early to mid-1990's with the participation of the Mortgage Bankers Association ("MBA"), which is "the national association representing the real estate finance industry..." http://mortgagebankers.org/AboutMBA (last visited April 8, 2013).

77.     The purpose of MERS is to allow its members to bypass the public recording system for mortgages through a private electronic registry of loans.  MERS is ostensibly intended to track the beneficial interests in the loans and changes in loan servicers.

78.     Prior to MERS, when a lender issued a mortgage, it recorded its identity and interest in the county clerk's office (or its equivalent) pursuant to state and local law.  If an assignment of the original loan was made by the lender, then the assignee would also record its identity and interest with the county clerk's office.

79.     In contrast, members of MERS typically name MERS as the mortgagee or the lender's nominal assignee or beneficiary.  When an assignment or transfer occurs between or among MERS members, MERS purports to privately track that assignment or transfer, but customarily does not record the transaction in public records.  Assignments or foreclosure actions are purportedly effectuated by MERS "certifying officers," who are employees of members or other individuals designated by the members themselves.

80.     MERS is the mortgagee for property in a conventional sense only insofar as it may be named as the mortgagee in a mortgage.  MERS does not hold the underlying note for the mortgage, and it does not receive any payments from homeowners under the note.

81.     MERS' private tracking system avoids any fees or filings associated with public recording of mortgages and assignments.

82.     Many tens of millions of mortgages have been run through MERS since its inception.

83.     MERS certifying officers, including defendants' employees and agents, and those acting on defendants' behalf or in association with them, have often failed to verify the chain of title before making assignments or filing foreclosure proceedings.  In an effort to cure the defects when they became known, they have executed questionable paperwork.  Many MERS assignments have numerous defects, including affirmative misrepresentations of fact, which render them false, deceptive or invalid.

*Financial Accounting Standards*

84.     Accounting methods in the United States are generally governed by a widely recognized framework known as Generally Accepted Accounting Principles ("GAAP").  GAAP rules for public and private companies and non-profit organizations are established by the

14

Financial Accounting Standards Board ("FASB"), a private non-profit entity devoted to this purpose.

85.     Up until recently, when the standards were codified, FASB guidance comprised statements that the organization issued from time to time – often in response to developments in accounting and feedback from constituents.

86.     Accounting issues in relation to mortgage securitization came into focus in Statement 65, which was issued in 1982.  This statement established accounting and reporting standards for certain mortgage banking activities, including transfers related to mortgage securitizations.

87.     Subsequently, in 1993, the FASB issued Statement 115, which elaborated upon accounting for securitized mortgage assets.  At the time, entities accounted for securitized non-mortgage assets in one of three categories – "trading," "available-for-sale" or "held-for-maturity."  "Trading" assets were posted at market price on a company's balance sheet, which cased interest rate fluctuations to reflect in a company's earnings.  "Held-to-maturity" assets, in contrast, were accounted for at book value, which meant that increases and decreases in the interest rate did not affect valuation or a company's balance sheet or earnings.  "Available-for-sale" assets – which could be sold before maturity but did not belong in a "trading" portfolio – were carried on balance sheets at market price; but, because unrealized gains and losses were not included in a company's income statement, variances in market value would not influence the company's reported earnings.

88.     In contrast to the guidelines for non-mortgage assets, under Statement 115, certain holdings relating to securitized mortgages were to be categorized exclusively as "trading."

89.     In the years following the issuance of Statement 115 – as MERS was being rolled out – the mortgage industry persuaded the FASB to include "held-to-maturity" and "available-for-sale" classifications for mortgage-related securities.  The moving force behind the effort was the MBA, which represented the industry as a whole and defendants that were members at that time.

90.     Responding to pressure from the MBA, in 1998, the FASB issued Statement 134.  Under this Statement, the applicable classification was based on a transferring entity's ability and intent to sell or hold the investment.

91.     The FASB further amended the classification system in 2000.  That year, it issued Statement 140, which provided standards for distinguishing transfers of financial assets that were sales from transfers that were secured borrowings.  Classification under Statement 140 turned on whether control of the asset was surrendered – if so, it was accounted for as a sale to the extent that consideration other than beneficial interest in the transferred assets was received in exchange.

92.     Mortgage bankers exploited the classification system that the MBA had obtained in Statement 140.

93.     As the FASB later observed:

After Statement 140 was issued, auditors, regulators, and other constituents raised concerns about certain transfers of portions of a financial asset that were being accounted for as sales.  In particular, constituents raised concerns about certain sales of undivided interests in pools of financial assets because of significant credit support provided by affiliates of the transferors.  The constituents indicated that, in some cases, transferred financial assets appear to have remained under the control of the transferor while being reported as sales.  Constituents and regulators also expressed concerns about highly structured transactions that were treated as sales when, in their view, the transferor continued to control the transferred financial assets, as evidenced by the fact that the underlying financial assets continued to be in the custody of the transferor and/or its consolidated affiliates and the transferor had significant continuing involvement through its

16

interests in the underlying financial asset(s).  FASB Statement 166 at 77. http://www.fasb.org/cs/BlobServer?blobkey=id&blobwhere=1175820927331&blobheader=application%2Fpdf&blobcol=urldata&blobtable=MungoBlobs (last visited April 9, 2013).

94.     To address these problems, in 2009 the FASB issued Statement 166, which

require[d] more information about transfers of financial assets, including securitization transactions, and where companies have continuing exposure to the risks related to transferred financial assets.  It eliminate[d] the concept of a 'qualifying special-purpose entity,' [the lynchpin of accounting for mortgage securities under Statement 140,] change[d] the requirements for derecognizing financial assets, and require[d] additional disclosures.  *See* www.fasb.org/cs/ContentServer?pagename=FASB%2FFASBContent _C%2FNewsPage&cid=1176156240834 (last visited March 1, 2013).

95.     With regard to the reforms implement by Statement 166, former FASB Chairman

Robert Herz stated:

> These changes were proposed and considered to improve existing standards and to address concerns about companies who were stretching the use of off-balance sheet entities to the detriment of investors.  The new standards eliminate existing exceptions, strengthen the standards relating to securitizations and special-purpose entities, and enhance disclosure requirements.  They'll provide better transparency for investors about a company's activities and risks in these areas. *See* http://www.fasb.org/cs/ContentServer?pagename=FASB%2FFASB Content_C%2FNewsPage&cid=1176156240834 (last visited April 12, 2013).

*Summary:*
*The Mortgage Industry, Accounting Practices And MERS*

96.     The mortgage industry – through the MBA – succeeded in securing provisions in

FASB Statement 140 that served the industry's interest in opacity.

97.     Defendants and the mortgage industry in general purported to derecognize

mortgage-related assets notwithstanding retention of ownership or ownership interests.

98.     The mortgage industry and defendants employed such methods to create the

illusion of liquidity and stability of their financial health.

99.     The scheme enabled mortgage bankers to appear liquid and profitable regardless

of potential or outstanding liabilities.

100.    Defendants benefited from the scheme by generating money and income through accounting methods that had been secured by the mortgage industry to defendants' advantage.

101.    Defendants invested the income and profits derived from the scheme into financing mortgage home loans and securitizations.

102.    The scheme rewarded mortgage loan volume over longevity, to the detriment individual home owners.  Securitized mortgages were subjugated to the economic interests of trusts rather than mortgagors or mortgagees seeking loan modifications.

103.    Defendants used MERS ostensibly to facilitate transfers among various parties in furtherance of the scheme prior to, during and after securitization.

104.    Defendants' conduct created clouds over title or broke chains of title.

105.    MERS enabled the mortgage industry and defendants to gloss over these deficiencies and irregularities for purposes of buying, selling and transferring mortgages and expediting foreclosures.

106.    During the relevant period, participants in various aspects of mortgage banking – including mortgage brokers, companies involved in securitizations, servicers and, ultimately, parties that sought foreclosure – benefited financially by using MERS and accounting methods applied to mortgage-related holdings.

107.    The success of the MBA in influencing the FASB, combined with the use of MERS, demonstrates defendants' coordinated activity through an association-in-fact in furtherance of their scheme.

*The Fraudulent Scheme In Operation*

108.    Veiled behind MERS and accounting standards designed to facilitate defendants' fraudulent scheme, defendants originated, bought and sold loans such as plaintiffs' mortgages, and foreclosed on properties including plaintiffs' homes.

109.    Defendants obtained mortgages from plaintiffs that were designed to be of short duration, and then accelerated foreclosures with filings containing misrepresentations designed to cover up deficiencies inherent in the scheme; and, in some instances defendants deceived plaintiffs by dual-tracking loan modifications and foreclosures.

110.    In furtherance of their scheme, defendants engaged in fraudulent conduct that included:

a.  Failing to properly identify foreclosing parties accurately;

b.  Preparing, executing, notarizing or presenting false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

c.  Engaging in "robo-signing."  This term refers colloquially to preparing, executing, or filing affidavits without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits.  Where third parties engaged in robo-signing on behalf of defendants, they did so with the knowledge and approval of defendants;

d.  Misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents; and

19

    e.   Inappropriately dual-tracking foreclosures and loan modifications, and failing to communicate with borrowers or providing misleading information with respect to foreclosure activities.

111.    Defendants profited from their scheme at each phase, including the buying and selling of mortgage loans, securitization, and foreclosure.

112.    Defendants' scheme reflected a pattern of coordinated activity which has included, but is not limited to:

    a.   Utilizing MERS as a data warehouse.  Defendants used the system to obtain and transfer or assign mortgages and to facilitate expedited foreclosures that proceeded based on materially false and misleading representations, in violation of applicable state laws.

    b.   Employing accounting standards in ways calculated to further the scheme. Creating the false impression of liquidity through illusory transfers and allocations of risk, defendants published income statements reflecting accounting statements that enabled defendants to mislead government entities, the public and plaintiffs regarding ownership interests in mortgages such as plaintiffs' home loans.

    c.   Investing profits made from the scheme.  Defendants invested income derived from (a) and (b) above into mortgage-related activities.  With such profits, defendants financed the origination of mortgages and conduct relating to mortgage securitization, and subsequent activities including accelerated or improper foreclosures, which injured plaintiffs.

113.    Each of the defendants engaged in, knew about or should have known about, the nature, extent and scope, and the means and methods, of the scheme.

114.    Plaintiffs suffered injury because defendants' scheme ultimately resulted in expedited foreclosures that violated state laws, including the ultimate result of null or invalid foreclosures.

115.    Two examples illustrate the extremes to which defendants' fraudulent scheme operated to the detriment of plaintiffs' property interests.

*Example One (New York)*

116.    Plaintiff Nancy Troske was the mortgagor of a property located in Fishkill, New York, pursuant to a mortgage executed on January 14, 2006.  The mortgage was in the amount of certain sum of money and it defined MERS as the mortgagee.  The lender was BNC Mortgage, Inc. ("BNC"), a former subprime subsidiary business of now defunct Lehman Brothers Holdings, Inc.  An adjustable rate balloon rider secured the note to BNC.

117.    On or about May 7, 2008, a document purporting to assign the mortgage was filed in the Dutchess County Clerk's Office.  The document stated that MERS – as the "nominee" for BNC – assigned the mortgage to U.S. Bank National Association, as Trustee for the Structured Asset Investment Loan Trust 2006-2 ("U.S. Bank, as Trustee").  There was no indication of how or when MERS became the "nominee" rather that the mortgagee.  Nor did the document assign the note.  U.S. Bank, as Trustee subsequently brought an action for foreclosure.

118.    The assignment was purportedly effected by Elpinki Bechakas, ostensibly acting in the capacity of Assistant Secretary and Vice President of MERS.  Elpinki Bechakas was a "robo-signer" working as an attorney with Steven J. Baum, P.C. ("Baum"), a former New York law firm involved with approximately 40% of foreclosures in the state at one point.  On October

21

6, 2011, Baum entered into a settlement with the United States Attorney for the Southern District of New York which prohibited Baum from engaging in certain practices relating to MERS, required an overhaul of Baum's practice in connection with foreclosure actions, and incorporated a $2 million dollar fine to the United States.  See http://www.justice.gov/usao/nys/pressreleases/October11/ stevenbaumpcagreementpr.pdf (last visited January 25, 2013).

119.    New York Real Property Law Article 9 establishes a public recording system to "furnish potential purchasers with actual or at least constructive notice of previous conveyances and encumbrances that might affect their interests and uses." *Witter v. Taggart*, 78 N.Y.2d 234, 238 (1991).  A conveyance of real property that has not been recorded with the clerk of the county where the property is located is "void as against any person who subsequently purchases or acquires by exchange or contracts to purchase or acquire by exchange…"  New York Real Prop. Law § 291.

120.    To foreclose on property, the foreclosing party must hold or have been assigned both the note and the mortgage at the commencement of the foreclosure action.  *U.S. Bank Nat'l Ass'n v. Madero*, 80 A.D.3d 751, 752-53 (2d Dep't 2011); *Countrywide Home Loans, Inc. v. Gress*, 68 A.D.3d 709, 709 (2d Dep't 2009).  "An assignment of a mortgage without assignment of the underlying note or bond is a nullity, and no interest is acquired by it." *Deutsche Bank Nat'l Trust Co. v. Barnett*, 88 A.D.3d 636, 637 (2d Dep't 2011)**.**  The right to assign a mortgage does *not* necessarily confer the right to assign the note.  *Bank of NY v. Silverberg*, 86 A.D. 3d 274, 280 (2d Dep't 2011).

121.    Since the note was never assigned to U.S. Bank, the foreclosure proceeded in violation of New York law.

122.    US Bank failed to disclose that it did not hold the note, and it utilized the mails in promulgating this subterfuge.

123.    The judgment was a nullity obtained through fraud, yet U.S. Bank profited from it.

*Example Two (Massachusetts)*

124.    Plaintiff Matthew Zicaro was the mortgagor, along with Juola Stefani, of a property located in Princeton, Massachusetts, pursuant to a mortgage executed on December 30, 2005 (the "Zicaro Mortgage").  The mortgage was in the amount of a certain sum of money and it defined MERS as the mortgagee.  The lender was Fremont Investment and Loan.

125.    The Zicaro Mortgage was apparently pooled into a group of mortgages which were securitized in a trust known as Fremont Home Trust 2006-1 (the "2006-1 Trust").  Fremont Investment and Loan was the servicer of the mortgages in the trust until June 30, 2006, and Wells Fargo was the servicer effective July 1, 2006.  Pursuant to the trust prospectus, the mortgage and the note were to be held by the trust itself.  The prospectus required the servicer to act on delinquent mortgage loans to secure the highest net value of the proceeds for recovery by the trust.

126.    Fremont filed for bankruptcy in 2008 and reorganized into Signature Group Holdings, Inc.

127.    Meanwhile, it appears that the Zicaro Mortgage was pooled into another group of securitized mortgages in a trust known as Securitized Asset Backed Receivables LLC Trust 2006-FR3 (the "2006-FR3 Trust").  HomeEq Servicing Corporation, which was purchased in 2010 by defendant Ocwen, was designated as the servicer, subject to the same requirements with respect to delinquent mortgages that were set forth in the 2006-1 Trust.

128.     On December 29, 2006, "Wells Fargo Bank, NA as Trustee" initiated a complaint in a foreclosure action as to the Zicaro Mortgage.

129.     Three months later, Wells Fargo submitted a Certification Regarding Compliance with Applicable Serving Criteria to the United States Securities Exchange Commission in connection with the 2006-FR3 Trust.  The submission included an acknowledgement by Wells Fargo that it had not provided trust investors with prior notification of intent to foreclose, as required by certain servicing agreements.

130.     The notices of sale published in connection with foreclosure indicated that Wells Fargo, NA as Trustee was the holder of the mortgage.

131.     In Massachusetts, the holder of a mortgage may foreclose the mortgagee's right of redemption by exercising a power of sale, if that power is granted by the mortgage.  The power of sale is codified in Mass. G. L. c. 183, § 21, as regulated by Mass. G. L. c. 244 §§ 11-17C and 35A.  Massachusetts law limits the power of foreclosure to "the mortgagee or his executors, administrators, successors or assigns."  Mass. G. L. c. 183 § 21.  Under § 21, the mortgage holder may sell defaulted property at a public auction and convey the property in fee simple. Courts in Massachusetts require that "one who sells under a power [of sale] must follow strictly its terms . . . [and i]f he fails to do so there is no valid execution of the power, and the sale is wholly void."  *Moore v. Dick*, 187 Mass. 207, 211 (1905).

132.     The statutory power of sale system in Massachusetts comprises an array of requirements.  Among other things, a foreclosing party must file an affidavit in the Land Court stating that the foreclosing party is the mortgagee or is authorized to act as the mortgagee.  Mass. G.L. c. 244 § 35A.  The party must also provide notice at least fourteen days prior to the proposed date of sale stating the redemption amount as of thirty days prior to the date of sale and

identifying the present holder of the mortgage. Mass. G.L. c. 244 § 14. In addition, the party is required to record an affidavit that "fully and particularly" states the acts taken in the course of conducting the foreclosure, along with published notices of the sale. Mass. G.L. 244 § 15.

133.   Further, G.L. 244 § 14 authorizes only "[t]he mortgagee or person having his estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal, or the legal guardian or conservator of such mortgage or a person acting in the name of such mortgagee or person" to exercise the statutory power of sale.

134.   Here, the Zicaro Mortgage appears to have remained the 2006-1 Trust. As a result, the foreclosure was invalid because Wells Fargo NA as Trustee was not the actual holder of the mortgage by way of assignment at the time of notice and sale. *See Lacey v. BAC Home Loans Servicing, LP (In re Lacey)*, 480 B.R. 13, 35-38 (Bankr. D. Mass. 2012).

135.   The foreclosure proceeded on the premise that MERS had assigned the mortgage to Wells Fargo, NA as Trustee, on October 11, 2007, with a "date of transfer" of August 21, 2007. Purportedly executed by "robo-signer" Tonya Blechinger, this post-foreclosure complaint "assignment" was invalid because the chain of title had been broken by the 2006-1 Trust.

136.   Because Wells Fargo, NA as Trustee completed the foreclosure action without holding the mortgage by valid assignment, the foreclosure violated Massachusetts law. Again, the judgment was a nullity obtained through fraud. However, Wells Fargo benefited financially from the foreclosure. Meanwhile, Fremont (succeeded by Signature), profited from securitization.

137.   Wells Fargo, Fremont/Signature and Ocwen utilized the mails in promulgating this subterfuge.

*A Pattern Of Brevity In Mortgages*

138.    Plaintiffs' mortgages were designed to be of short duration.  The Mortgage Table below provides the respective time span for each plaintiff's mortgage and the average life of the mortgages prior to the filing of a foreclosure complaint – 33 months.

Mortgage Duration Table

| Plaintiff | Defendant(s) | Mortgage Date | Date of Foreclosure Complaint | Months Until Foreclosure Complaint |
|---|---|---|---|---|
| | | | | |
| Anctil | Money Warehouse, Citimortgage | 4/22/08 | 8/6/10 | 27.5 |
| Babb, Jr. | Flagstar | 8/31/07 | 3/27/08 | 7 |
| Barbosa | Fremont/Signature, Wells Fargo, Ocwen | 1/10/06 | 1/8/08 | 24 |
| Bernat | Provident Funding Group, Wells Fargo | 3/9/07 | 5/11/10 | 38 |
| Branch | Ocwen | 5/22/07 | 1/21/10 | 32 |
| Crofoot | Capital One | 10/12/06 | 11/5/09 | 37 |
| Ferris | Countrywide, Bank of America | 11/7/07 | 9/9/10 | 34 |
| Grillo | Wells Fargo, US Bank | 2/15/07 | 4/8/08 | 14 |
| Hogan | First Franklin & PNC (by successor), Deutsche Bank, DBNTC | 10/25/05 | 3/25/08 | 29 |
| Jones | Deutsche Bank, DBNTC | 1/7/05 | 1/11/08 | 36 |
| Jorgensen | JP Morgan Chase | 5/11/05 | TBV | TBV |

| | | | | |
|---|---|---|---|---|
| Kadlec | Homeward Residential (as successor to American Home Mortgage Servicing, Inc.) | 7/20/07 | TBV | TBV |
| Lapidez | MortgageIt, Wells Fargo | 8/29/07 | 2/3/09 | 17 |
| Lopes | MortgageIt, Wells Fargo | 10/27/06 | 12/2/08 | 25 |
| McGough | Wells Fargo | 2/25/05 | 4/2/09 | 49 |
| Pariseau | Bank of America (successor to Countrywide) | 8/30/05 | 11/5/08 | 38 |
| Perry | Bank of America (successor to BAC) | TBV | 12/10/09 (TBV) | TBV |
| Ralston | Aurora | 5/3/07 | 11/3/09 | 30 |
| Reid | Bank of America (as successor to FleetBoston or Fleet Financial Group affiliate or parent), PHH Mortgage | 4/18/03 | 11/17/10 | 91 |
| Ryan | JP Morgan Chase, Chase Home Finance | 7/13/05 | 12/3/07 | 29 |
| Schriefer | Bank of America, PNC (successor to National City Bank subsidiary FNMC) | 3/15/06 | 5/7/10 | 50 |
| Silver | Cincinnati Federal, CitiMortgage s/b/m ABN AMRO Mortgage Group, Inc. | 9/12/07 | 7/15/10 | 34 |
| Terzis | Aurora | 3/16/06 | 12/18/06 | 9 |
| Thurrott | Ally (then GMAC) | 10/1/03 | 4/28/09 | 67 |
| Troske | US Bank | 1/14/06 | 8/26/08 | 31.5 |
| Weber | Bank of America (successor to BAC) | 2/5/07 | 12/5/08 | 22 |

| | | | | |
|---|---|---|---|---|
| Williams | Countrywide, Bank of America (successor to BAC) | 10/11/05 | 5/12/09 | 43 |
| Zicaro | Fremont, Wells Fargo | 12/30/05 | 12/28/06 | 12 |
| | | | | |
| | TBV = To Be Verified | | Average | 33 |

139.    The brevity of plaintiffs' mortgages reflects a pattern of coordinated, related and continued activity in furtherance of the defendants' fraudulent scheme, which defendants executed through their association-in-fact.

*Defendants' Association-In-Fact*
*Roles*

140.    Defendants' scheme involves their participation in various roles in the mortgage industry, such as mortgage loan brokering or origination, securitization, servicing, and foreclosure.

141.    During the relevant period, defendants assumed one or more roles relating to these activities, including, but not limited to, the following examples.

    a.    *Mortgage loan brokers or originators*.  These actors are responsible for the initial lending for mortgages.  Defendants involved in this role have included Bank of America (as successor to Countrywide), Cincinnati Federal, Fremont/Signature, Money Warehouse, MortgageIt, Provident, Wells Fargo, Fleet and JPMorgan Chase.

    b.    *Parties involved in securitization.*  Securitization is a multi-step process.  It typically involves an entity that buys mortgages and sells them to a depositor, which in turn sells the loans to a trust.  The trust is made available to investors.  During the life of the trust, master loan servicers handle ongoing loan servicing

28

responsibilities, and trustees fulfill various duties.  Each defendant benefitted directly or indirectly from the securitization of mortgages such as plaintiffs' during the relevant period.  Defendants that are highly active in securitization activities include Aurora, Bank of America, CitiMortgage, Deutsche Bank, Fremont/Signature, US Bank and Wells Fargo.

c. *Servicers*.  Parties who undertake to "service" loans – i.e., to collect monthly payments from mortgagors for at least some period during the loan prior to foreclosure – are known as "servicers."  Servicing rights may be acquired at various stages in the life of a loan, including during or in connection with the securitization process.  Defendants who have fulfilled this role include Ally (then GMAC), Aurora, Bank of America, Capital One, CitiMortgage, Flagstar, Fremont, Ocwen (as successor to HomeEq Servicing and Saxon), PHH, Wells Fargo.

d. *Foreclosing parties.*  These parties – purported mortgage holders, assignees or trustees – seek foreclosure.   Defendants who have executed this role include Aurora, Bank of America (as successor to BAC), CitiMorgate, First Franklin, Flagstar, PHH, US Bank and Wells Fargo.

<u>*Defendants' Association-In-Fact*</u>
<u>*The MBA And MERS*</u>

142.    Defendants are associated-in-fact through their membership in the MBA and MERS directly or through a relationship with a parent or subsidiary.

143.    As to the MBA, upon information and belief, each defendant, or a subsidiary, affiliate or parent company of each defendant, is a member of the MBA or has participated in MBA activities, conferences or meetings.

144.    The MBA "ha[s] over 2,400 member companies, including all elements of real estate finance: mortgage companies, mortgage brokers, commercial banks, thrifts, life insurance companies and others in the mortgage field."  *See* http://mortgagebankers.org/AboutMBA.

145.    The MBA website states, "Make no mistake about it; we are an organization dedicated to helping our members do their business.  We actively advocate for our members, and have done so for nearly a century."  *Id*.

146.    As to MERS, upon information and belief, each defendant, or a subsidiary, affiliate or parent company of each defendant, is a member of MERS.

147.    MERS shareholders include the MBA and defendants Bank of America, CitiMortgage and Wells Fargo.

148.    The MERS Board of Directors currently includes employees of defendants: Diane Citron, Senior Vice President, Director of Strategy for Mortgage Operations at Ally; Kathy Gray, Executive Vice President at Wells Fargo; Brian McCrackin, Director of Finance at CitiMortgage; and Lawrence Washington, Managing Director and Servicing Portfolio Strategy Executive at Bank of America.

149.    According to the MERS website, the organization was

> created by the mortgage banking industry to streamline the mortgage process by using electronic commerce to eliminate paper.  Beneficiaries of MERS include mortgage originators, services, warehouse lenders, wholesale lenders, retail lenders, document custodians, settlement agents, title companies, insurers, investors, county recorders and consumers.  *See* http://www.mersinc.org/about-us/about-us (last visited April 12, 2013).

150.    With regard to both the MBA and MERS, David Stevens, President and CEO of the MBA, sits on the MERS Board of Directors.

151.    Both the MBA and MERS serve to facilitate coordination of defendants' activities in the mortgage industry and the pattern of related conduct in furtherance of their scheme.

152.    Defendants' association-in-fact extends beyond MERS and the MBA.

153.    At least seven defendants are associated-in-fact through an affiliation with robo-signers at the Harmon Law Offices, a law firm currently or previously located in Newton, Massachusetts:

| _Defendant_ | _Robo-signer(s) at the Harmon Law Offices_ |
| --- | --- |
| Ally (then GMAC) | Francis Nolan |
| Aurora | Andrew Harmon |
| Bank of America | Debora Corwin and Francis Nolan |
| Chase Home Finance | Francis Nolan |
| Flagstar | Francis Nolan |
| US Bank | Andrew Harmon |
| Wells Fargo | Andrew Harmon, Francis Nolan and Andre Osofsky |

154.    An investigation into the Harmon Law Firm by the Massachusetts Attorney General came to light in October 2010.  A website purporting to represent the firm's internet presence consists of a form to "order a reinstatement or payoff though this site" for "[h]omeowners and borrowers who are involved in a foreclosure case with [the firm]," with instructions about submitting the form.  _See_ http://www.hloreinstatement.com/ (last visited April 12, 2013).

155.    Defendants' collective association-in-fact is exemplified by way of their common involvement in conduct relating to plaintiffs.  Insofar as these connections have been identified to date, they are reflected in the tables above.

156.    Upon information and belief, information regarding securitization of plaintiffs' mortgages will further confirm defendants' association-in-fact as it pertains to plaintiffs.  For

example, in addition to the information above, it appears that Wells Fargo was involved in securitization of the Jones mortgage, and a subsidiary or an affiliate of defendant PNC Financial Services or its predecessor, National City Home Loan Services, Inc., was involved in securitization of the Hogan mortgage.

157.    In addition to the foregoing, US Bank is associated-in-fact with the former law firm Steven J. Baum, P.C., *supra*, by relationship with a former employee or individual affiliated with the firm, robo-signer Elpinki Bachakas.

## *Mail Fraud And Wire Fraud*

158.    Defendants have willfully and knowingly mailed or caused to be mailed numerous mailings in furtherance of their scheme to deceive borrowers, courts and the public in relation to mortgages and in order to unlawfully foreclose on homes.

159.    Defendants have willfully and knowingly transmitted or caused to be transmitted data, information or documents over the wires in furtherance of their scheme to deceive borrowers in relation to mortgages and in order to unlawfully foreclose on homes.

160.    Having devised a scheme to defraud and obtain money and property by false or fraudulent pretenses as set forth in this complaint, and in furtherance of such scheme, each defendant engaged in at least two racketeering acts.

161.    Each racketeering act comprises mail or wire fraud in violation of 18 U.S.C. § 1341 or § 1343, respectively, as appropriate.

162.    The following Racketeering Acts Table describes each racketeering act and identifies the parties involved and any associated robo-signer.

Racketeering Acts Table

| Plaintiff | RA No. | Description of Each RA & Names of Parties Involved | Associated Robo-signer |
|---|---|---|---|

Ally (then GMAC)

| Plaintiff | RA No. | Description of Each RA & Names of Parties Involved | Associated Robo-signer |
|---|---|---|---|
| Thurrott | 1 | On or about April 27, 2009, Ally (then GMAC) deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by means of wire, information, data or documents concerning a purported assignment of the plaintiff's mortgage to MERS. Parties: The defendant and MERS. | Francis Nolan (Harmon Law Offices) |
| | 2 | On or about April 16, 2010, Ally (then GMAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $283,000, among and between the defendant and FNMA. | |
| | 3 | On or about April 16, 2010, Ally (then GMAC), caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in Newton, Massachusetts, to a location in Norfok County, Massachusetts. Parties: the defendant or Francis Nolan and an agent of either. | Francis Nolan (Harmon Law Offices) |

Aurora

| | | | |
|---|---|---|---|
| Ralston | 4 | In or about October or November, 2009, Aurora caused to be deposited for the purpose of being sent or delivered by the Postal Service or a commercial carrier, or caused to be transmitted by means of wire, information, data or documents relating to a purported assignment of the plaintiff's mortgage, from a location in Scottsbluff, Nebraska to a location in in Massachusetts to a location in Scottsbluff, Nebraska. Parties: Theodore Schultz or the defendant and an agent of either. | |
| | 5 | On or about October 27, 2009, Aurora caused to be deposited for the purpose of being sent or delivered by the Postal Service or a commercial carrier, or caused to be transmitted by means of wire, information, data or documents relating to the plaintiff's mortgage to MERS. Parties: the defendant or Theodore Schultz and MERS. | |
| | 6 | On or about May 24, 2010, Aurora caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $288,000.00, to itself at a location in Nebraska. | |
| Terzis | 7 | In or about March 2008, Aurora caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Andrew Harmon and MERS. | Andrew Harmon (Harmon Law Offices) |
| | 8 | On or about April 14, 2008, Aurora caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, the amount of $252,850.00 to itself at a location in Colorado. | |
| | 9 | In or about April 2008, Aurora caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commerical carrier, or caused to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in Indiana to a location in Massachusetts. Parties: Stephen Broviak or the defendant and an agent of either. | |

Bank of America

| | | | |
|---|---|---|---|
| Ferris | 10 | In or about July 2011, Bank of America (s/b/m BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents concerning the plaintiff's mortgage from a location in California to a location in Massachusetts, and/or documents including an affidavit regarding facts relating to the plaintiff's mortgage, from Newton, Massachusetts to a location in Hampden County, Massachusetts. Parties: Michelle Girvan and the defendant. | Deborah Corwin (Harmon Law Offices) |
| | 11 | On or about August 4, 2010, Bank of America (s/b/m BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Francis Nolan and MERS. | Francis Nolan (Harmon Law Offices) |
| | 12 | On or about July 18, 2011, Bank of America (s/b/m BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $190,026.00, which sum or data regarding which sum was transferred or transmitted among and between FNMA to Bank of America (s/b/m BAC). | |

Bank of America *cont'd*

| | | | |
|---|---|---|---|
| Pariseau | 13 | In or about November 2008, Bank of America (successor to Countrywide) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Francis Nolan and MERS. | Francis Nolan (Harmon Law Offices) |
| | 14 | In or about January 2010, Bank of America (successor to Countrywide) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from Newton, Massachusetts to a location in Bristol County, Massachusetts. Parties: the defendant or Francis Nolan and the agent of either. | Francis Nolan (Harmon Law Offices) |
| | 15 | On or about January 18, 2010, Bank of America (successor to Countrywide) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $265,751.36, which sum or data regarding which sum was transferred or transmitted among and between FNMA to Bank of America (successor to Countrywide). | |

Bank of America *cont'd*

| | | | |
|---|---|---|---|
| Perry | 16 | On or about November 12, 2009, Bank of America (s/b/m BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, information, data or documents regarding the plaintiff's mortgage to MERS. Parties: the defendant or Andrew Harmon and MERS. | Andrew Harmon (Harmon Law Offices) |
| | 17 | In or about July 2010, Bank of America (s/b/m BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in Texas to a location in Massachusetts. Parties: Kathy Repka and the defendant. | |
| | 18 | On or about July 16, 2010, Bank of America (s/b/m BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $177,100.00, which sum or data regarding which sum was transferred or transmitted among and between Federal Home Loan Mortgage Corporation to Bank of America (s/b/m BAC). | |

Bank of America *cont'd*

| | | | |
|---|---|---|---|
| Weber | 19 | On or above December 9, 2008, Bank of America (then BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, information, data or documents concerning a purported assignment of the plaintiff's mortgage. Parties: the defendant or Francis Nolan and MERS. | Francis Nolan (Harmon Law Offices) |
| | 20 | On or about November 17, 2009, Bank of America (then BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $420,211.80, which sum or data regarding which sum was transferred or transmitted between and among FNMA and Bank of America (then BAC). | |
| | 21 | In or about November or December 2009, Bank of America (then BAC), caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit concerning the plaintiff's foreclosed property from a location in Texas to a location in Massachusetts. Parties: the defendant or Keri Selman and an agent of either. | |
| Williams | 22 | On or about May 4, 2009, Bank of America (then BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, information, data or documents concerning a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Francis Nolan and MERS. | Francis Nolan (Harmon Law Offices) |
| | 23 | On or about March 10, 2010, Bank of America (then BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, $323,589.78, which sum was transferred or transmitted among and between FNMA to Bank of America (then BAC) to MERS. | |
| | 24 | In or about January 2010, Bank of America (then BAC) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in Texas to a location in Massachusetts. Parties: the defendant or Sandra Williams and an agent of either. | |

Capital One (then Chevy Chase)

| Crofoot | 25 | In or about September 2009, Capital One (then Chevy Chase) deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by wire, information, data or documents concerning a purported assignment of the plaintiff's mortgage to MERS or an entity that provided such information to MERS. Parties: Jeffrey Huston or the defendant and MERS. | |
|---|---|---|---|
| | 26 | In or about September 2009, Capital One (then Chevy Chase) deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by wire, documents concerning the plaintiff's mortgage from a location in Maryland to a location in Washington, DC. Parties: Jeffrey Huston and the defendant. | |

Cincinnati Federal

| Silver | 27 | In or about September 2007, Cincinnati Federal caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commecial carrier, or caused to be transmitted by wire, a document relating to the plaintiff's mortgage to a location in Ohio. Parties: the defendant or its agent and the defendant. | |
|---|---|---|---|
| | 28 | In or about September 2007, Cincinnati Federal caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by wire, a document purporting to reflect an assignment of plaintiff's mortgage, to a location in Ohio. Parties: the defendant or its agent and the defendant. | |

CitiMortgage

| | | | |
|---|---|---|---|
| Anctil | 29 | On or about August 4, 2010, CitiMortgage caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, an affidavit regarding the plaintiff's mortgage, from a location in Missouri to a location in Massachusetts. Parties: Scott Scheiner and Korde & Associates. | |
| | 30 | In or about March 2011, CitiMortgage caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, a document regarding the plaintiff's mortgage, from a location in Missouri to a location in Massachusetts. Parties: Michael McDevitt and the defendant. | |
| | 31 | On or about August 4, 2010, CitiMortgage caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding the plaintiff's mortgage to MERS. Defendant and MERS. Parties: the defendant or Scott Scheiner and MERS. | |
| Silver | 32 | On or about December 21, 2010, CitiMortgage caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, the amount of $354,451.57, which sum or data about which sum was transferred among and between FNMA and CitiMortgage. | |
| | 33 | In or about October 2010, CitiMortgage caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents concerning foreclosure of the plaintiff's home including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in Missouri to a location in Massachusetts.  Parties: Michael McDevitt and the defendant. | |

DBNTC

| | | | |
|---|---|---|---|
| Hogan | 34 | In or about September 2009, DBNTC caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, documents relating to a purported assignment relating to a mortgage extended by Martin and Janice Hogan, to a location in Amherst, New York. Parties: the defendant and Pillar Processing. | |
| | 35 | In or about April 2010, DBNTC caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, documents relating to plaintiffs' foreclosed property, from Dutchess County to a location in Buffalo, New York. Parties: Steven J. Baum, PC and an agent of same. | |
| Jones | 36 | In or about January 2005, DBNTC, through a relationship with Litton Loan Servicing, caused to be deposited for delivery by the Postal Service or a private carrier, a purported assignment of the plaintiff's mortgage, from (a) a location in California to (b) a location in Massachusetts to (c) a location in Houston, Texas. Parties: the defendant or its agent and Litton Loan Servicing. | |
| | 37 | In or about October 2008, DBNTC, through its attorney in fact Litton Loan Servicing, caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in Texas to a location in Massachusetts.  Parties: Marti Noriega for Litton Loan Servicing or the defendant and an agent of either. | |
| | 38 | In or about October 2008, DBNTC, deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or transmitted or caused to be transmitted by means of wire, the amount of $240,900.00 to itself as trustee at a location in California. | |

Flagstar

| | | | |
|---|---|---|---|
| Babb | 39 | On or about January 22, 2009, Flagstar caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, the amount of $331,427.44, which sum or data regarding which sum was transferred among and between FNMA and Flagstar. | |
| | 40 | On or about January 22, 2009, Flagstar caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, an affidavit relating to foreclosure of the plaintiff's property, from a location in Michigan to a location in Massachusetts. Parties: Robert Stoudemire and the defendant. | |
| | 41 | On or about April 3, 2008, Flagstar caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Francis Nolan and MERS. | Francis Nolan (Harmon Law Offices) |

Fleet

| | | | |
|---|---|---|---|
| Reid | 42 | In or about November 2010, Fleet caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, or to be transmitted by means of wire, a purported assignment relating to the plaintiff's mortgage from a location in Florida to a location in Massachusetts. Parties: Daniel Schmidt or the defendant and an agent of either. | |
| | 43 | On or about November 9, 2010, Fleet caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, information, data or documents regarding the plaintiff's mortgage to MERS. Parties: Daniel Schmidt or the defendant and MERS. | |

Fremont/Signature

| | | | |
|---|---|---|---|
| Barbosa | 44 | On or about January 10, 2006, Fremont caused to be deposited for delivery by the Postal Service or a private carrier, a document reflecting the plaintiff's mortgage, from a location in Massachusetts to a location in California. Parties: the defendant or its agent and Defendant. | |
| | 45 | On or about June 30, 2008, Fremont deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or transmitted by wire, documents, data or information regarding the plaintiff's mortgage to MERS. Parties: Joyce Nelson or the defendant and MERS. | |
| | 46 | On or about June 30, 2008, Fremont deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or transmitted by wire, a purported assignment of the plaintiff's mortgage, from a location in California to a location in Massachusetts. Parties: the defendant or its agent and Doonan, Graves and Longoria. | |

Homeward Residential

| | | | |
|---|---|---|---|
| Kadlec | 47 | In or about January or February 2010, Homeward Residential (then AHMSI) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, a purported assignment regarding a mortgage extended by Donald Kadlec, from a location in Florida, to a location in Massachusetts. Parties: Kathy Smith and the defendant. | |
| | 48 | In or about January 2010, Homeward Residential (then AHMSI) caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: Kathy Smith or the defendant and MERS. | |
| | 49 | On or about July 2, 2010, Homeward Residential (then AHMSI), deposited or caused to be deposited for delivery by the Postal Service or private carrier, or caused to be transmitted by means of wire, the amount of $255,000.00 to itself at a location in Florida. Parties: the defendant (then AHMSI) and itself. | |

JPMorgan Chase and Chase Home Finance

| | | |
|---|---|---|
| Jorgensen | 50 | In or about March 2009, JPMorgan Chase deposited or caused to be depoisited or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, a document purporting to assign substitute trustees, from a location in Minnesota to a location in Maryland. Parties: Eric Tate or the defendant and an agent of either. | |
| | 51 | In or about April 2009, JPMorgan Chase caused to be depoisited or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, a document purporting to assign substitute trustees, from a location in Maryland to a location in Fairfax, Virginia. Parties: the defendant and Shapiro and Burson. | |
| Ryan | 52 | In or about May 2008, JPMorgan Chase deposited or caused to be depoisited or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, a purported assignment from a location in Ohio to a location in Massachusetts. Parties: the defendant or Christina Trowbridge and an agent of either. | |
| | 53 | In or about September 2008, JPMorgan Chase or Chase Home Finance caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, the sum of $325,138.66 among and between FNMA to JPMorgan Chase or Chase Home Finance. | |
| | 54 | In or about September 2008, JPMorgan Chase or Chase Home Finance caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from Newton, Massachusetts to a location in Middlesex County, Massachusetts. Parties: the defendant or Francis Nolan and an agent of either. | Francis Nolan (Harmon Law Offices) |

Money Warehouse

| | | | |
|---|---|---|---|
| Anctil | 55 | In or about April 2008, Money Warehouse deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by means of wire, documents reflecting plaintiff's mortgage from a location in Massachusetts to a location in Southampton, Pennsylvania. Parties: Defendant's agent and the defendant. | |
| | 56 | In or about April 2008, Money Warehouse deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by means of wire, information, data or documents concerning the plaintiff's mortgage to MERS. Parties: the defendant and MERS. | |

MortgageIt

| | | | |
|---|---|---|---|
| Lapidez | 57 | In or about August or September 2007, MortgageIt deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or transmitted by means of wire, documents reflecting the plaintiff's mortgage, from a location in Massachusetts to a location in Wyoming. Parties: Defendant or its agent and the defendant. | |
| | 58 | In or about September 2007, MortgageIt deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or transmitted by means of wire, documents reflecting the plaintiff's mortgage to MERS. Parties: the defendant and MERS. | |
| Lopes | 59 | In or about October 2006, MortgageIt caused to be deposited for delivery by the Postal Service or a private carrier, documents reflecting the plaintiff's mortgage, from a location in Massachusetts to a location in Wyoming. Parties: Deb Hildreth or MortgageIt and an agent of either. | |
| | 60 | In or about October or November 2007, MortgageIt deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by means of wire, information, data or documents concerning the plaintiff's mortgage to MERS. Parties: the defendant and MERS. | |

Ocwen

| | | |
|---|---|---|
| Barbosa | 61 | On or about January 10, 2006, HomeEq Servicing (as predecessor to Ocwen) deposited or caused to be deposited, or caused to be transmitted by wire, information, data or documents concerning the plaintiff's mortgage to MERS. Parties: HomeEq Servicing (as predecessor to Ocwen) and MERS. | |
| | 62 | At a point or at multiple points in or about January 2008 to until in or about May 2008, HomeEq Servicing (as predecessor to Ocwen) deposited or caused to be deposited for delivery by the Postal Service or private carrier, or caused to be transmitted by wire, information, data or documents relating to the plaintiff's mortgage to Wells Fargo. Parties: HomeEq Servicing (as predecessor to Ocwen) or Ocwen and Wells Fargo. | |
| Branch | 63 | At a point in or about May 2007 to in or about June 2011, Ocwen (as successor to Saxon Mortgage Services) delivered or caused to be delivered by the Postal Service or a private carrier, or to be transmitted by wire, information, data or documents concerning the plaintiff's mortgage to MERS. Parties: Ocwen (as successor to Saxon Mortgage Services) and MERS. | |

PHH Mortgage

| | | |
|---|---|---|
| Reid | 64 | On or about November 9, 2010, PHH Mortgage caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, information, data or documents regarding the plaintiff's mortgage to MERS. Parties: the defendant and MERS. | |
| | 65 | In or about May 2011, PHH Mortgage caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, or caused to be transmitted by means of wire, $142,248.02, to itself at a location in New Jersey. | |
| | 66 | In or about May or June 2011, PHH Mortgage caused to be deposited for delivery by the Postal Service or private carrier, or to be transmitted by wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in Florida to a location in Massachusetts. Tracy Johnson or Parties: the defendant and an agent of the defendant. | |

PNC/First Franklin

| | | | |
|---|---|---|---|
| Hogan | 67 | In or about November 2005, First Franklin caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, a mortgage extended by Martin and Janice Hogan to First Franklin, in the amount of $579,500, from a location in New York to a location in Idaho Falls, Idaho. Parties: the defendant and "Security Connection." | |
| | 68 | In or about April 2006, First Franklin caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, documents including a purported assignment of the plaintiff's mortgage, from a location in New York to a location in Idaho. Parties: the defendant and "Security Connection." | |
| | 69 | In or about February 2008, First Franklin or its parent caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private commercial carrier, documents relating to a purported assignment relating to a mortgage extended by Martin and Janice Hogan, to a location in Pittsburgh, PA. Parties: the defendant and Ray Ann Reidell at Home Loan Services, Inc. | |

Provident

| | | | |
|---|---|---|---|
| Bernat & Demers | 70 | In or about March 2007, Provident caused to be deposited for delivery by the Postal Service or a private carrier, a document reflecting the plaintiff's mortgage, from a location in Massachusetts to a location in California. Parties: the defendant or its agent and the defendant. | |
| | 71 | On or about March 9, 2007, Provident deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by wire, information, data or documents concerning a purported assignment of the plaintiff's mortgage to MERS or an entity that provided such information to MERS. Parties: the defendant or its agent and MERS. | |

US Bank

| | | | |
|---|---|---|---|
| Grillo | 72 | In or about August 2008, US Bank and Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Andrew Harmon and MERS. | Andrew Harmon (Harmon Law Offices) |
| | 73 | In or about October 2008, US Bank deposited or caused to be deposited for delivery by the Postal Service or a private carrier, or to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in South Carolina to a location in Massachusetts. Parties: Thomas Westmoreland and Kevin Marks and the defendant. | |
| | 74 | In or October 29, 2008, US Bank caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $575,000.00, which sum or data regarding which sum was transferred or transmitted among and between US Bank and US Bank, acting as Trustee for CSMC 2007-4, to Wells Fargo. | |
| Troske | 75 | On or about April 17, 2008, US Bank caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, information, data or documents concerning the plaintiff's mortgage to MERS. Parties: the defendant or Elpinki Bechakas and MERS. | Elpinki Bechakas (Steven J. Baum, P.C.) |
| | 76 | In or about March 2010, US Bank caused to be deposited for delivery by the Postal Service or a private carrier, documents relating to the foreclosure of the plaintiff's home, from a location in Dutchess County, New York, to a location in Buffalo, New York. Parties: an agent of Steven J. Baum, PC and Steven J. Baum, PC. | |
| | 77 | In or about August or September of 2008, US Bank caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, a notice of pendency of a foreclosure action relating to the plaintiff's mortgage. Parties: the defendant or its agent and the plaintiff. | |

Wells Fargo

| | | | |
|---|---|---|---|
| Barbosa | 78 | On or about June 30, 2008, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: Defendant or Joyce Nelson, Doonan, Graves & Longoria (Nicole Dove) and MERS. | |
| | 79 | In or about December 2008, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, the amount of $189,000.00, which sum or data regarding which sum was transferred or transmitted in connection with Securitized Asset Backed Receivables LLC Trust 2006-FR2 Mortgage Pass-Through Certificates Series 2006-FR2. Parties: Wells Fargo and the aforementioned trust or itself. | |
| | 80 | In or about December 2008, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit relating to foreclosure on plaintiff's home, from a location in Maryland to a location in Massachusetts. Parties: Kevin Tregdon and the defendant. | |

Wells Fargo *cont'd*

| | | | |
|---|---|---|---|
| Bernat & Demers | 81 | On or about March 15, 2011, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, the amount of $299,302.61, which sum or data regarding which sum was transferred among and between Wells Fargo and FNMA. | |
| | 82 | On or about May 10, 2010, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Andrew Harmon and MERS. | Andrew Harmon (Harmon Law Offices) |
| | 83 | In or about March 2011, Wells Fargo caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by wire, documents including an affidavit concerning the foreclosure of the plaintiff's mortgage, from Newton, Massachusetts to a location in Bristol Fall River County, Massachusetts. Parties: the defendant or Francis Nolan and an agent of either. | Andre Osofsky (Harmon Law Offices) |

Wells Fargo *cont'd*

| | | |
|---|---|---|
| Grillo | 84 | In or about February 2007, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding plaintiff's mortgage from a location in Massachusetts to a location in Montana. Parties: the defendant's agent in Massachusetts and the defendant. | |
| | 85 | In or about August 2008, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Andrew Harmon and MERS. | Andrew Harmon (Harmon Law Offices) |
| | 86 | In or about September or October 2008, Wells Fargo, acting as "attorney in fact" for U.S. Bank, NA, as Trustee for CSMC 2007-4, deposited or caused to be deposited to be delivered by the Postal Service or a private carrier, or transmitted by means of wire, documents including an affidavit relating the foreclosure of the plaintiff's property, from a location in South Carolina to a location in Massachusetts. Parties: Thomas Westmoreland and the defendant. | |

Wells Fargo *cont'd*

| | | | |
|---|---|---|---|
| Lapidez | 87 | On or about February 2, 2009, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Andrew Harmon and MERS. | Andrew Harmon (Harmon Law Offices) |
| | 88 | On or about August 27, 2009, Wells Fargo caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by means of wire, the amount of $453,212.14, which sum or data about which sum was transferred among and between Wells Fargo and FNMA. | |
| | 89 | In or about July or August 2009, Wells Fargo caused to be deposited for delivery by the Postal Service or a private carrier, or caused to be transmitted by means of wire, documents including an affidavit relating to the foreclosure of the plaintiff's home, from Newtown Highlands, Massachusetts to a location in Norfolk County, Massachusetts. Parties: the defendant or Francis Nolan and an agent of either. | Francis Nolan (Harmon Law Offices) |

Wells Fargo *cont'd*

| | | | |
|---|---|---|---|
| Lopes | 90 | In or about December 2008, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal service or a private or commercial carrier, or caused to be transmitted by means of wire, information, data or documents concerning a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant and Andrew Harmon or MERS. | Andrew Harmon (Harmon Law Offices) |
| | 91 | In or about February 2010, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents including an affidavit regarding facts relating to the plaintiff's mortgage, from Newton, Massachusetts to a location in Bristol County, Massachusetts. Parties: the defendant or Francis Nolan and an agent of either. | Francis Nolan (Harmon Law Offices) |
| | 92 | On or about February 26, 2010, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $206,399.72, which sum or data regarding which sum was transferred or transmitted among and between FNMA and Wells Fargo. | |

Wells Fargo *cont'd*

| | | | |
|---|---|---|---|
| McGough | 93 | In or about April 2009, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, data, information or documents regarding a purported assignment of the plaintiff's mortgage to MERS. Parties: the defendant or Andrew Harmon and MERS. | Andrew Harmon (Harmon Law Offices) |
| | 94 | In or about January 2010, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents concerning foreclosure of the plaintiff's home including an affidavit regarding facts relating to the plaintiff's mortgage, from Newton, Massachusetts to a location in Worcester County, Massachusetts. Parties: the defendant or Francis Nolan and an agent of either. | Francis Nolan (Harmon Law Offices) |
| | 95 | On or about January 18, 2010, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $171,500.00, which sum or data regarding which sum was transferred or transmitted between and among Federal Home Loan Mortgage Corporation and Wells Fargo. | |

Wells Fargo *cont'd*

| | | |
|---|---|---|
| Zicaro | 96 | In or about February 2009, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, documents concerning foreclosure of the plaintiff's home including an affidavit regarding facts relating to the plaintiff's mortgage, from a location in Maryland to a location in Massachusetts. Parties: Kevin Tregdon and the defendant. |
| | 97 | On or about October 11, 2007, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, information, data or documents concerning the plaintiff's mortgage to MERS. Parties: the defendant or Tonya Blechinger and MERS. |
| | 98 | In or about February 2009, Wells Fargo caused to be deposited for the purpose of being sent or delivered by the Postal Service or a private or commercial carrier, or caused to be transmitted by means of wire, $617,000.00, to itself as Trustee for Securitized Asset Backed Receivables LLC Trust 2006-FR3 Mortgage Pass-Through Certificates Series 2006-FR3. Parties: Wells Fargo and the aforementioned trust or itself as trustee. |

163.    Defendants willfully and knowingly used the mails or wires as reflected above in the Racketeering Acts Table to transmit document(s) relating to plaintiffs' mortgages or foreclosures on plaintiffs' homes in furtherance of defendants' fraudulent scheme.

164.    Defendants' use of the mails and wires is related, collectively and individually, in that such use has the similar purpose of furthering the scheme against plaintiffs and facilitating the process of ultimately obtaining foreclosures of their homes.

165.    Defendants used the mails and wires on a continuous basis, by transmitting documents in furtherance of their scheme throughout the relevant period.

166.    Defendants' use of the mails and wires extended over a substantial period of time, in that it occurred from at least as early as February 2007 until at least as late as July 2011, collectively, and in that it occurred at least two times with respect to each plaintiff, individually.

167.    Defendants' use of the mails and wires poses a threat of further continuity in light of the duration and scope of defendants' scheme and their continuous use of the mails and wires in furtherance of the scheme until at least as late as July 2011.

168.    Courts, public agencies and plaintiffs relied upon representations made by defendants in documents, data and information referred to in the table above.  Such reliance inured to the detriment of plaintiffs in that they lost their homes and property interests in their mortgages.

*Fraudulent Concealment*

169.    As members and beneficiaries of MERS, defendants (or their respective parents or subsidiaries) have utilized and continue to utilize the system to wrongfully conceal material defects in mortgage assignments and transfers, including those at issue here.

170.    The MERS website states, "Any loan registered on the MERS system is inoculated against future assignments because MERS remains the nominal mortgagee no matter how many times servicing is traded."  http://www.mersinc.org/about-us/about-us (last visited March 22, 2013).

171.    This statement is false and misleading because purported MERS assignments have been invalidated by a break in the chain of title or another infirmity that rendered an assignment null or void.

172.    The statement, located on the internet where homeowners were likely to and did read it, is deceptive: it falsely indicates MERS' status and the integrity of all loans registered on

MERS, regardless of underlying error or fraud including instances where robo-signers executed material documents without proper authority.

173.    Benefiting from their membership in MERS, defendants wrongfully concealed material facts relating to their wrongdoing.

174.    As late as November 2010, MERS insisted that use of the system rested upon sound legal principles. *See* testimony of former MERS Chief Executive Officer ("CEO") Mr. R.K. Arnold, November 16, 2010, Senate Banking, Housing and Urban Affairs Committee ("Arnold Tsm."), at 18, http://www.banking.senate.gov/public/index.cfm?FuseAction=Files. View&FileStore_id=1a958f85-bd10-4ac7-b5e1-9ad0c43d97c6 (last visited March 21, 2013).

175.    Notwithstanding its claim of soundness, MERS has made several admissions through former CEO Arnold:

a.    MERS was aware that some certifying officers were signing documents without authority at least as early as 2009. *See* Arnold Tsm. at 19.

b.    MERS knew of irregularities in document execution despite purported attempts at remediation.  As CEO Arnold testified:

> When we saw actions were being undertaken to accelerate foreclosure document processing, we became concerned that certifying officers might be pressured to perform their responsibilities in a manner inconsistent with the MERS rules. When we did not receive the assurances we thought appropriate that this would not happen, we suspended relationships with some prominent players involved in the foreclosure process. *Id.*

c.    MERS' awareness included knowledge that "some 'robo-signers' were MERS certifying officers." *Id.* at 20.

176.    Despite these admissions, former CEO Arnold testified, "I am hopeful that as people understand more about MERS and the role we play, they will see that MERS adds great

57

value to our nation's system of housing finance in ways that benefit not just financial institutions, the broader economy and the government, but—most of all—real people." *Id.* at 22.

177.    MERS speaks on behalf of defendants with regard to matters relating to MERS on the basis that:

      a.   MERS exists as a membership organization for the benefit of defendants;

      b.   MERS shareholders include certain defendants and the MBA, which advocates on behalf of defendants as a group; and

      c.   Half of the current MERS Board of Directors are employees of defendants or the MBA.

178.    Subsequent to MERS' insistence on the integrity of its system, a Consent Order was executed on April 13, 2011.  It stated that MERS' tracking and registration services were subject to inadequacies in MERS protocol, and that MERS services were improperly delivered.

179.    MERS concealed material and necessary facts pertaining to plaintiffs' claims until publication of the April 13, 2011 Consent Order.

180.    This concealment was intentional and knowing, and it furthered the concealment of defendants' fraudulent scheme.

181.    With regard to financial accounting standards, the mortgage industry including defendants exploited FASB Statement 140 and exploited its provisions in a manner inconsistent with transparency.

182.    During the relevant period, defendants employed accounting standards to deceive regulatory authorities, investors and the public including plaintiffs.

183.     Defendants used financial accounting standards to shift mortgage-related assets on and off balance sheets to generate the illusion of liquidity to finance and enable mortgage-related activities.

184.     On a quarterly basis during the relevant period, certain defendants submitted income statements to the FDIC.

185.     Such statements were false and deceptive insofar as they reflected defendants' use of accounting standards in furtherance of their scheme.  The falsity of such statements was and is concealed through submission of the statements themselves.

186.     Defendants have utilized MERS and financial accounting methods to conceal their fraudulent scheme and their conduct in furtherance of the scheme.

187.     Defendants' concealment has prevented and continues to impede discovery of their wrongdoing.

188.     Defendants' actions have included and continue to include concealing the nature and extent of their wrongdoing.

189.     Plaintiffs have exercised diligence in pursuing the discovery of defendants' wrongdoing; however, defendants' misrepresentations and false information have prevented and continue to prevent plaintiffs from doing so.

190.     Defendants' omissions include misrepresenting the true holder of plaintiffs' mortgages or the corresponding notes, failing to disclose material information necessary to establish standing to initiate foreclosure actions against plaintiffs, issuing income statements that reflected accounting standards to further the fraudulent scheme, dual-tracking home loan modifications and foreclosures, and concealing the nature and scope of the fraudulent acts.

191.    Defendants, and agents, assignees, transferees or counsel acting on defendants' behalf in foreclosure actions, failed to make disclosures required to evaluate the propriety of mortgage assignments and foreclosure actions concerning plaintiffs.

192.    Defendants' omissions misled plaintiffs, public agencies and courts by leading them to believe that defendants held mortgages or had standing to foreclose when they did not, and by concealing the identity of mortgage holders and relevant parties.

193.    Through their fraud, defendants obtained mortgages and foreclosures and related profits generated before and after such foreclosures.

<em>Parent Companies</em>

194.    Parent company defendants operated with their respective subsidiaries as a single entity for the purposes of furthering the fraudulent scheme.  The parent companies are intermixed with their respective subsidiaries to the point where, as a practical matter, there is no justification for distinguishing between them:

a.    CitiGroup, Citibank and CitiMortgage.  CitiGroup's subsidiaries include Citibank, which is Citigroup's consumer banking entity, and defendant CitiMortgage. CitiGroup and Citibank are essentially a corporate entity in its entirety, referring to themselves simply as "Citi" in correspondence to the Federal Reserve. http://www.federalreserve.gov/bankinforeg/citigroup-20120703.pdf CitiMortgage operations are conducted in Citibank locations throughout the country.  Citibank and CitiMortgage share branch locations and office space and offer coordinated financial services to consumers.

b.    Deutsche Bank, DBNTC, DBTC, and MortgageIt. The Deutsche Bank website lists DBNTC's address as one of Deutsche Bank's California office locations, and

the phone number provided as Deutsche Bank's contact for mortgaged-backed securities is DBNTC's phone number. DBNTC and Deutsche Bank share the same telephone number area code and initial four-number exchange. Deutsche Bank is the ultimate parent company of both DBNTC and DBTC. On the FDIC website, DBTC's corporate website is listed as Deutsche Bank's website. Deutsche Bank is also the parent company of MortgageIt, and, reflected in the tables above, both DBNTC and MortgageIt engaged in a pattern of conduct in furtherance of defendants' fraudulent scheme.

c. PNC, First Franklin and FNMC. First Franklin is or was a subsidiary of National City Bank. National City Bank sold First Franklin in 2006 but retained a substantial portion of its mortgages. FNMC was a "division" of National City Bank. PNC purchased National City Bank in October 2008.

195. The parent companies exercised dominion over their respective subsidiaries in connection with conduct in furtherance of defendants' fraud.

196. The subsidiaries acted under the direction of their respective parent companies, and the parent companies were fully aware of their subsidiaries' actions.

## V. Claims for Relief

### FIRST CLAIM
### Violation of Racketeer Influenced and Corrupt Organization Act
### 18 U.S.C. § 1962(c)
### Ally, Aurora, Bank of America, Chase Home Finance,
### Cincinnati Federal, CitiMortgage, Countrywide, DBNTC,
### First Franklin, Flagstar, Fremont/Signature, JPMorgan Chase,
### Money Warehouse, MortgageIt, Ocwen, PHH, PNC,
### Provident, US Bank and Wells Fargo

197.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

198.    At all relevant times, each defendant was a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

199.    The defendants, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  The defendants are, and have been, associated-in-fact, including through common participation in the MBA and MERS, and via an association among certain defendants with robo-signers at the Harmon Law Firm.

200.    Defendants are organized through an association-in-fact under the MBA.  All defendants, or a parent or subsidiary of each defendant, participate as members of the MBA; defendants Bank of America, CitiMortgage and Wells Fargo are shareholders; and, employees of defendants Wells Fargo, CitiMortgage and Bank of America serve on the MBA Board of Directors.

201.    Defendants are also organized through an association-in-fact via MERS.

202.    MERS shareholders include the MBA and defendants Bank of America, CitiMortgage and Wells Fargo, and the MERS Board of Directors includes employees of defendants Ally, Bank of America, CitiMortgage and Wells Fargo.

203.    MERS and the MBA are connected: the CEO of the MBA sits on the MERS Board of Directors.

204.     Ally (then GMAC), Aurora, Bank of America, Chase Home Finance, Flagstar, US Bank and Wells Fargo are associated-in-fact through their affiliation with the Harmon Law Firm and robo-signers at the firm.

205.     Defendants' enterprise engages in, and the activities of it affect, interstate commerce.  Defendants participating in the enterprise, and MERS and MBA members in general, include national banks with branches throughout the country.  Defendants' involvement in conduct relating to plaintiffs' mortgages and foreclosures on their homes affected interstate banking and financial activities.

206.     Defendants' scheme reflects a hierarchy and structure separate and apart from the pattern of racketeering in which the defendants engaged.  Defendants comprise a group of mortgage bankers who engage in various roles in the mortgage industry, including mortgage brokers or originators, entities involved in the securitization process, servicers and parties seeking foreclosure as purported mortgage holders, transferees or assignees.

207.     Defendants' conduct was willful and with full knowledge of the fraudulent scheme.

208.     Defendants participated in at least two instances of mail fraud or wire fraud conducted on their behalf in furtherance of their fraud, as reflected in the Racketeering Act Table above.

209.     Defendants' fraudulent conduct includes the use of MERS, which was involved as a nominee, beneficiary or mortgagee at some time during the life of a mortgage or a foreclosure involving each plaintiff except Julio Grillo, Mary Jones, Karl and Oksana Jorgensen, Michael Ryan, Benita and William Schriefer and Michael Silver.  Upon information and belief, each plaintiff's mortgage was included in the MERS database.

210.    Defendants received a financial benefit as a result of their association-in-fact, including, but not limited to, moneys or other fiscal benefits they have obtained through mortgages and foreclosures.

211.    Documents presented or filed on behalf of defendants in relation to plaintiffs' mortgages or during the course of foreclosure proceedings against plaintiffs were fraudulent. Such documents were presented or filed under the direction, or with the knowledge, of defendants.  Among other things, such documents repeatedly misrepresented defendants' status as mortgagees and MERS' role in connection with foreclosures.

212.    Defendants used their scheme to originate mortgages and expedite foreclosures by glossing over deficiencies in underlying transfers of property or assignments, or by filing or presenting fraudulent, false or misleading documents in public offices or courts.  This scheme enabled defendants to hide violations of state property and recording laws, while defendants' acts extinguished plaintiffs' property interests and legal protections intended to protect those interests.

213.    Plaintiffs would not have suffered the injuries described herein but for defendants' conduct in violation of RICO and applicable state and local laws.

214.    The injuries defendants caused plaintiffs were foreseeable, defendants' conduct directly caused such injuries, and there were no intervening causes aside from defendants' conduct.

## SECOND CLAIM
### Violation of Racketeer Influenced and Corrupt Organization Act
### 18 U.S.C. § 1962(c)
### Aurora

215.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

216.    At all relevant times, Aurora and Andrew Harmon were each a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

217.    Aurora and Andrew Harmon, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  They are or were associated-in-fact through their relationship with one another within the mortgage industry.

218.    The enterprise has engaged in, and the activities of it affect, interstate commerce. Aurora is and has been engaged in mortgage banking activities in numerous states.

219.    Aurora and Andrew Harmon's scheme reflects a hierarchy and structure separate and apart from the pattern of racketeering in which they engaged.  Andrew Harmon acted as a robo-signer on Aurora's behalf under the direction, or with the knowledge, of Aurora.

220.    Aurora and Andrew Harmon are organized in an association-in-fact through their business relationship with one another and by virtue of their participation in a scheme to defraud.

221.    Aurora and Andrew Harmon's conduct was willful and with full knowledge of the fraudulent scheme.

222.    Aurora participated in at least two instances of mail fraud or wire fraud conducted on its behalf in furtherance of its fraudulent scheme with Andrew Harmon, as reflected in the Racketeering Act Table above.

223.    Aurora and Andrew Harmon received a financial benefit for their association-in-fact, including, but not limited to, moneys or other fiscal benefits they have obtained through foreclosure on plaintiff Terzis' home.

224.     Documents filed in relation to this foreclosure on behalf of Aurora, or under the direction or with the knowledge of Aurora, were improper or fraudulent.

225.     Plaintiff Terzis would not have suffered the injuries described herein but for Aurora and Andrew Harmon's conduct in violation of RICO and applicable state and local laws.

226.     The injuries plaintiff Terzis suffered were foreseeable, Aurora and Andrew Harmon's conduct directly caused such injuries, and there were no intervening causes aside from that conduct.

**THIRD CLAIM**
**Violation of Racketeer Influenced and Corrupt Organization Act**
**18 U.S.C. § 1962(c)**
**Bank of America**

227.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

228.     At all relevant times, Bank of America (or its predecessor), Debra Corwin and Francis Nolan were each a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

229.     Bank of America (as successor or otherwise), Debra Corwin and Francis Nolan, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  They are or were associated-in-fact through their relationship with one another wihin the mortgage industry.

230.     The enterprise has engaged in, and the activities of it affect, interstate commerce. Bank of America is and has been engaged in mortgage banking activities in numerous states.

231.     Bank of America, Debra Corwin and Francis Nolan's scheme reflects a hierarchy and structure separate and apart from the pattern of racketeering in which they engaged.  Debra Corwin and Francis Nolan acted as robo-signers on Bank of America's behalf under the direction, or with the knowledge, of Bank of America.

232.    Bank of America, Debra Corwin and Francis Nolan's conduct was willful and with full knowledge of the fraudulent scheme.

233.    Bank of America, Debra Corwin and Francis Nolan are or were organized in an association-in-fact through their business relationship with one another and by virtue of their participation in a scheme to defraud.

234.    Bank of America participated in at least two instances of mail fraud or wire fraud conducted on its behalf in furtherance of its fraudulent scheme with Debra Corwin and Francis Nolan, as reflected in the Racketeering Act Table above.

235.    Bank of America, Debra Corwin and Francis Nolan received a financial benefit for their association-in-fact, including, but not limited to, moneys or other fiscal benefits they have obtained through foreclosure on the homes of plaintiffs Ferris, Pariseau, Weber and Williams.

236.    Documents filed in relation to these foreclosures on behalf of Bank of America or its predecessor(s) , or under the direction or with the knowledge of Bank of America or its predecessor(s), were improper or fraudulent.

237.    Plaintiffs Ferris, Pariseau, Weber and Williams would not have suffered the injuries described herein but for conduct by Bank of America, Debra Corwin and Francis Nolan in violation of RICO and applicable state and local laws.

238.    The injuries plaintiffs Ferris, Pariseau, Weber and Williams suffered were foreseeable; conduct by Bank of America, Debra Corwin and Francis Nolan directly caused such injuries; and, there were no intervening causes aside from that conduct.

**FOURTH CLAIM**
**Violation of Racketeer Influenced and Corrupt Organization Act**
**18 U.S.C. § 1962(c)**
**Flagstar**

239.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

240.     At all relevant times, Flagstar and Francis Nolan were each a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

241.     Flagstar and Francis Nolan, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  They are or were associated-in-fact through their relationship with one another within the mortgage industry.

242.     The enterprise has engaged in, and the activities of it affect, interstate commerce. Flagstar is and has been engaged in mortgage banking activities in numerous states.

243.     Flagstar and Francis Nolan's scheme reflects a hierarchy and structure separate and apart from the pattern of racketeering in which they engaged.  Francis Nolan acted as a robo-signer on Flagstar's behalf under the direction, or with the knowledge of, Flagstar.

244.     Flagstar and Francis Nolan are or were organized in an association-in-fact through their business relationship with one another and by virtue of their participation in a scheme to defraud.

245.     Flagstar and Francis Nolan's conduct was willful and with full knowledge of the fraudulent scheme.

246.     Flagstar participated in at least two instances of mail fraud or wire fraud conducted on its behalf in furtherance of its fraudulent scheme with Francis Nolan, as reflected in the Racketeering Act Table above.

247.    Flagstar and Francis Nolan received a financial benefit for their association-in-fact, including, but not limited to, moneys or other fiscal benefits they have obtained through foreclosure on the home of plaintiff Babb.

248.    Documents filed in relation to this foreclosure on behalf of Flagstar, or under the direction or with the knowledge of Flagstar, were improper or fraudulent.

249.    Plaintiff Babb would not have suffered the injuries described herein but for Flagstar and Francis Nolan's conduct in violation of RICO and applicable state and local laws.

250.    The injuries plaintiff Babb suffered were foreseeable, conduct by Flagstar and Francis Nolan directly caused such injuries, and there were no intervening causes aside from that conduct.


**FIFTH CLAIM**
**Violation of Racketeer Influenced and Corrupt Organization Act**
**18 U.S.C. § 1962(c)**
**JP Morgan Chase and Chase Home Finance**

251.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

252.    At all relevant times, JPMorgan Chase, Chase Home Finance and Francis Nolan were each a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

253.    JPMorgan Chase, Chase Home Finance and Francis Nolan, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  They are or were associated-in-fact through their relationship with one another in the mortgage industry.

254.    The enterprise has engaged in, and the activities of it affect, interstate commerce. JPMorgan Chase and Chase Home Finance are and have been engaged in mortgage banking activities in numerous states.

69

255.    JPMorgan Chase, Chase Home Finance and Francis Nolan's scheme reflects a hierarchy and structure separate and apart from the pattern of racketeering in which they engaged.  Francis Nolan acted as a robo-signer on JPMorgan Chase and Chase Home Finance's behalf under the direction, or with the knowledge, of JPMorgan Chase and Chase Home Finance.

256.    JPMorgan Chase, Chase Home Finance and Francis Nolan are or were organized in an association-in-fact through their business relationship with one another and by virtue of their participation in a scheme to defraud.

257.    JPMorgan Chase, Chase Home Finance and Francis Nolan's conduct was willful and with full knowledge of the fraudulent scheme.

258.    JPMorgan Chase and Chase Home Finance participated in at least two instances of mail fraud or wire fraud conducted on their behalf in furtherance of their fraudulent scheme with Francis Nolan, as reflected in the Racketeering Act Table above.

259.    JPMorgan Chase, Chase Home Finance and Francis Nolan received a financial benefit for their association-in-fact, including, but not limited to, moneys or other fiscal benefits they have obtained through foreclosure on the home of plaintiff Ryan.

260.    Documents filed in relation to this foreclosure on behalf of JPMorgan Chase and Chase Home Finance, or under the direction or with the knowledge of JPMorgan Chase and Chase Home Finance, were improper or fraudulent.

261.    Plaintiff Ryan would not have suffered the injuries described herein but for JPMorgan Chase, Chase Home Finance and Francis Nolan's conduct in violation of RICO and applicable state and local laws.

262.     The injuries plaintiff Ryan suffered were foreseeable, conduct by JPMorgan

Chase, Chase Home Finance and Francis Nolan directly caused such injuries, and there were no

intervening causes aside from that conduct.

**SIXTH CLAIM**
**Violation of Racketeer Influenced and Corrupt Organization Act**
**18 U.S.C. § 1962(c)**
**US Bank (Harmon)**

263.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

264.     At all relevant times, US Bank and Andrew Harmon were each a "person" within

the meaning of RICO, 18 U.S.C. § 1961(3).

265.     US Bank and Andrew Harmon, or their assigns, affiliates or successors, comprise

an "enterprise" as defined in 18 U.S.C. § 1961(4).  They are or were associated-in-fact through

their relationship with one another in the mortgage industry.

266.     The enterprise has engaged in, and the activities of it affect, interstate commerce.

US Bank is and has been engaged in mortgage banking activities in numerous states.

267.     US Bank and Andrew Harmon's scheme reflects a hierarchy and structure

separate and apart from the pattern of racketeering in which they engaged.  Andrew Harmon

acted as a robo-signer on US Bank's behalf under the direction, or with the knowledge, of US

Bank.

268.     US Bank and Andrew Harmon are or were organized in an association-in-fact

through their business relationship with one another and by virtue of their participation in a

scheme to defraud.

269.     US Bank and Andrew Harmon's conduct was willful and with full knowledge of

the fraudulent scheme.

270.    US Bank participated in at least two instances of mail fraud or wire fraud conducted on its behalf in furtherance of its fraudulent scheme with Andrew Harmon, as reflected in the Racketeering Act Table above.

271.    US Bank and Andrew Harmon received a financial benefit for their association-in-fact, including, but not limited to, moneys or other fiscal benefits they have obtained through foreclosure on the home of plaintiff Grillo.

272.    Documents filed in relation to this foreclosure on behalf of US Bank, or under the direction or with the knowledge of US Bank, were improper or fraudulent.

273.    Plaintiff Grillo would not have suffered the injuries described herein but for US Bank and Andrew Harmon's conduct in violation of RICO and applicable state and local laws.

274.    The injuries plaintiff Grillo suffered were foreseeable, conduct by US Bank and Andrew Harmon directly caused such injuries, and there were no intervening causes aside from that conduct.

**SEVENTH CLAIM**
**Violation of Racketeer Influenced and Corrupt Organization Act**
**18 U.S.C. § 1962(c)**
**US Bank (Baum)**

275.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

276.    At all relevant times, US Bank and Elpinki Bachakas were each a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

277.    US Bank and Elpinki Bachakas, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  They are or were associated-in-fact through their relationship with one another within the mortgage industry.

278.    The enterprise has engaged in, and the activities of it affect, interstate commerce. US Bank is and has been engaged in mortgage banking activities in numerous states.

279. US Bank and Elpinki Bachakas's scheme reflects a hierarchy and structure separate and apart from the pattern of racketeering in which they engaged. Elpinki Bachakas acted as a robo-signer on US Bank's behalf under the direction, or with the knowledge, of US Bank.

280. US Bank and Elpinki Bachakas are or were organized in an association-in-fact through their business relationship with one another and by virtue of their participation in a scheme to defraud.

281. US Bank and Elpinki Bachakas' conduct was willful and with full knowledge of the fraudulent scheme.

282. US Bank participated in at least two instances of mail fraud or wire fraud conducted on its behalf in furtherance of its fraudulent scheme with Elpinki Bachakas, as reflected in the Racketeering Act Table above.

283. US Bank and Elpinki Bachakas received a financial benefit for their association-in-fact, including, but not limited to, moneys or other fiscal benefits they have obtained through foreclosure on the home of plaintiff Troske.

284. Documents filed in relation to this foreclosure on behalf of US Bank, or under the direction or with the knowledge of US Bank, were improper or fraudulent.

285. Plaintiff Troske would not have suffered the injuries described herein but for US Bank and Elpinki Bachakas's conduct in violation of RICO and applicable state and local laws.

286. The injuries plaintiff Troske suffered were foreseeable, conduct by US Bank and Elpinki Bachakas directly caused such injuries, and there were no intervening causes aside from that conduct.

**EIGHTH CLAIM**
**Violation of Racketeer Influenced and Corrupt Organization Act**
**18 U.S.C. § 1962(c)**
**Wells Fargo**

287.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

288.    At all relevant times, Wells Fargo, Andrew Harmon, Francis Nolan and Andre Osofsky were each a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

289.    Wells Fargo, Andrew Harmon, Francis Nolan and Andre Osofsky, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4). They are or were associated-in-fact through their relationship with one another within the mortgage industry.

290.    The enterprise has engaged in, and the activities of it affect, interstate commerce. Wells Fargo is and has been engaged in mortgage banking activities in numerous states.

291.    Wells Fargo, Andrew Harmon, Francis Nolan and Andre Osofsky's scheme reflects a hierarchy and structure separate and apart from the pattern of racketeering in which they engaged.  Andrew Harmon, Francis Nolan and Andre Osofsky acted as robo-signers on Wells Fargo's behalf under the direction, or with the knowledge, of Wells Fargo.

292.    Wells Fargo, Andrew Harmon, Francis Nolan and Andre Osofsky are or were organized in an association-in-fact through their business relationship with one another and by virtue of their participation in a scheme to defraud.

293.    Wells Fargo, Andrew Harmon, Francis Nolan and Andre Osofsky's conduct was willful and with full knowledge of the fraudulent scheme.

294.    Wells Fargo participated in at least two instances of mail fraud or wire fraud conducted on its behalf in furtherance of its fraudulent scheme with Andrew Harmon, Francis Nolan and Andre Osofsky, as reflected in the Racketeering Act Table above.

295.    Wells Fargo, Andrew Harmon, Francis Nolan and Andre Osofsky received a financial benefit for their association-in-fact, including, but not limited to, moneys or other fiscal benefits they have obtained through foreclosure on the homes of plaintiffs Bernat and Demers, Grillo, Lapidez, Lopes and McGough.

296.    Documents filed in relation to these foreclosures on behalf of Wells Fargo, or under the direction or with the knowledge of Wells Fargo, were improper or fraudulent.

297.    Plaintiffs Bernat and Demers, Grillo, Lapidez, Lopes and McGough would not have suffered the injuries described herein but for Wells Fargo, Andrew Harmon, Francis Nolan and Andre Osofsky's conduct in violation of RICO and applicable state and local laws.

298.    The injuries plaintiffs Bernat and Demers, Grillo, Lapidez, Lopes and McGough suffered were foreseeable; conduct by Wells Fargo, Andrew Harmon, Francis Nolan and Andre Osofsky directly caused such injuries; and, there were no intervening causes aside from that conduct.

## NINTH CLAIM
### Violation of Racketeer Influenced and Corrupt Organization Act
### 18 U.S.C. § 1962(a)
### Bank of America, Citibank, Citigroup, Deutsche Bank, DBNTC, DBTC, Flagstar, JPMorgan Chase, US Bank and Wells Fargo

299.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

300.    At all relevant times, each defendant was a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

301.    The defendants, or their assigns, affiliates or successors, comprise an "enterprise" as defined in 18 U.S.C. § 1961(4).  The defendants are, and have been, associated-in-fact, including through common participation in the MBA and MERS, and via an association among certain defendants with robo-signers at the Harmon Law Firm.

302.     Defendants are organized through an association-in-fact under the MBA.  All defendants, or a parent or subsidiary of each defendant, participate as members of the MBA; defendants Bank of America, CitiMortgage and Wells Fargo are shareholders; and, employees of defendants Bank of America, CitiMortgage and Wells Fargo serve on the MBA Board of Directors.

303.     Defendants are also organized through an association-in-fact via MERS.

304.     MERS shareholders include the MBA and defendants Bank of America, CitiMortgage and Wells Fargo, and the MERS Board of Directors includes employees of defendants Ally, Bank of America, CitiMortgage and Wells Fargo.

305.     MERS and the MBA are connected: the CEO of the MBA sits on the MERS Board of Directors.

306.     Bank of America, Flagstar, US Bank and Wells Fargo are associated-in-fact through their affiliation with the Harmon Law Firm and robo-signers at the firm.

307.     Defendants' enterprise engages in, and the activities of it affect, interstate commerce.  Defendants participating in the enterprise, and MERS and MBA members in general, include national banks with branches throughout the country.  Defendants' involvement in conduct relating to plaintiffs' mortgages and foreclosures on their homes affected interstate banking and financial activities.

308.     Defendants' scheme reflects a hierarchy and structure separate and apart from the pattern of racketeering in which the defendants engaged.  Defendants comprise a group of mortgage bankers who engage in various roles in the mortgage industry, including mortgage brokers or originators, entities involved in the securitization process, servicers and parties seeking foreclosure as purported mortgage holders, transferees or assignees.

309.    Defendants' conduct was willful and with full knowledge of the fraudulent scheme.

310.    Defendants' scheme encompassed exploiting FASB Statement 140, which defendants had persuaded the FASB to issue through a campaign by the MBA.  Defendants' exploitation of FASB Statement 140 was contrary to the purpose and intent of the financial accounting standards it set forth.

311.    Defendants exploited accounting standards contained in FASB Statement 140 to create the illusion of liquidity, gains or losses by purporting to transfer assets while retaining ownership or financial interests in such assets.  Defendants engaged in this conduct in order to generate and procure income for investment in mortgage-related assets or business transactions, including activity related to plaintiffs' mortgages.

312.    During the relevant period, Bank of America, Citibank, Citigroup (through affiliation with Citibank as a subsidiary), Deutsche Bank (through affiliation with DBTC as a subsidiary), DBNTC (through affiliation with DBTC as a parent), Flagstar, JPMorgan Chase, US Bank and Wells Fargo (the "1962(a) Defendants") engaged in a pattern of submitting quarterly income statements to the FDIC.

313.    The 1962(a) Defendants' income statements reflected their use of financial accounting standards in furtherance of their scheme.

314.    The 1962(a) Defendants' income statements included accounting in relation to assets that appear to have remained under their control while being reported as sales, for example, instances where the 1962(a) Defendants retained custody or maintained significant involvement in mortgages during or after securitization.

77

315.    The 1962(a) Defendants willfully and intentionally submitted income statements to the FDIC in furtherance of their scheme against plaintiffs and other mortgagors, such conduct comprising a fraud against the FDIC ("specified unlawful activity"), in violation of 18 U.S.C. § 1005.

316.    The 1962(a) Defendants participated or shared in or received, directly or indirectly, moneys, profits, property or benefits through the specified unlawful activity, including illusory financial positions created to further the scheme.

317.    The 1962(a) Defendants knowingly engaged in monetary transactions utilizing income from the specific unlawful activity to finance or enable purchases of mortgages, the securitization of mortgages, and foreclosures, including such activity with relation to plaintiffs as set forth in this complaint, in amounts greater than $10,000 in each instance, in violation of 18 U.S.C. § 1957(a).

318.    The 1962(a) Defendants received profits or moneys through perpetrating their scheme ("racketeering income").

319.    The 1962(a) Defendants invested racketeering income into mortgage-related activities including conduct directed against plaintiffs, such as buying and selling their mortgages and securitizing same, and expediting foreclosures.

320.    Plaintiffs suffered injury as a result of the 1962(a) Defendants' investment of racketeering income into mortgage-related activities, including the loss of plaintiffs' mortgages and improper foreclosure on their homes.

321.    The injuries the 1962(a) Defendants caused plaintiffs were foreseeable, the defendants' conduct directly caused such injuries, and there were no intervening causes aside from the defendants' conduct.

**TENTH CLAIM**
**Violation of New York General Business Law, Section 349**
**Deceptive Acts and Practices**

322.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

323.    New York General Business Law ("GBL") § 349 prohibits deceptive acts and practices in the conduct of any business, trade or commerce.  Defendants' scheme comprised a means and method by which they perpetrated fraud in connection with mortgages and the foreclosure process.  This fraud occurred in the conduct of the defendants' business as a matter of course, throughout mortgage origination, subsequent acts including the transfer or assignment of mortgages, loan modifications and foreclosure proceedings.  The pattern of fraudulent acts represented a status quo for the defendants.

324.    Plaintiffs Hogan and Troske (the "New York Plaintiffs") are "consumers" as defined in § 349.

325.    Defendants First Franklin, PNC and U.S. Bank (the "New York Defendants") conducted trade and commerce in New York within the meaning of § 349.

326.    The New York Defendants' acts include making misrepresentations and filing documents with false information in relation to mortgages, assignments and foreclosure proceedings against plaintiffs.  Robo-signers executed documents without reading them or verifying their accuracy.  Such fraudulent or false documents, whether in relation to mortgages, assignments or foreclosure proceedings, led to the eviction of plaintiffs from their homes.

327.    The New York Defendants engaged in deceptive or unfair acts or practices in connection with loan modifications, by dual-tracking such negotiations with foreclosure proceedings.

328.    The New York Defendants' statements had the capacity, likelihood and tendency to deceive and confuse consumers and public offices or agencies and courts in which documents were presented or filed on behalf of the New York Defendants.

329.    The New York Defendants' acts materially misled the New York Plaintiffs, consumers, the public and the courts.

330.    The deceptive acts and practices of the New York Defendants have directly, foreseeably and proximately harmed the New York Plaintiffs.  Damages include actual and statutory damages and the loss of property interests and legal protections intended for plaintiffs and the public.

## ELEVENTH CLAIM
### Common Law Fraud – New York

331.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein, including the foregoing paragraphs relating specifically to the New York Defendants and the New York Plaintiffs.

332.    The New York Defendants made misrepresentations or omissions of material facts in connection with mortgages and foreclosures relating to the New York Plaintiffs, including but not limited to the status of the mortgage holder, assignee or transferee, and facts relating to loan modifications, to the New York Plaintiffs and others.

333.    The New York Defendants made the misrepresentations or omissions at issue willfully, knowing that they were false.

334.    The New York Defendants made the misrepresentations or omissions at issue with the intention of inducing reliance by the New York Plaintiffs and public agencies and courts in the State of New York.

335.     The New York Plaintiffs and public agencies and courts of the State of New York reasonably relied on the material misrepresentations or material omissions in relation to foreclosure proceedings against the New York Plaintiffs.

336.     The foregoing caused injury to the New York Plaintiffs, including but not limited to the loss of their homes and property interests.

## TWELFTH CLAIM
### Violation of the Consumer Protection Act,
### Massachusetts General Laws, Chapter 93A

337.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

338.     Massachusetts G. L. c. 93A § 2 provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  In the power of sale context, Massachusetts law requires that an entity wishing to foreclose must file an affidavit demonstrating compliance with G. L. c. §§ 15 and 35A, *supra*.

339.     The failure of banks seeking foreclosure to comply with applicable Massachusetts law has become well known.  There was widespread use of robo-signers who purportedly executed hundreds if not thousands of documents without personal knowledge as to the substance of the affidavits they signed.  This practice included, without limitation, assignments and documents submitted in connection with mortgages and foreclosure proceedings.

340.     As discussed throughout this complaint, defendants participated in a scheme to profit from generating mortgages and expediting foreclosures through a pattern of fraud.  These business practices were structured to deceive and unfairly deprive plaintiffs of their property interests and legal protections intended to ensure those interests, in violation of applicable laws.

341.     Defendants Ally, Aurora, Bank of America, Chase Home Finance, Cincinnati Federal, CitiGroup, CitiMortgage, Countrywide, DBNTC, Flagstar, Fremont/Signature,

Homeward Residential, JPMorgan Chase, Money Warehouse, MorgageIt, Ocwen, PHH

Mortgage, PNC Financial Services, Provident Funding Group, U.S. Bank and Wells Fargo (the

"Massachusetts Defendants") were engaged in trade or commerce within the meaning of M.G.L.

c. 93A § 1.

342.     Plaintiffs Anctil, Babb, Barbosa, Bernat and Demers, Ferris, Grillo, Jones,

Kadlec, Lapidez, Lopes, James and Priscilla McGough, Pariseau, Mark and Lisa Perry, Ralston,

Reid, Ryan, Silver, Terzis, Thurrott, Weber, Williams and Zicaro (the "Massachusetts

Plaintiffs") engaged in commerce within the meaning of M.G.L. ch. 93A § 11 through the

purchases of homes and by extending mortgages to the Massachusetts Defendants.

343.     The Massachusetts Defendants failed to comply with applicable Massachusetts

foreclosure statutes, and they knew or should have known that their conduct was unfair and

deceptive.

344.     The Massachusetts Defendants also engaged in deceptive or unfair acts or

practices in connection with loan modifications, by dual-tracking such negotiations with

foreclosure proceedings.

345.     The Massachusetts Defendants' actions alleged herein constitute unfair and/or

deceptive acts or practices in the conduct of trade or commerce within the meaning of, and in

violation of, M.G.L. c. 93A §§ 2 and 9.

346.     The Massachusetts Defendants' actions described above occurred within the

Commonwealth of Massachusetts, in connection with mortgages or related foreclosures in that

state.

347.     The Massachusetts Plaintiffs suffered monetary damages and the loss of legal

protections as a result of the Massachusetts Defendants' actions alleged above.

348.   On March 12, 2013, the Massachusetts Plaintiffs provided the Massachusetts Defendants (except Chase Home Finance, which is an arm of JPMorgan Chase) with written notice of the instant claim and a demand for relief pursuant to M.G.L. ch. 93A § 9.

## THIRTEENTH CLAIM
### Common Law Fraud – Massachusetts

349.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein, including the preceding paragraphs relating specifically to the Massachusetts Defendants and the Massachusetts Plaintiffs.

350.   The Massachusetts Defendants knowingly made false statements or omissions to the Maryland Plaintiffs and others, which included material misrepresentations regarding the Massachusetts Defendants' status as mortgage holders, assignees or transferees, during and in connection with foreclosure proceedings relating to the Massachusetts Plaintiffs.  The Massachusetts Defendants also made misstatements or statements made with the intention to deceive, in relation to home loan modifications.

351.   The Massachusetts Defendants made the false statements or omissions at issue willfully, and with the intent to deceive the Massachusetts Plaintiffs and public agencies and courts in the State of Massachusetts.

352.   The false statements or omissions at issue were material.  Among other things, they related to the status of the Massachusetts Defendants for the purposes of determining compliance with applicable state foreclosure laws, when the Massachusetts Defendants were in violation of same.

353.   The Massachusetts Plaintiffs, and public agencies and courts in the State of Massachusetts reasonably relied on the Massachusetts Defendants' material misrepresentations or omissions.

354.     The Massachusetts Plaintiffs suffered injury as a result of their reliance, including but not limited to the loss of their homes and property interests.

### FOURTEENTH CLAIM
### Violation of Maryland Code Ann., Com. Law II § 13-303
### Unfair or Deceptive Trade Practices

355.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

356.     Title 13 of the Maryland Commercial Law (the "Maryland Consumer Protection Act") proscribes unfair or deceptive trade practices in Subtitle 3, § 13-303.  The defendants' scheme comprised a means and method by which they perpetrated fraud in connection with mortgages and the foreclosure process.  This fraud occurred in the conduct of defendants' business as a matter of course, throughout mortgage origination, subsequent acts including the transfer or assignment of mortgages, and foreclosure proceedings.  The pattern of fraudulent acts represented a status quo for the defendants.

357.     Plaintiffs George Branch, Gary Crofoot, Karl and Oksana Jorgensen and Benita and William Schriefer (the "Maryland Plaintiffs") sustained injury or loss as a result of conduct prohibited by § 13-303, within the meaning of the Maryland Consumer Protection Act § 13-408.

358.     Defendants Bank of America, Capital One, JPMorgan Chase, Ocwen and PNC (the "Maryland Defendants") conducted trade and commerce in Maryland and elsewhere within the meaning of § 13-303.

359.     The Maryland Defendants' acts include making misrepresentations and presenting and filing documents with false information in relation to mortgages, assignments and foreclosure proceedings against plaintiffs.  Robo-signers executed documents without reading them or verifying their accuracy.  Such fraudulent or false documents, whether in relation to mortgages, assignments or foreclosure proceedings, led to the eviction of plaintiffs.

84

360.     The Maryland Defendants also engaged in deceptive or unfair acts or practices in connection with loan modifications, by dual-tracking such negotiations with foreclosure proceedings.

361.     The Maryland Defendants' statements had the capacity, likelihood and tendency to deceive and confuse consumers and public offices or agencies and courts in which documents were presented or filed on behalf of the Maryland Defendants.

362.     The Maryland Defendants' acts materially misled the Maryland Plaintiffs, consumers, the public and the courts.

363.     The deceptive acts and practices of the Maryland Defendants have directly, foreseeably and proximately harmed the Maryland Plaintiffs.  Damages include monetary damages and the loss of property interests and legal protections intended for plaintiffs and the public.

## FIFTEENTH CLAIM
### Common Law Fraud – Maryland

364.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein, including the preceding paragraphs relating specifically to the Maryland Defendants and the Maryland Plaintiffs.

365.     The Maryland Defendants knowingly made false statements or omissions to the Maryland Plaintiffs and others, which included material misrepresentations regarding their status as mortgage holders, assignees or transferees, during and in connection with foreclosure proceedings relating to the Maryland Plaintiffs.  The Maryland Defendants made misstatements or statements made with the intention to deceive in relation to home loan modifications.

366.     The Maryland Defendants made the false statements or omissions at issue willfully, and with the intent to deceive the Maryland Plaintiffs and public agencies and courts in

the State of Maryland, or the Maryland Defendants made such statements or omissions with reckless indifference as to the truth.

367.   The Maryland Defendants made the false statements or omissions at issue with the purpose of defrauding the Maryland Plaintiffs and public agencies and courts in the State of Maryland.

368.   The false statements or omissions at issue were material.  Among other things, they related to the status of the Maryland Defendants for the purposes of determining compliance with applicable state foreclosure laws, when the Maryland Defendants were in violation of same.

369.   The Massachusetts Plaintiffs, and public agencies and courts in the State of Massachusetts, reasonably relied on the Massachusetts Defendants' material misrepresentations or omissions.

370.   The Massachusetts Plaintiffs suffered injury as a result of their reliance, including but not limited to the loss of their homes and property interests.

## VI.  Prayer For Relief

WHEREFORE, plaintiffs request judgment against defendants, jointly and severally, and for relief as follows:

(a)     Disgorgement of all profits connected to each plaintiff's mortgage;

(b)     Actual damages;

(c)     Statutory damages;

(d)     Treble damages;

(e)     Prejudgment interest as permitted by law;

(f)     Reasonable attorneys' fees and costs;

(g)     Interest on the judgment as provided by law; and

(h)     Such other relief as the Court deems just and proper.

## VII.    Jury Request

Plaintiffs demand a trial by a jury of all triable issues.


Dated: April 12, 2013                                     Respectfully submitted,

                                                          Zoe Dolan
                                                          One of the attorneys for Plaintiffs

Scott A. Kamber
KAMBERLAW, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Tel: (212) 920-3072
skamber@kamberlaw.com

Zoe Dolan
Law Offices of Zoe Dolan
154 Grand Street
New York, New York 10013
Tel: (347) 301-5180
zdolan@gmail.com