UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

JOHN ANCTIL, LEE BABB, GISELE BARBOSA,
CHRISTINE BERNAT, GEORGE BRANCH,
GARY CROFOOT, PAUL DEMERS, CHARLES
and CONSUELO FERRIS, JULIO GRILLO,
MARTIN and JANICE HOGAN, MARY JONES,
KARL and OKSANA JORGENSEN, DONALD
KADLEC, SANDRA LAPIDEZ, JOHN LOPES,
JAMES and PRISCILLA MCGOUGH, FRANCIS
PARISEAU, MARK and LISA PERRY, REBECCA
RALSTON, DOROTHY CARPENTER-REID, MICHAEL
RYAN, BENITA and WILLIAM SCHRIEFER, MICHAEL
SILVER, FLAVIO TERZIS, JONATHAN THURROTT,
NANCY TROSKE, INGRID WEBER, KELLY
WILLIAMS, and MATTHEW ZICARO,

    Plaintiffs,

                -against-

ALLY FINANCIAL, INC., AURORA LOAN SERVICES,
LLC, BANK OF AMERICA, N.A., CHASE HOME
FINANCE, LLC, CINCINNATI FEDERAL SAVINGS
AND LOAN, CITIBANK, N.A., CITIGROUP, INC.,
CITIMORTGAGE, INC., COUNTRYWIDE HOME
LOANS, INC., DEUTSCHE BANK, AG, DEUTSCHE
BANK NATIONAL TRUST CO., FIRST FRANKLIN
LOAN SERVICES, FLAGSTAR BANK, FSB, FREMONT
INVESTMENT AND LOAN CORP., HOMEWARD
RESIDENTIAL, JPMORGAN CHASE & CO., MONEY
WAREHOUSE, MORTGAGEIT, INC., OCWEN
FINANCIAL CORPORATION, PHH MORTGAGE, THE
PNC FINANCIAL SERVICES GROUP, INC.,
PROVIDENT FUNDING GROUP, INC., SIGNATURE
GROUP HOLDINGS, INC., U.S. BANK, N.A., and
WELLS FARGO, N.A.,

    Defendants.

-----------------------------------------------------------------------X

**PLAINTIFFS'
RESPONSE TO
DEFENDANTS'
MOTIONS TO
DISMISS**

Table Of Contents

Table Of Contents ................................................................................................................. i

Table Of Authorities .......................................................................................................... iii

Preliminary Statement ......................................................................................................... 1

Introduction

   Defendants' Fraudulent Scheme Has Harmed Plaintiffs And The Public ................................... 2

   Submissions By Three Defendants Support The Sufficiency Of The Complaint ....................... 6

Argument

   I.     No "Threshold" Issues Bar Plaintiffs' Claims.

          A.  The *Rooker/Feldman* Doctrine, *Res Judicata* And
              Collateral Estoppel Are Inapplicable ................................................ 7

          B.  Pre-foreclosure Defendants Are Liable .................................................. 13

          C.  Liability Reaches Certain Parent Companies .......................................... 15

          D.  Fraudulent Concealment Tolls The Statutes Of Limitations ................................ 17

   II.    Each Claim Has Been Appropriately Pled Under Rules 12(b)(6) and 9(b).

          A.  Standard Of Review ........................................................................ 20

          B.  The Foreclsure Judgments Were Fraudulently Procured ................................ 21

          C.  The RICO Claims Are Well-Pled .......................................................... 24

          D.  The Consumer Protection Claims Are Appropriately Pled .......................... 28

          E.  The Common Law Fraud Claims Are Adequately Set Forth ...................... 32

   III.   Response To Defendants' Supplemental Motions

          A.  PNC ......................................................................................... 34

          B.  DBNTC ..................................................................................... 36

          C.  Deutsche Bank And MortgageIT .......................................................... 38

D.  Ally Financial, Inc ................................................................................. 38

IV.  In The Event This Court May Find The Claims Deficient,
Plaintiffs Request Leave To Amend The Complaint ................................... 38

Conclusion ................................................................................................... 40

Table Of Authorities

Cases

*Abbas v. Dixon*,
  480 F.3d 636 (2d Cir. 2007) ................................................................... 17

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ..................................................................... 38

*Anschutz Corp. v. Merrill Lynch & Co.*,
  690 F.3d 98 (2d Cir. 2012) ..................................................................... 21

*Apple v. Atlantic Yards Dev. Co. LLC*,
  2012 U.S. Dist. LEXIS 84281 (E.D.N.Y. June 18, 2012 ......................... 30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................... 20

*Bank of N.Y. v. Silverberg*,
  86 A.D.3d 274 (2d Dep't 2011) .............................................................. 22

*Banks v. Consume Home Mortgage, Inc.*,
  2003 U.S. Dist. LEXIS 8230 (E.D.N.Y. March 28, 2003) ....................... 32

*Bean v. Bank of N.Y. Mellon*,
  2012 U.S. Dist. LEXIS 132447 (D. Mass. Sept. 18, 2012) ..................... 31

*Bell Atlantic Corporation v. Twombly*,
  550 U.S. 544 (2007) ............................................................................... 20

*Bridge v. Pheonix Bond & Indm. Co.*,
  553 U.S. 639 (2008) ............................................................................... 26

*Brown v. Felsen*,
  442 U.S. 127 (1979) ............................................................................... 12

*Campbell v. Bank of New York Trust Company, N.A.*,
  2012 U.S. Dist. LEXIS 100595 (S.D.N.Y. May 8, 2012) ......................... 10

*City of New York v. Smokes-Spirits.com, Inc.*,
  541 F.3d 425 (2d Cir. 2008) ................................................................... 30

*Conklin v. Anthou*,
  495 Fed. Appx. 257 (3d Cir. 2012) .......................................................... 9

*Corley v. Rosewood Care Center, Inc. of Peoria*,
  142 F.3d 1041 (7th Cir. 1998) ............................................................. 26

*Doe v. Archdiocese of Washington*,
  689 A.2d 634 (Md. App. 1997) ............................................................ 18

*Douglass v. NIT-TSS, Inc.*,
  632 F. Supp. 2d 486 (D. Md. 2009) ..................................................... 18

*Dwoskin v. Bank of America, N.A.*,
  2013 U.S. Dist. LEXIS 14571 (D. Md. Jan. 31, 2013) ......................... 32

*Epstein v. C.R. Bard, Inc.*,
  460 F.3d 183 (1st Cir. Mass. 2006) ..................................................... 17

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*,
  544 U.S. 280 (2005) .............................................................. 7, 8, 12

*Foman v. Davis*,
  371 U.S. 178 (1962) ............................................................... 37, 38

*Forsberg v. Land Court of the Commonwealth of Massachusetts*,
  2010 U.S. Dist. LEXIS 107804 (D. Mass. Oct. 7, 2010) ...................... 10

*Gaidon v. Guardian Life Ins. Co. of Am.*,
  94 N.Y.2d 330 (1999) .......................................................................... 30

*Geyer v. Ingersoll Publications Co.*,
  621 A.2d 784 (Del. Ch. 1992) ............................................................. 16

*Goddard v. Citibank, NA*,
  2006 U.S. Dist. LEXIS 19651 (E.D.N.Y. Mar. 27, 2006) .................. 9, 12

*Gray v. Martinez*,
  465 Fed. Appx. 86 (3d Cir. 2012) .......................................................... 9

*H.J., Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ............................................................................. 24

*Hinds v. Option One Mortg. Corp.*,
  2012 U.S. Dist. LEXIS 184271 (E.D.N.Y. Dec. 6, 2012) ..................... 11

*Hoblock v. Albany County Bd. of Elections*,
  422 F.3d 77 (2d Cir. N.Y. 2005) ....................................................... 8, 9

*In re Lupron Mktg. & Sales Practices Litig.*,
   295 F. Supp. 2d 148 (D. Mass. 2003) ............................................................. 31

*In re Sumitomo Copper Litigation*,
   104 F. Supp. 2d 314, 319 (S.D.N.Y. 2000) ................................................. 21, 24

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. N.Y. 2012) ................................................................ 17

*Lance v. Dennis*,
   546 U.S. 459 (2006) ...................................................................................... 8

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*,
   507 U.S. 163 (1993) ...................................................................................... 30

*Linkage Corp. v. Trs. of Boston Univ.*,
   425 Mass. 1 (Mass. 1997) ............................................................................ 29

*Lumax Industries, Inc. v. Aultman*,
   543 Pa. 38 (1995) ........................................................................................ 16

*M&T Mortg. Corp. v. White*,
   736 F. Supp. 2d 538 (E.D.N.Y. 2010) .......................................................... 31

*Mac Pherson v. State St. Bank* & Trust Co.,
   452 F. Supp. 2d 133 (E.D.N.Y. 2006) ............................................................. 9

*Marshall v. Grant*,
   521 F. Supp. 2d 240 (E.D.N.Y. 2007) ............................................................. 9

*McKithen v. Brown*,
   481 F.3d 89 (2d Cir. 2007) ........................................................................... 11

*Moccio v. New York State Office of Court Admin.*,
   95 F.3d 195 (2d Cir. 1996) ........................................................................... 12

*NetJets Aviation, Inc. v. LHC Communs., LLC*,
   537 F.3d 168 (2d Cir. N.Y. 2008) ................................................................. 16

*Newton v. City of New York*,
   2010 U.S. Dist. LEXIS 6998 (S.D.N.Y. Jan. 27, 2010) ................................ 37

*O'Brien v. Nat'l Prop. Analysts Partners*,
   936 F.2d 674 (2d Cir. 1991) ......................................................................... 21

*Pelman v. McDonald's Corp.*,
  396 F.3d 508 (2d Cir. N.Y. 2005) ................................................................ 30

*Puritan Med. Ctr., Inc. v. Cashman*,
  596 N.E.2d 1004 (Mass. 1992) .................................................................... 18

*Putter v. North Shore Univ. Hosp.*,
  7 N.Y.3d 548 (2006) .................................................................................. 17

*Rakes v. United States*,
  442 F.3d 7 (1st Cir. Mass. 2006) ................................................................ 18

*Riehle v. Margolies*,
  279 U.S. 218 (1929) .................................................................................. 12

*Rinck v. Rinck*,
  363 Pa.Super. 593 (Pa.Super. 1987)............................................................ 16

*Rotella v. Wood*,
  528 U.S. 549 (U.S. 2000) .......................................................................... 26

*Saud v. Bank of New York*,
  929 F.2d 916 (2d Cir. 1991) ...................................................................... 13

*Schmuck v. United States*,
  489 U.S. 705 (1989) .................................................................................. 24

*Sly Magazine, LLC v. Weider Publ'ns LLC*,
  241 F.R.D. 527 (S.D.N.Y. 2007) ................................................................ 37

*Smith v. Weinberger, P.C.*,
  994 F. Supp. 418 (E.D.N.Y. 1988)............................................................... 12

*Spagnola v. Chubb Corp.*,
  574 F.3d 64 (2d Cir. 2009) ........................................................................ 29

*Sterling Nat'l Bank v. A 1 Hotels Int'l, Inc.*,
  2001 U.S. Dist. LEXIS 2997 (S.D.N.Y. March 22, 2001)........................... 21, 24, 26

*Swiatkowski v. Citibank*,
  745 F. Supp. 2d 150 (E.D.N.Y. 2010)........................................................... 10

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002) .................................................................................. 30

*Sykes v. Harris & Assocs.*,
  757 F. Supp. 2d 413 (S.D.N.Y. 2010) ............................................. 16, 31

*Truong v. Bank of America, N.A.*,
  717 F.3d 377 (5th Cir. 2013) .......................................................... 9

*United States v. Utley*,
  2000 U.S. Dist. LEXIS 6482 (S.D.N.Y. May 12, 2000) ................... 24

*Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ......................................................................... 8

*Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*,
  517 F.3d 104 (2d Cir. 2008) ........................................................... 20

*W&D Imports, Inc. v. Lia*,
  2013 U.S. Dist. LEXIS 58651 (E.D.N.Y. Apr. 22, 2013) ............... 8

*Young v. Wells Fargo Bank, N.A.*,
  717 F.3d 224 (1st Cir. 2013) ........................................................... 29

Federal Rules Of Civil Procedure

Fed. R. Civ. P. 15 .................................................................................. 37

Fed. R. Civ. Pro. 12(b)(6) ..................................................................... 20

Fed. R. Civ. Pro. 15 .............................................................................. 38

Fed. R. Civ. Pro. 15(a)(2) ..................................................................... 36

Fed. R. Civ. Pro. 21 ......................................................................... 36, 37

Fed. R. Civ. Pro. 9(b) ................................................................... passim

Fed. R. Civ. Pro. 41(a)(2) ..................................................................... 38

Federal Statutes

18 U.S.C. § 1005 ................................................................................... 27

18 U.S.C. § 1341 ................................................................................... 24

18 U.S.C. § 1343 ................................................................................... 24

18 U.S.C. § 1956(c)(7)(D) ..................................................................... 27

18 U.S.C. § 1957 ................................................................................................ 27

18 U.S.C. § 1957(f)(3) ....................................................................................... 27

18 U.S.C. § 1961(1) ........................................................................................... 24

18 U.S.C. § 1961(5) ........................................................................................... 24

18 U.S.C. § 1962(a) ................................................................................. 23, 27, 28

18 U.S.C. § 1962(c) ..................................................................................... 24, 28

18 U.S.C. § 1964(c) ........................................................................................... 26

28 U.S.C. § 1331 .................................................................................................. 7

28 USC § 1738 ................................................................................................... 12

New York Rules And Statutes

New York GBL § 349(a) ........................................................................ 29, 30, 31

NY CPLR § 5015(a)(3) ...................................................................................... 12

Massachusetts Rules And Statutes

Rule 60(b) of the Massachusetts Rules of Civil Procedure ........................... 12

M.G. L. ch. 93A § 2 .......................................................................................... 28

M.G.L. ch. § 1(b) .............................................................................................. 28

M.G.L. ch. 244 § 14(g) ................................................................................. 14, 15

M.G.L. ch. 244 § 14(j) .................................................................................. 14, 15

M.G.L. ch. 244 § 35A ....................................................................................... 14

M.G.L. ch. 260 § 12 .......................................................................................... 17

Maryland Rules And Statutes

Rule 2-535 of the Maryland Rules ................................................................... 12

Maryland Code, Court and Judicial Proceedings, § 5-203 .......................... 18

Maryland Code Ann., Com. Law § 13-301(1) ................................................................. 29

Maryland Code Ann., Com. Law § 13-303 ..................................................................... 29

Maryland Code Ann., Com. Law § 13-303(3) ................................................................. 29

## PRELIMINARY STATEMENT

Defendants in this case are enterprises involved in the mortgage banking industry, including mortgage originators, who set up mortgages for residential customers; mortgage "servicers," who receive monthly mortgage loan payments from homeowners; and large banks, which are involved in securitizing bundles of home loans.  Plaintiffs are prior homeowners whose properties were subject to mortgages or foreclosures involving defendants.

Defendants created a scheme to profit from originating mortgages that were designed to fail quickly, and from accelerating foreclosure proceedings after payment default.  To facilitate this scheme, defendants and others created the Mortgage Electronic Registration System ("MERS"), an electronic warehouse of mortgage information.  MERS enabled defendants to bypass traditional property recording requirements and cover up their activities.  To further conceal their conduct, defendants implemented Financial Accounting Standards Board ("FASB") guidelines obtained on defendants' behalf by the Mortgage Bankers Association ("MBA").

Behind these veneers of legality, defendants sought numerous foreclosures contrary to applicable state law, or they improperly accelerated foreclosures before they had the legal right to do so.  Plaintiffs and the public were injured in at least three ways: (1) defendants' conduct created problems in the title of homeowners' properties through faulty or invalid mortgage assignments; (2) the scheme undermined laws designed to protect real property and home ownership; and (3) defendants' acts resulted in loss of occupancy time and invalid foreclosures.

In their motions to dismiss, defendants seek to obfuscate the allegations in the complaint and avoid its plain reading.  The plaintiffs' claims are sufficient for the reasons set forth below.

## INTRODUCTION

Plaintiffs' second amended complaint ("SAC") comprises claims under 18 U.S.C. § 1962(a) and (c) (the Racketeer Influenced Corrupt Organizations Act ("RICO")), and for consumer protection violations and common law fraud in Massachusetts, New York and Maryland.  Each claim is adequately established in the SAC: defendants' scheme has harmed plaintiffs and the public, and submissions by three defendants support the sufficiency of the complaint.

**Defendants' Fraudulent Scheme Has Harmed Plaintiffs And The Public**.

The roots of defendants' scheme lie in the securitization of residential mortgages, which involves bundling mortgages into large groups and marketing them to investors.  Securitization began in the 1960's and 1970's and became routine in the 1990's.  At that point, the mortgage industry – including defendants in this action – created MERS to facilitate mortgage securitization activities.  SAC at ¶¶ 69-93.  It is now widely known that MERS procedures were faulty or improperly implemented over time; indeed, 50 attorneys general initiated investigations or prosecutions in the wake of the subprime mortgage crisis in recent years.

Defendants' scheme to improperly accelerate foreclosure proceedings and fraudulently procure foreclosure judgments centers around flawed or invalid mortgage assignments.  In many instances, defendants' conduct resulted in illegal foreclosures.  For example, US Bank procured a foreclosure judgment against plaintiff Nancy Trotske by misrepresenting that it held the note when it did not.  *Id.* at ¶¶ 116-123.  Similarly, Wells Fargo obtained a foreclosure against plaintiff Matthew Zicaro in the role of Trustee for one particular trust, while the mortgage remained in another trust.  *Id.* at ¶¶ 124-137.

Defendants made numerous filings in county clerks' offices and land courts that "contain[ed] misrepresentations designed to cover up deficiencies inherent in the scheme." *Id.* at ¶ 109. Among other things, defendants:

- misrepresented the true holder of plaintiffs' mortgages or the corresponding notes and failed to disclose material information pertaining to the impropriety of foreclosures, *id.* at 190, *see also,* e.g.*, id.* at ¶¶ 116-123 and ¶¶ 124-137;

- submitted affidavits executed by persons without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits, *id.* at ¶ 110(c);

- misrepresented the identity, office, or legal status of affiants executing foreclosure-related documents, *id.* at ¶ 110(d); and

- failed to properly identify foreclosing parties accurately, *id.* at ¶ 110(a).

This conduct "misled plaintiffs, public agencies and courts by leading them to believe that defendants held mortgages or had standing to foreclose when they did not, and by concealing the identity of mortgage holders and relevant parties." *Id.* at ¶ 192; *see also id.* at ¶¶ 2, 109-110, 158, 162, 168, 190-91, 193, 211-12, 328-29, 350-53, 359-62, and 365-69.

To facilitate their scheme, defendants used MERS to bypass traditional property recording requirements and shield their activities from public view. *Id.* at ¶¶ 78-79, 105, 108, and 112(a). MERS enabled defendants to transfer ownership of the mortgages without plaintiffs or the public knowing, and it concealed the true holders of mortgages at any given time. This concealment was particularly problematic during loan modifications or foreclosure. At these points, the identity of the mortgage holder was critical, and keeping it hidden impeded plaintiffs' ability to negotiate loan modifications or contest foreclosure proceedings. *See, e.g., id.* at ¶¶ 103, 190-192, 211-212 .

"MERS certifying officers, including defendants' employees and agents, and those acting on defendants' behalf or in association with them, have often failed to verify the chain of

title before making assignments or filing foreclosure proceedings." *Id*. at ¶ 83.  In an effort to cure the defects when they became known, defendants executed questionable paperwork – indeed, "[m]any MERS assignments have numerous defects, including affirmative misrepresentations of fact, which render them false, deceptive or invalid." *Id*.; *see also id.* at ¶¶ 116-47 (examples of defendants' fraudulent scheme in operation).

In furtherance of defendants' scheme, MERS has misrepresented to plaintiffs and the public that "[a]ny loan registered on the MERS system is inoculated against future assignments because MERS remains the nominal mortgagee no matter how many times servicing is traded." *See id*. at ¶ 170 (quoting MERS website).  This statement has led plaintiffs, consumers and the public to believe that assignments of mortgages involving MERS were automatically insulated by the MERS system.  They were not – and MERS and defendants knew so.

As the former Chief Executive Officer ("CEO") of MERS Mr. R.K. Arnold testified: "'MERS was aware that some certifying officers were signing documents without authority at least as early as 2009.'" *Id.* at ¶¶ 175(a) (quoting testimony of Mr. Arnold before the Senate Banking, Housing and Urban Affairs Committee on November 16, 2010).  Further, MERS has acknowledged knowing that problematic "actions were being undertaken to accelerate foreclosure document processing…" *Id.* at ¶ 175(b).  One problem was "robo-signing," which involves "preparing, executing, or filing affidavits without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits." *Id.* at ¶ 110(c).  MERS knew that "…some 'robo-signers' were MERS certifying officers," *id.* at ¶ 175(c), which included defendants, *id.* at ¶ 79 ("Assignments or foreclosure actions are purportedly effectuated by MERS 'certifying officers,' who are employees of members or other individuals designated by the members themselves.").

Rather than disclose its knowledge, "[a]s late as November 2010, MERS insisted that use of the system rested upon sound legal principles." *Id.* at ¶ 174 (citing testimony of Mr. Arnold). There can be no question that this concealment was fraudulent: "[s]ubsequent to MERS' insistence on the integrity of its system, a Consent Order was executed on April 13, 2011.  It stated that MERS' tracking and registration services were subject to inadequacies in MERS protocol, and that MERS services were improperly delivered." *Id.* at ¶ 178.

MERS' statements furthered defendants' scheme by concealing their fraudulent conduct in relation to improper or invalid mortgage assignments or transfers before, during and after foreclosure proceedings.  "MERS speaks on behalf of defendants with regard to matters relating to MERS on the basis that: MERS exists as a membership organization for the benefit of defendants; MERS shareholders include certain defendants and the MBA, which advocates on behalf of defendants as a group; and [h]alf of the current MERS Board of Directors are employees of defendants or the MBA." *Id.* at ¶ 177(a)-(c).

Plaintiffs suffered harms from defendants' conduct throughout their mortgages and afterward. *Id.* at ¶ 3 ("Injuries to plaintiffs include loss of their mortgages and the deprivation of legal protections intended to ensure that property interest and the public interest in property laws."), ¶ 36 ("Each plaintiff was individually harmed by fraud perpetrated in furtherance of defendants' scheme.  The harm included expedited foreclosure on plaintiffs' homes and procurement [of] fraudulent foreclosure judgments against them."), ¶ 104 ("Defendants' conduct created clouds over title or broke chains of title."), ¶ 109 ("Defendants … accelerated foreclosures with filings containing misrepresentations designed to cover up deficiencies inherent in the scheme …"), ¶ 112(b) ("…defendants published income statements reflecting accounting statements that enabled defendants to mislead government entities, the public and

plaintiffs regarding ownership interests in mortgages."), ¶ 158 ("Defendants have willfully and knowingly mailed or caused to be mailed numerous mailings in furtherance of their scheme to deceive borrowers, courts and the public in relation to mortgages and in order to unlawfully foreclose on homes."), and ¶ 182 ("During the relevant period, defendants employed accounting standards to deceive regulatory authorities, investors and the public including plaintiffs.").

**Submissions By Three Defendants Support The Sufficiency Of The Complaint.**

The SAC describes the nature, background and operation of defendants' scheme in detail. Specific mechanisms employed by defendants to further their fraud are listed, SAC at ¶¶ 108-15 and 299-321, examples of the most egregious conduct are provided, *id.* at ¶¶ 116-39, defendants' association and racketeering acts are described, *id.* at ¶¶ 140-68 and pp. 33-55, and material fraudulent statements made on behalf of defendants by MERS are included, *id.* at ¶¶ 168-93.

Defendants Cincinnati Federal Savings and Loan, Deutsche Bank, AG ("Deutsche Bank"), Deutsche Bank National Trust Company ("DBNTC"), MortgageIT and The PNC Financial Services Group LLC ("PNC") attach numerous exhibits to their supplemental motions, responded to individually in section III, *infra*, which include various mortgages, notes and foreclosure documents.  Before the SAC was filed, and even prior to the first amended complaint, MortgageIT and Deutsche Bank filed a pre-motion to dismiss letter discussing each phase of the life of the mortgage at issue, with relevant exhibits attached.  *See* Letter to the Court from Joy Harmon Sperling dated Jaunary 17, 2013, docket entry # 31 ("JHS 1/17/13 Ltr.").  Curiously, the now-pending motions of MortgageIT and Deutsche Bank do not address so much of plaintiffs' response that undercut the substantive premise of these defendants' pre-motion submission.  *See* Letter to the Court from Zoe Dolan dated February 13, 2013, docket entry # 43, at page 3, attached as Exhibit A.

In any event, the essential documents required to support plaintiffs' claims are either in the possession of the relevant defendant or obtainable by them.  Foreclosure proceedings were public and initiated by defendants themselves, and filings with county clerk's offices are available online.  Income statements submitted to the Federal Deposit Insurance Corporation ("FDIC") were filed on a quarterly basis during the relevant period.  In sum, the documents at issue comprise a finite universe that is identified the SAC.

## ARGUMENT

I.   **No "Threshold" Issues Bar Plaintiffs' Claims.**

A.  **The *Rooker/Feldman* Doctrine, *Res Judicata* And Collateral Estoppel Are Inapplicable.**

Plaintiffs' RICO, consumer protection act and fraud claims are independent of the state foreclosure judgments.  Beyond the judgments themselves, the harms that plaintiffs suffered include mortgages that were designed to be brief in duration, breaks in chains of title, improper acceleration of foreclosures, fraud that impeded their ability to contest the foreclosures, and, ultimately, the fraudulent procurement of the foreclosure judgments.  Each of plaintiffs' claims is autonomous, and this action properly seeks monetary damages for these harms rather than the reversal of any state court judgment or the vacatur of any foreclosure.

### i.  *Rooker-Feldman*

The *Rooker-Feldman* doctrine precludes a federal district court from reviewing and reversing a state court judgment in instances where it caused the injury at issue in the federal litigation.  *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284-89 (2005).  The "doctrine merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to [the Supreme Cout]."  *Exxon Mobil*, 544 U.S. at 292 (2005)

(quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 644 n. 3 (2002)).  The Supreme Court has found the doctrine applicable only twice, in *Rooker* and in *Feldman, see id.* at 28, and it has cautioned against a broad reading, *see, e.g., Lance v. Dennis,* 546 U.S. 459, 464-65 (2006) (citing *Exxon Mobil,* 544 U.S. at 283).

*Rooker-Feldman* has two substantive requirements: "1) the federal plaintiff must complain of injury from a state-court judgment; and 2) the federal plaintiff must seek federal-court review and rejection of the state-court judgment." *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. N.Y. 2005).  Although some courts have focused on whether claims are "inextricably intertwined" with the state judgment, "the phrase 'inextricably intertwined' has no independent content.  It is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil*." *Id.* at 86-87.

As the Second Circuit has recognized, the doctrine does not preclude a federal suit seeking a remedy for harm caused by action "ratified, acquiesced in, or left unpunished" by the state court judgment.  *Id.* at 88-89.  Nor is a district court divested of subject matter jurisdiction under *Rooker-Feldman* "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Exxon Mobil*, 544 U.S. at 293 (internal quotation marks and citation omitted).  Rather, an independent claim may survive even if it "denies a legal conclusion that a state court has reached in a case to which he was a party…" *Id.*

Some courts in this Circuit have held that claims alleging "fraud in the procurement of the judgment" survive *Rooker-Feldman*.  *See W&D Imports, Inc. v. Lia*, 2013 U.S. Dist. LEXIS 58651, *16-17 (E.D.N.Y. Apr. 22, 2013) ("Although recovery by plaintiffs on their claims against the RICO defendants would imply that the state-court judgment was erroneous (having been procured by fraud), such a possibility does not necessarily deprive the Court of jurisdiction,

as 'a suit asking a federal court to deny a legal conclusion reached by a state court [may] nonetheless be independent for *Rooker–Feldman* purposes.... The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal [of the state-court judgment], forbidden by *Rooker–Feldman* ....'") (quoting *Hoblock*, 422 F.3d at 87–88); *Marshall v. Grant*, 521 F. Supp. 2d 240, 244-45 (E.D.N.Y. 2007) ("perjury, fraud and misrepresentations ... are the type of claims held by the *Exxon Mobil* Court to be independent from the state judgment because they allege fraud in the procurement of the judgment and not just that the state court issued an incorrect opinion."); *see also Goddard v. Citibank, NA*, 2006 U.S. Dist. LEXIS 19651, at *6 (E.D.N.Y. Mar. 27, 2006); *Mac Pherson v. State St. Bank* & Trust Co., 452 F. Supp. 2d 133, 140 (E.D.N.Y. 2006).

Other courts are in accord. *See*, e.g.*, Truong v. Bank of America, N.A.*, 717 F.3d 377, 381-85 (5th Cir. 2013) (holding claims that banks "misled the state court" and "misled [the plaintiff] into foregoing her opportunity to dispute authenticity in the state-court proceedings" were "independent claims … and the damages she requested were for injuries caused by the banks' actions, not injuries arising from the foreclosure judgment."); *Conklin v. Anthou*, 495 Fed. Appx. 257, 262 (3d Cir. 2012) (holding that, although *Rooker-Feldman* barred direct review, it did not prevent plaintiff "from otherwise attacking the parties to the foreclosure proceedings or alleging that the methods and evidence employed were the product of fraud or conspiracy, regardless of whether his success on those claims might call the veracity of the state-court judgments into question"); *see also Gray v. Martinez*, 465 Fed. Appx. 86, n. 4 (3d Cir. 2012) ("Were the financial defendants to have engaged in fraud, collusion, or other malfeasance in securing foreclosure, Rooker–Feldman would not prevent the exercise of jurisdiction simply because relief would cast doubt on the state-court judgment.").

Here, the *Rooker-Feldman* doctrine is inapplicable because the causes of actions exist notwithstanding the foreclosure judgments.  Defendants' scheme is broad in scope, ranging from the origination of mortgages designed to be brief to the fraudulent procurement of judgments, fraudulent statements and the submission of fraudulent documents in county clerks' offices and state land courts.  Many of the harms caused by defendants' conduct – such as the origination of mortgages and breaks in chains of title – predated the foreclosure proceedings.  Moreover, even assuming that resolution of harms caused by defendants' conduct were inherent in the judgments, defendants' fraudulent procurement of the judgments precludes reliance on *Rooker-Feldman*.

Case law cited by defendants is consistent with the propriety of plaintiffs' claims.  In *Campbell v. Bank of New York Trust Company, N.A.*, 2012 U.S. Dist. LEXIS 100595, *42 and *28-29 (S.D.N.Y. May 8, 2012), a report and recommendation adopted by Your Honor in a mortgage loan and foreclosure case, the court dismissed plaintiffs' RICO and New York General Business Law ("GBL") § 349 claims without prejudice to provide an opportunity to amend. While the fraud claim was dismissed, *id.* at *18-26, unlike here, in *Cambell* there were no allegations of a broader scheme or the improper *acceleration* of foreclosure.  Nor were there allegations of fraudulent concealment through statements by MERS in furtherance of the scheme.

Defendants also rely on *Forsberg v. Land Court of the Commonwealth of Massachusetts*, 2010 U.S. Dist. LEXIS 107804 (D. Mass. Oct. 7, 2010), and *Swiatkowski v. Citibank*, 745 F. Supp. 2d 150 (E.D.N.Y. 2010).  These cases are inapposite, as the purpose of the suits was to undo or prevent foreclosure.  Here, in contrast, plaintiffs seek a remedy for harms caused by defendants' RICO and consumer protection act violations and common law fraud, which impeded the administration of justice for plaintiffs and the public.

Defendants' fraudulent scheme is broad in scope, ranging from fraudulent statements they made directly and through MERS to fraudulent documents they submitted in county clerks' offices and state land courts relating to plaintiffs' mortgages.  The injuries suffered by plaintiffs give rise to causes of actions that exist notwithstanding the foreclosure judgments.  Indeed, many of the harms discussed above predated the foreclosure judgments.  *See McKithen v. Brown,* 481 F.3d 89, 97–98 (2d Cir. 2007) ("[A] party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed prior in time to the state-court proceedings, and so could not have been 'caused by' those proceedings.").  Thus, plaintiffs properly seek remedies under RICO, the relevant state consumer protection acts, and common law fraud causes of action that are not barred by *Rooker-Feldman*.

### ii. *Res Judicata* And Collateral Estoppel

Preclusion is not appropriate because defendants' conduct before and after the foreclosures goes beyond issues inherent in the foreclosure judgments.  Though the underlying facts here involve the foreclosure process to varying degrees, plaintiffs' claims are distinct from the foreclosure judgments.  The injuries plaintiffs suffered – for example, mortgages designed to further defendants' scheme, clouds over or breaks chains of title due to faulty or invalid transfers or assignments, and improperly accelerated foreclosures – caused harms that exist independent of the foreclosure judgments themselves.

In any event, courts in this Circuit have held that preclusion is inappropriate where, as here, the underlying judgment was fraudulently procured.  *Hinds v. Option One Mortg. Corp.,* 2012 U.S. Dist. LEXIS 184271, *18-19 (E.D.N.Y. Dec. 6, 2012) ("[a]lthough there is disagreement in this circuit, some courts . . . have found that a plaintiff may collaterally attack a judgment based on a lack of jurisdiction or demonstration that the prior judgment was procured

by fraud."); *Goddard*, 2006 U.S. Dist. LEXIS 19651 ("'…New York law … provides that a plaintiff may attempt a collateral attack on a judgment based either on a lack of jurisdiction, or a demonstration that the prior judgment was procured by fraud.'") (quoting *Smith v. Weinberger, P.C.*, 994 F. Supp. 418, 421 (E.D.N.Y. 1988)[1] (internal quotation marks and citation omitted)).

These decisions align with Supreme Court jurisprudence.  *See Riehle v. Margolies*, 279 U.S. 218, 225 (1929) (recognizing preclusive effect of *res judicata* "in the absence of fraud or collusion"); *see also Brown v. Felsen*, 442 U.S. 127, 132 (1979) ("Because res judicata may govern grounds and defenses not previously litigated, however, it *blockades unexplored paths that may lead to truth*.  For the sake of repose, *res judicata shields the fraud and the cheat as well as the honest person.  It therefore is to be invoked only after careful inquiry*.") (emphasis supplied).  Moreover, at the state level, New York, Massachusetts and Maryland each recognize collateral attacks on the basis of fraud.  N.Y. CPLR § 5015(a)(3); Rule 60(b) of the Massachusetts Rules of Civil Procedure; and Rule 2-535 of the Maryland Rules.

---

[1] *Smith* also involved a preclusion argument, which the court resolved as follows:

> Salvatore's res judicata argument is easily disposed of.  Smith alleges that Salvatore procured the prior foreclosure judgment through "usury and fraud."  According to the plaintiff's opposition papers, the alleged fraud refers to a perjured affidavit used to secure the foreclosure judgment. […]  Accordingly, the Court finds that Salvatore's motion to dismiss based on the defense of res judicata is denied.

*Smith*, 994 F. Supp. at 421 (quoting its prior decision).  To be sure, the court in *Smith* held that the *Rooker-Feldman* doctrine applied to its review of the plaintiff's claims relating to foreclosure.  *Id.* at 422-24.  However, the court's application of the doctrine was premised on the Second Circuit's decision in *Moccio v. New York State Office of Court Admin.*, 95 F.3d 195, 198 (2d Cir. 1996), and the Supreme Court specifically identified *Moccio* as an example of *Rooker-Feldman* having "been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 USC § 1738."  *Exxon Mobil*, 544 U.S. at 283.

No law sanitizes defendants' conduct or removes it from reach.  Assuming *arguendo* that the issue of standing to foreclose were decided as defendants' posit, their concealment of evidence necessary to understand the magnitude of their scheme militates against preclusion. *Saud v. Bank of New York*, 929 F.2d 916, 920 (2d Cir. 1991) (recognizing newly discovered evidence that was fraudulently concealed creates exception to *res judicata*).

### B. Pre-foreclosure Defendants Are Liable.

All defendants, even those who did not participate directly in a foreclosure, were involved in and benefitted from the fraudulent scheme.  Defendants' roles within their association-in-fact are described in the SAC at ¶¶ 140 and 141(a)-(d) (discussing mortgage originators, parties involved in securitization, servicers and foreclosing entities).  Mortgage originators include MortgageIT, Cincinnati Federal Savings and Loan and Provident Funding Group, Inc. ("Provident") (collectively, the "Originator Defendants"), who seek dismissal because they "were not responsible" for the foreclosures.  *See* Defendants' Joint Motion To Dismiss ("Defs. JMTD"), docket entry 94, at 14-16.  These defendants were responsible for generating mortgages that were designed to be brief.  *See* SAC at ¶¶ 138-39 (and related table) and 141(a).  This step in the process is a *sine qua non* of defendants' scheme as a whole.  *See id.* at ¶¶ 2, 64, 108-09, 140-41, 206 and 212.

Each defendant was or is a member of MERS, which has provided and continues to provide a mechanism that enables defendants to implement their scheme and profit from glossing over clouds or breaks in chains of title.  *Id.* at ¶¶ 146, 105-06.  Additionally, each defendant, including the Originator Defendants, was or is a member of the MBA.  The organization has been and is crucial to defendants' scheme, as it persuaded the FASB to make changes in financial accounting standards designed to further defendants' conduct.  *Id.* at ¶¶ 143-45, 84-99

and 106 ("During the relevant period, participants in various aspects of mortgage banking –

including mortgage brokers, companies involved in securitizations, servicers and, ultimately,

parties that sought foreclosure – benefited financially by using MERS and accounting methods

applied to mortgage-related holdings."), and ¶ 107.

"Both the MBA and MERS serve to facilitate coordination of defendants' activities in the

mortgage industry and the pattern of related conduct in furtherance of their scheme." *Id.* at ¶

151. "The success of the MBA in influencing the FASB, combined with the use of MERS,

demonstrates defendants' coordinated activity through an association-in-fact in furtherance of

their scheme." *Id.* at ¶ 107.

Defendants engaged in a pattern of fraudulent conduct through their association-in-fact.

The Originator Defendants were involved in actions that typify the scheme:

- Plaintiff John Lopes' mortgage (MortgageIT and Wells Fargo). The foreclosure is premised on a loan assignment from MERS to Wells Fargo Bank, N.A., back-dated to November 19, 2008. *See* Exhibit B to JHS 1/17/13 Ltr. This foreclosure is problematic because the assignment was not executed until December 12, 2008, and the foreclosure complaint was filed before then, on December 2, 2008. *Wells Fargo v. John Lopes*, Commonwealth of Massachusetts Land Court, 08 MISC 389395, docket sheet attached as Exhibit B. Thus, it appears – pending further information regarding potential securitization of the loan – that MortgageIt held the mortgage when the foreclosure proceedings were commenced. Notably, the assignment was made by robo-signer Andrew Harmon, who is associated with other defendants. *See* SAC at ¶ 153.

- The mortgages of plaintiffs Sandra Lapidez and Christine Bernat / Paul Demers. In 2007, the Massachusetts legislature promulgated emergency laws designed to protect, among other things, existing mortgages. *See* Massachusetts 2007 Acts, Chapter 206. As enacted, M.G.L. ch. 244 § 35A provides that, prior to enforcing a mortgage, the mortgagee or anyone holding thereunder must provide notice of either 150 or 91 days, depending on whether good faith efforts to negotiate a reasonable alternative to foreclosure have been conducted. M.G.L. ch. 244 § 14(g). "A copy of the notice required by this section and an affidavit demonstrating compliance with this section shall be filed by the mortgagee, or anyone holding thereunder, in any action or proceeding to foreclose on such residential real property." M.G.L. ch. 244 § 14(j).

- The Lapidez mortgage, originated by MortgageIT, was assigned to Wells Fargo on February 2, 2009.  *See* assignment attached as Exhibit C.  Foreclosure commenced on February 3, 2009.  *See Wells Fargo Bank, NA v. Lapidez*, Commonwealth of Massachusetts Land Court, 09 Misc 393012, docket sheet attached as Exhibit D.  Robo-signer Andrew Harmon executed the assignment on behalf of MERS.  Because the assignment was made the day prior to foreclosure proceedings, MortgageIT apparently held the mortgage during the notice period, and Wells Fargo could not have provided the requisite notice as mortgagee or filed a proper affidavit as required by § 14(j).  It bears noting that, under paragraph 22 of the Lapidez mortgage, attached as Exhibit C to Declaration of Michael Weiss ("Weiss Decl."), docket entry # 91, the Lender (MortgageIT) was obliged to give notice prior to foreclosure specifying the default, the action required to cure it and a due date, and stating that failure could result in acceleration of sums secured by the mortgage and sale of the property.  *Id.*  The notice was also required to provide information concerning the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of default or any other defense to acceleration and sale.  *Id.*

- The Bernat/Demers mortgage, originated by Provident, was assigned to Wells Fargo on May 10, 2010.  *See* assignment attached as Exhibit E.  The foreclosure proceeding commenced on May 11, 2010.  *See Wells Fargo v. Bernat & Demers*, Commonwealth of Massachusetts Land Court, 10 Misc. 429485, docket sheet attached as Exhibit F.  Thus, Provident apparently held the mortgage during the § 14(g) notice period, and the affidavit requirement of § 14(j) could not have been properly met.  As with the Lapidez loan, the underlying mortgage contained notice provisions concerning acceleration and sale, and robo-signer Andrew Harmon purportedly effectuated the assignment.

- Plaintiff Michael Silver's mortgage.  Cincinnati Federal Savings and Loan originated the loan.  *See* Exhibit A to Declaration of Harold Damm, docket entry # 101.  The assignment of the mortgage to "ABN AMRO MORTGAGE GROUP" was filed in Massachusetts the same day that the mortgage itself was signed and filed.  *See id.* at Exhibits A and B.  The assignment was purportedly executed in Ohio.  Thus, the loan was apparently assigned before it had closed.

## C. Liability Reaches Certain Parent Companies.

Plaintiffs believe that parent companies Deutsche Bank, Citigroup and JPMorgan Chase & Co. are incorporated in Delaware, and that PNC is incorporated in Pennsylvania.  "Delaware law permits a court to pierce the corporate veil 'where there is fraud or where 'the corporation is in fact a mere instrumentality or alter ego of its owner.'"  *NetJets Aviation, Inc. v. LHC*

*Communs., LLC*, 537 F.3d 168, 176 (2d Cir. N.Y. 2008) (quoting *Geyer v. Ingersoll Publications*

*Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)).  "Th[e] analysis requires that: (1) 'the business entity

and its owner operated as a single entity' and (2) 'an overall element of injustice or unfairness.'"

*Sykes v. Harris & Assocs.*, 757 F. Supp. 2d 413, 430 (S.D.N.Y. 2010) (quoting *NetJets*, *supra*)

(secondary internal quotation marks and citation omitted).  Similarly, Pennsylvania law

recognizes that veil piercing may be appropriate where the corporate form was used to perpetrate

fraud, *Lumax Industries, Inc. v. Aultman*, 543 Pa. 38, 42 (1995), or in instances "whenever

necessary to avoid injustice."  *Rinck v. Rinck*, 363 Pa.Super. 593, 597 (Pa.Super. 1987).

By all appearances, Deutsche Bank is indistinguishable from DBNTC: they share a phone

number area code and initial four-number exchange, they apparently share offices, and DBNTC

is Deutsche Bank's contact for mortgage-backed securities.  SAC at ¶ 194(b).  The degree of

synchronicity among all defendants, including Deutsche Bank and DBNTC, is set forth in the

SAC generally.  So too with respect to Deutsche Bank and MortgageIt.  *Id.* at ¶ 194(a).

Likewise, PNC and First Franklin Loan Services were involved in highly coordinated mortgage-

related activity.  *Id.* at ¶ 194(c).  Citimortgage, Citibank and Citigroup cannot be said to operate

at arms' length – indeed, Citimortgage operates out of Citibank branch locations, *id.* at ¶ 194(a),

and, in turn, Citigroup and Citibank are essentially a single corporate entity.  *Id.* at ¶ 194(a).

Defendants' fraudulent scheme has operated effectively for many years.  The parent

companies have not denied membership in MERS or the MBA.  Nor have Citigroup, Deutsche

Bank or JPMorgan Chase challenged the basis of plaintiffs' Ninth Claim under § 1962(a), SAC

at ¶¶ 299-321, which involves submitting fraudulent income statements to the FDIC in

furtherance of defendants' scheme.  As to PNC, upon information and belief, either that

company or its predecessor was involved in securitization of one or more of the loans at issue,

and plaintiffs believe that discovery will further confirm PNC's involvement in defendants'

association-in-fact.  *Id.* at ¶ 156.

### D.  Fraudulent Concealment Tolls The Statutes Of Limitations.

Wrongful concealment tolls a statute of limitations that might otherwise apply.  In the

Second Circuit,

> [u]nder federal common law, a statute of limitations may be tolled due to the defendant's
> fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully
> concealed material facts relating to defendant's wrongdoing; (2) the concealment
> prevented plaintiff's discovery of the nature of the claim within the limitations period;
> and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the
> period plaintiff seeks to have tolled.

*Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. N.Y. 2012) (internal quotation marks

and citation omitted).

"Under New York law, the doctrines of equitable tolling or equitable estoppel may be

invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud,

misrepresentations or deception to refrain from filing a timely action."  *Abbas v. Dixon*, 480 F.3d

636, 642 (2d Cir. 2007) (overruled on other grounds) (internal quotation and citation omitted).

*See also Putter v. North Shore Univ. Hosp.*, 7 N.Y.3d 548, 552-53 (2006) (New York doctrine of

equitable estoppel may preclude wrongdoing-defendant from asserting limitations defense).

In Massachusetts, "If a person liable to a personal action fraudulently conceals the cause

of such action from the knowledge of the person entitled to bring it, the period prior to the

discovery of his cause of action by the person so entitled shall be excluded in determining the

time limited for the commencement of the action."  M.G.L. ch. 260 § 12.  "The statute of

limitations may be tolled under [§ 12] 'if the wrongdoer . . . concealed the existence of a cause of

action through some affirmative act done with intent to deceive.'"  *Epstein v. C.R. Bard, Inc.*,

460 F.3d 183 (1st Cir. Mass. 2006) (quoting *Puritan Med. Ctr., Inc. v. Cashman*, 596 N.E.2d

1004, 1010 (Mass. 1992)). "The rule governing fraudulent concealment is that the defendant raising the limitations defense must have engaged in fraud or deliberate concealment of material facts relating to his wrongdoing and the plaintiff must have failed to discover these facts within the normal limitations period despite his exercise of due diligence." *Rakes v. United States*, 442 F.3d 7, 26 (1st Cir. Mass. 2006) (internal quotation marks and citation omitted).

The Maryland Code, Court and Judicial Proceedings, § 5-203, provides, "If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." "The complaint 'must . . . contain specific allegations of how the fraud kept the plaintiff in ignorance of a cause of action, how the fraud was discovered, and why there was a delay in discovering the fraud, despite the plaintiff's diligence.'" *Douglass v. NIT-TSS, Inc.*, 632 F. Supp. 2d 486, 491 (D. Md. 2009) (quoting *Doe v. Archdiocese of Washington*, 689 A.2d 634, 643 (Md. App. 1997)).

Here, defendants have hidden their acts (and omissions) from public view, *e.g.*, "[v]eiled behind MERS." SAC at ¶ 103. "The *purpose* of MERS is to allow its members *to bypass the public recording system* for mortgages through a private electronic registry of loans." *Id*. at ¶ 77 (emphasis supplied). "Prior to MERS, when a lender issued a mortgage, it recorded its identity and interest in the county clerk's office (or its equivalent) pursuant to state and local law." *Id.* at ¶ 78. "If an assignment of the original loan was made by the lender, then the assignee would also record its identity and interest with the county clerk's office." *Id*. "In contrast … [w]hen an assignment or transfer occurs between or among MERS members, MERS purports to privately track that assignment or transfer, but customarily *does not record the transaction in public records*." *Id*. at ¶ 79 (emphasis supplied). Because MERS is a private tracking system, plaintiffs

18

had no reasonable means of discovering such defendants' fraudulent activities.  *See id.* at ¶¶ 74, 77-79 and 103-106.

Defendants have concealed their scheme with the statement on the MERS website that "[a]ny loan registered on the MERS system is inoculated against future assignments because MERS remains the nominal mortgagee no matter how many times servicing is traded."  The underlying fraud remained concealed at least until Mr. Arnold testified before the Senate Banking, Housing and Urban Affairs Committee in November of 2010.  *See id.* at ¶ 175(a) (quoting Mr. Arnold who stated, "MERS was aware that some certifying officers were signing documents without authority at least as early as 2009.").

Mr. Arnold's testimony establishes that the concealment on behalf of MERS and defendants was knowing and intentional.  According to his testimony, "[MERS] saw actions were being undertaken to accelerate foreclosure document processing…"  *Id.* at ¶ 175(b).  MERS knew that "some 'robo-signers' were MERS certifying officers," *id.* at ¶ 175(c), and defendants knew of this fraud firsthand, *id.* at ¶ 79 ("Assignments or foreclosure actions are purportedly effectuated by MERS 'certifying officers,' who are employees of members or other individuals designated by the members themselves.").

Defendants' concealment went beyond the MERS statement.  *Id.* at ¶ 190 ("Defendants' omissions include misrepresenting the true holder of plaintiffs' mortgages or the corresponding notes, failing to disclose material information necessary to establish standing to initiate foreclosure actions against plaintiffs, issuing income statements that reflected accounting standards to further the fraudulent scheme, dual-tracking home loan modifications and foreclosures, and concealing the nature and scope of the fraudulent acts."), and ¶ 192 ("Defendants' omissions misled plaintiffs, public agencies and courts by leading them to believe

that defendants held mortgages or had standing to foreclose when they did not, and by concealing the identity of mortgage holders and relevant parties.").

"Defendants' concealment has prevented and continues to impede discovery of their wrongdoing." *Id.* at ¶ 187. "Plaintiffs have exercised diligence in pursuing the discovery of defendants' wrongdoing; however, defendants' misrepresentations and false information have prevented and continue to prevent plaintiffs from doing so." *Id.* at ¶ 189.

Accordingly, the statutes of limitations run from November 16, 2010, when Mr. Arnold's testimony revealed the nature of the injury to plaintiffs. Each claim is within this period.

## II.  Each Claim Has Been Appropriately Pled Under Rules 12(b)(6) and 9(b).

### A.  <u>Standard of Review</u>

"To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A court considering a motion to dismiss must draw all reasonable inferences in a plaintiff's favor. *See id.*; *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). The inquiry is whether the allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. A plausible claim "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 556 (2007)). The determination of plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Rule 9(b) of the Federal Rules of Civil Procedure states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice,

intent, knowledge, and other conditions of a person's mind may be alleged generally." "The

purpose of Rule 9(b) is threefold -- it is designed to provide a defendant with fair notice of a

plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing,

and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop.*

*Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). As a general matter, to satisfy Rule 9(b), a

plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify

the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir.

2012) (internal quotations and citation omitted). However, in the context of civil RICO cases,

"'Rule 9(b) requires only that the plaintiff delineated, with adequate particularity in the body of

the complaint, the specific circumstances constituting the overall fraudulent scheme.'" *Sterling*

*Nat'l Bank v. A 1 Hotels Int'l, Inc.*, 2001 U.S. Dist. LEXIS 2997 at *10 (S.D.N.Y. March 22,

2001) (quoting *In re Sumitomo Copper Litigation*, 104 F. Supp. 2d 314, 319 (S.D.N.Y. 2000)).

### B.  The Foreclosure Judgments Were Fraudulently Procured.

Defendants' arguments regarding the Troske and Zicaro mortgages are incorrect, and the

fraudulent procurement of the foreclosure judgments against plaintiffs warrants further judicial

scrutiny. With regard to the Troske mortgage, in an assignment of the mortgage dated April 17,

2008 and executed by Elpinki Bechakas, MERS purported to assign the mortgage "together with

the bond or obligation described in said mortgage, and the moneys due and to grow thereon with

interest." *See* assignment attached as Exhibit G. However, only the mortgage had been assigned

to MERS, *see* mortgage attached as Exhibit H at ¶ (C), and not the note. "[A]s 'nominee,'

MERS's authority was limited to only those powers which were specifically conferred to it and

authorized by the lender . . . although the [document] gave MERS the right to assign the

mortgages themselves, it did not specifically give MERS the right to assign the underlying note[]…" *Bank of N.Y. v. Silverberg*, 86 A.D.3d 274, 281 (2d Dep't 2011) (collecting cases). Whether there was delivery to transfer such interest, as defendants argue, is at best an issue of fact. *See* SAC at ¶ 80 ("MERS does not hold the underlying note for the mortgage, and it does not receive any payments from homeowners under the note.").

Uncertainty concerning the execution of the April 17, 2008 assignment remains to be dispelled. Ms. Bechakas worked for the law firm Steven J. Baum, P.C., which entered into a practice overhaul agreement including a $2 million fine with the United States Attorney's Office for the Southern District of New York on October 6, 2011. *See id.* at ¶ 118; http://www.justice.gov/usao/nys/pressreleases/October11/stevenbaumpcagreementpr.pdf (last visited August 5, 2013). Even assuming Ms. Bechakas's had "authority" to execute the assignment, nothing in defendants' arguments establishes that the execution procedures she implemented were proper. *See id.* (although not a finding of wrongdoing, "[t]he Agreement resolves an investigation into BAUM's mortgage foreclosure-related practices, specifically whether the firm, on behalf of its lender clients, filed misleading pleadings, affidavits, and mortgage assignments in state and federal courts in New York.").

The assignment itself is a mystery. It purports to assign the mortgage and "the bond or obligation described [therein]" from MERS to U.S. Bank National Association, as Trustee for the Structured Asset Investment Loan Trust 2006-2 ("SAILT 2006-2"). However, plaintiffs have been unable to confirm the existence of SAILT 2006-2, and it appears that documents concerning this trust were never filed with the Securities Exchange Commission. Even if SAILT 2006-2 exists, its effect on the assignment has yet to be verified.

With regard to the Zicaro mortgage, it appears that the mortgage was pooled into a trust known as Fremont Home Trust 2006-1 (the "2006-1 Trust"), and plaintiffs are aware of no evidence that it did not remain there.  It also appears that defendant Wells Fargo foreclosed on the mortgage as Trustee for the Securitized Asset Back Receivables LLC Trust 2006-FR3 (the "2006-FR3 Trust").  Thus, either the securitization process involving transfer into the 2006-1 Trust broke the chain of title prior to the foreclosure initiated on behalf of the 2006-FR3 Trust, or the 2006-FR3 Trust never properly contained the mortgage.

In any event, the foreclosure process on the Zicaro loan was improperly accelerated.  The foreclosure complaint was filed on December 29, 2006, and notice publications and filings were made, *see* docket sheet attached as Exhibit I, before there was a purported assignment from MERS to Wells Fargo Bank, NA as Trustee, dated October 11, 2007 and backdated to August 21, 2007, attached as Exhibit J.  Even assuming the backdating is valid, it does not cover the period in which Wells Fargo prosecuted the complaint for almost eight months beforehand.  *Id.*

As to plaintiffs Julio Grillo, Mary Jones, Karl and Oksana Jorgensen, Michael Ryan, Benita and William Schriefer and Michael Silver, it is of no consequence that their mortgages did not name MERS as a beneficiary or mortgagee.  Inclusion of their mortgages in the MERS database has not been precluded.  Moreover, defendants involved in these mortgages – with the exception of JPMorgan Chase & Co. (the Jorgensen mortgage) and JPMorgan Chase & Co. & Chase Home Finance (the Jorgensen and Ryan mortgages) – were otherwise involved in MERS mortgages extended to other plaintiffs.  For its part, JPMorgan Chase & Co. is subject to the 18 U.S.C. § 1962(a) claim, discussed below, which involves the submission of income statements in furtherance of defendants' scheme.  Further, even where the mortgages apparently were not connected with MERS at all, defendants' scheme still reflects improper acceleration of the

foreclosure process.  *See* Exhibit K (Ryan foreclosure docket sheet) and Exhibit L (assignment of Ryan mortgage) (collectively establishing more than six months of foreclosure proceedings prior to assignment).

### C.  The RICO Claims Are Well-Pled.

To reiterate, in a civil RICO case such as this one, "'Rule 9(b) requires only that the plaintiff delineated, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme.'"  *Sterling Nat'l Bank*, 2001 U.S. Dist. LEXIS 2997, at *10 (quoting *In re Sumitomo*, 104 F. Supp. 2d at 319).

### i.  The First Through Eighth Claims – § 1962(c)

A claim under 18 U.S.C. § 1962(c) must allege that defendants have associated with an enterprise that engages in, or the activities of which affect, interstate commerce, through a pattern of racketeering activity.  An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(1).  As provided in 18 U.S.C. § 1961(1), "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 or § 1343, which proscribe, respectively, use of the mails or the wires to further a scheme to defraud.  The mailings or wire transmissions need not contain false or misleading statements, provided that they further a scheme which has a fraudulent purpose.  *Schmuck v. United States*, 489 U.S. 705, 715 (1989) (mailing of routine title documents furthered fraudulent scheme); *United States v. Utley*, 2000 U.S. Dist. LEXIS 6482, *1 (S.D.N.Y. May 12, 2000) (same principle applies to wire fraud).  A "pattern" of racketeering activity involves at least two acts of racketeering, 18 U.S.C. § 1961(5), which must be related to one another and amount to or pose a threat of continued criminal activity.  *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989).

24

With regard to the enterprise, the SAC describes defendants' association-in-fact at ¶¶ 140-157.  Defendants play roles as mortgage loan brokers or originators, entities involved in securitization, servicers and foreclosing parties in a hierarchy within the mortgage banking industry.  SAC at ¶¶ 141(a)-(d).  They are associated-in-fact through the MBA and MERS.  *Id.* at ¶¶ 142-51.  These organizations are synchronized: a number of defendants' executives sit on the MERS Board of Directors, as does the President and Chief Administrative Officer of the MBA.  *Id.* at ¶¶ 148 and 150.  Further, at least seven defendants are or have been associated-in-fact with "robo-signers" at the Harmon Law Offices in Newton, Massachusetts, *id.* at ¶ 153, which is or was subject to an investigation by the Massachusetts Attorney General, *id.* at ¶ 154.

With respect to racketeering activity, the SAC contains specific racketeering acts in which defendants engaged.  Each defendant participated in at least two acts as to each plaintiff.  *Id.* at pp. 33-55 (enumerating specific racketeering acts comprising mail or wire fraud).  These acts furthered defendants' conduct against plaintiffs, *id.* at ¶¶ 163-65, thus they were incident to defendants' fraudulent scheme as a whole.

In addition to identifying each underlying mortgage and its duration, *id.* at ¶¶ 9-36 and pp. 26-28, the SAC lists the fraudulent conduct of defendants collectively, *id.* at ¶¶ 110 and 112.  This conduct includes failing to identify foreclosing parties accurately, generating and utilizing false or misleading documents, engaging in robo-signing, misrepresenting information regarding affiants in foreclosure-related documents, and inappropriately dual-tracking foreclosures and home loan modifications.  *Id.* at ¶ 110(a)-(d).  The scheme also includes using MERS and accounting standards to further defendants' objectives, *id.* at ¶ 112(a)-(b), and, in the case of certain defendants, investing profits from the scheme into activities that injured plaintiffs, *id.* at ¶¶ 112(c) and 299-321.

Thus, plaintiffs have provided the detail required at this stage of litigation.  *See Sterling Nat'l Bank*, 2001 U.S. Dist. LEXIS 2997 at *10, *supra*.

There is also a basis for further discovery.  SAC at ¶ 156 ("Upon information and belief, information regarding securitization of plaintiffs' mortgages will further confirm defendants' association-in-fact as it pertains to plaintiffs.  For example . . . it appears that Wells Fargo was involved in securitization of the Jones mortgage, and a subsidiary or an affiliate of defendant PNC Financial Services or its predecessor, National City Home Loan Services, Inc., was involved in securitization of the Hogan mortgage."); *Rotella v. Wood*, 528 U.S. 549, 560 (U.S. 2000) (noting "that Rule 9(b) will exact some cost" on civil RICO claims, albeit tempered by "the flexibility provided by Rule 11(b)(3), allowing pleadings based on evidence reasonably anticipated after further investigation or discovery.  See, e.g., *Corley v. Rosewood Care Center, Inc. of Peoria*, 142 F.3d 1041, 1050-1051 (CA7 1998) (relaxing particularity requirements of Rule 9(b) where RICO plaintiff lacks access to all facts necessary to detail claim).").

Civil RICO claims are a private enforcement vehicle available to "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive restrictions.  18 U.S.C. § 1964(c).  Even assuming that each foreclosure here was warranted in principle, the RICO claims survive: defendants effectuated their scheme through use of the mails and wires, *see* SAC at ¶¶ 158-66 and Racketeering Acts Table at pp. 33-55, and plaintiffs suffered cognizable harm as a result of defendants' fraudulent acts before and after any default in mortgage payments.  *See Bridge v. Pheonix Bond & Indm. Co.*, 553 U.S. 639, 654-59 (2008) (third party reliance on misrepresentations sufficient to support RICO claim based on mail fraud).

### ii.  **The Ninth Claim – § 1962(a)**

The Ninth Claim, which arises under 18 U.S.C. § 1962(a) against Bank of America, Citibank, Citigroup, Deutsche Bank, DBNTC, Flagstar, JPMorgan Chase, US Bank and Wells Fargo (the "1962(a) Defendants"), is essentially unchallenged.  Section 1962(a) provides, in pertinent part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

18 U.S.C. § 1962(a).

As relevant here, "racketeering activity" includes any act indictable under 18 U.S.C. § 1957, which criminalizes "knowingly engag[ing] or attempt[ing] to egngage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity."  18 U.S.C. § 1957(a).  "Specified unlawful activity" encompasses conduct relating to fraudulent bank entries in violation of 18 U.S.C. § 1005.  *See* 18 U.S.C. § 1957(f)(3); 18 U.S.C. § 1956(c)(7)(D).  Section 1005 prescribes punishment for, *inter alia*, "[w]ho[m]ever with intent to defraud the United States or any agency thereof, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution…"  18 U.S.C. § 1005.  The FDIC is included in § 1005.  *Id.*

The Ninth Claim details the 1962(a) Defendants' pattern of violating § 1005 by submitting quarterly income statements to the FDIC in furtherance of the fraudulent scheme against plaintiffs.  SAC at ¶¶ 291-321.  In essence, the 1962(a) Defendants created the illusion of

liquidity through the utilization of accounting standards that the MBA had obtained to serve the interest of its constituents – including defendants – in opacity.  Defendants used the financial positions they created to generate racketeering income, which they invested into mortgage-related activities directed against plaintiffs, including the buying and selling of their mortgages, securitization and the acceleration of foreclosures.  *Id.* at ¶¶ 312-21.

The 1962(a) Defendants apparently do not contest this basis for liability.  To the extent that they challenge aspects of the complaint generally, their arguments are addressed elsewhere in this submission.  With regard to injury, the 1962(a) Defendants' conduct caused harm to plaintiffs through manipulation of the mortgage marketplace.  Thus, the § 1962(a) claim survives even in the absence of the § 1962(c) claims.

       **D.**  **The Consumer Protection Claims Are Appropriately Pled.**

The Massachusetts, New York and Maryland consumer protection act claims are appropriately pled under each of the applicable consumer protection statutes.

Massachusetts G. L. ch. 93A § 2 provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  "'Trade' and 'commerce' shall include the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed…" *Id.* at § 1(b).  "The Massachusetts courts have explained that 'a practice is unfair if it is within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes

substantial injury.'" *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224 (1st Cir. 2013) (quoting

*Linkage Corp. v. Trs. of Boston Univ.*, 425 Mass. 1, 679 N.E.2d 191, 209 (Mass. 1997)).[2]

Turning to Maryland, the consumer protection act of that state mandates, in pertinent

part, that:

> A person may not engage in any unfair or deceptive trade practice . . . in:
> …
> (2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;
> …
> (4) The extension of consumer credit; [or]
>
> (5) The collection of consumer debts…

Maryland Code Ann., Com. Law § 13-303.  Unfair or deceptive trade practices include any

"[f]alse, falsely disparaging, or misleading statement, visual description, or other representation

of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers,"

and any "[f]ailure to state a material fact if the failure deceives or tends to deceive…" *Id.* at §

13-301(1) and (3).

New York GBL § 349(a) proscribes "[d]eceptive acts or practices in the conduct of any

business, trade or commerce in the furnishing of any service in [New York]."  In general, a

proper claim under § 349 alleges: "(1) the act or practice was consumer-oriented; (2) the act or

practice was misleading in a material respect; and (3) the plaintiff was injured as a result."

*Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).  Nevertheless, "[t]he gravamen of a §

349 claim is consumer injury or harm to the public interest."  *City of New York v. Smokes-*

---

[2]  With regard to the Massachusetts claim, on March 12, 2013, 30 days before filing the SAC, plaintiffs provided the relevant defendants with written notice and a demand for relief pursuant to M.G.L. § 93A § 9.  Such notice was sufficient even though the § 93A claims were brought in a prior iteration of the complaint.  *See Burns v. Hale & Dorr LLP*, 445 F. Supp. 2d 94, 96-97 (D. Mass. 2006).  In any event, the SAC filing date was scheduled on consent, as various other submissions and adjournments have been.

*Spirits.com, Inc.*, 541 F.3d 425, 455 (2d Cir. 2008).  And, as Judge Gleeson has observed in the

context of an employment case:

> Some cases support the . . . view that a case is sufficiently consumer-oriented if it
> involves a matter that affects the public interest.  This view garners additional support
> from the fact that the Court of Appeals distinguished consumer-oriented cases from those
> involving mere private contract disputes, unique to the parties.  It did not draw a
> distinction between cases involving markets for goods and services and those involving
> other markets, such as labor or real estate.

*Apple v. Atlantic Yards Dev. Co. LLC*, 2012 U.S. Dist. LEXIS 84281, at *10-12 (E.D.N.Y. June

18, 2012) (internal quotation marks and citations omitted).[3]

Defendants' scheme has harmed plaintiffs and the public as a whole.   SAC ¶ 3 ("Injuries

to plaintiffs [from defendants' scheme] include … the deprivation of legal protections intended

to ensure … *the public interest* in property laws.") (emphasis supplied), ¶ 110(b) (defendants

published income statements reflecting accounting statements that enabled defendants to mislead

government entities, *the public* and plaintiffs regarding ownership interests in mortgages such as

plaintiffs' home loans.") (emphasis supplied), ¶ 158 ("Defendants have willfully and knowingly

mailed or caused to be mailed numerous mailings in furtherance of their *scheme to deceive*

---

[3] While Rule 9(b) may apply to the Massachusetts and Maryland consumer protection act claims,
it is inapplicable to the New York statute

> because § 349 extends well beyond common-law fraud to cover a broad range of
> deceptive practices, see *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343,
> 725 N.E.2d 598, 1999 N.Y. LEXIS 3932, 704 N.Y.S.2d 177 (1999), and because a
> private action under § 349 does not require proof of the same essential elements (such as
> reliance) as common-law fraud, an action under § 349 is not subject to the pleading-with-
> particularity requirements of Rule 9(b), Fed. R. Civ. P., but need only meet the bare-
> bones notice-pleading requirements of Rule 8(a), Fed. R. Civ. P., see generally
> *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002);
> *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S.
> 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993).

*Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. N.Y. 2005).

*borrowers, courts and the public* in relation to mortgages and in order to unlawfully foreclose on homes.") (emphasis supplied), and ¶ 182 ("defendants employed accounting standards to deceive regulatory authorities, investors *and the public* including plaintiffs") (emphasis supplied). Thus, it is axiomatic that the defendants' scheme was "consumer-directed." *See,* e.g*., Sykes*, 757 F. Supp. 2d at 428 (allegations concerning fraudulent procurement of judgments scheme sufficient to state § 349 claim).

Statements made by MERS on behalf of defendants in furtherance of the fraudulent scheme are particularized in the SAC at ¶¶ 169-93. Further, defendants' deceptive acts are specified in the racketeering acts listed in the SAC at pp. 33-55. "Mail and wire fraud, the predicate acts underlying plaintiffs' RICO claims, are by definition unfair and deceptive acts. If plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the elements of a consumer protection act claim under any of the referenced statutes will follow almost as a matter of course." *In re Lupron Mktg. & Sales Practices Litig*., 295 F. Supp. 2d 148, 180-81 (D. Mass. 2003). In addition, the relevant documents are identified in the SAC.

The Massachusetts and Maryland consumer protection act statutes specifically contemplate practices directed toward real property, and, while GBL § 349 does not delineate specific deceptive acts or practices, it does not except activities relating to real property. Jurisprudence within the appropriate Circuits is in accord. *See,* e.g*., Bean v. Bank of N.Y. Mellon*, 2012 U.S. Dist. LEXIS 132447, at *26 (D. Mass. Sept. 18, 2012) (noting that "a lawful foreclosure may violate Chapter 93A if conducted in bad faith," though finding that plaintiff had not alleged that foreclosure at issue was "for a reason so obviously against public policy"); *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 571 (E.D.N.Y. 2010) (stating, "The court is not willing to find as a matter of law that a purchase of a home and accompanying mortgage cannot

be harmful to the public interest generally and therefore cannot be sufficiently 'consumer-oriented' to comply with the statute.  That position is not fully consistent with the case law."; and collecting cases, including *Banks v. Consume Home Mortgage, Inc.*, 2003 U.S. Dist. LEXIS 8230, at *7 (E.D.N.Y. March 28, 2003) ("it is well settled that Section 349 covers real estate transactions")); *Dwoskin v. Bank of America, N.A.*, 2013 U.S. Dist. LEXIS 14571, *13-16 (D. Md. Jan. 31, 2013) (various state consumer protection claims including Maryland survived motion to dismiss in "no fee" mortgage case).

### E.  The Common Law Fraud Claims Are Adequately Set Forth.

For purposes of this opposition, plaintiffs do not contest defendants' summary of the basic elements necessary to sustain common a law fraud claim in Massachusetts, New York and Maryland: (1) a material false representation, (2) knowledge of falsity or reckless disregard of the truth, (3) intent to defraud, (4) first-party justifiable reliance, and (5) direct injury.  *See* Defs. JMTD at 42-43.

The MERS website states that "[a]ny loan registered on the MERS system is inoculated against future assignments because MERS remains the nominal mortgagee no matter how many times servicing is traded."  *See id*. at ¶ 170 (quoting MERS website).  This statement is fraudulent.  *See id.* at ¶¶ 175(b) and 178 ("[A] Consent Order was executed on April 13, 2011.  It stated that MERS' tracking and registration services were subject to inadequacies in MERS protocol, and that MERS services were improperly delivered.").  And there can be no dispute that MERS and its constituents including defendants knew and know of the falsity of the averment.  *See id.* at ¶ 175(a)-(c) (testimony of former MERS CEO Arnold regarding robo-signing and acceleration of foreclosures).

The statement on the MERS website has furthered defendants' scheme by concealing it. *See id*. at ¶ 180.  This concealment combines with a variety of omissions by defendants, such as: "misrepresenting the true holder of plaintiffs' mortgages or the corresponding notes, failing to disclose material information necessary to establish standing to initiate foreclosure actions against plaintiffs, issuing income statements that reflected accounting standards to further the fraudulent scheme, dual-tracking home loan modifications and foreclosures, and concealing the nature and scope of the fraudulent acts."  *Id.* at ¶ 190; *see also id.* at ¶¶ 110(a)-(e) (enumerating fraudulent acts of defendants and identifying universe of relevant documents), and ¶¶ 116-37 (describing specific examples that illustrate the extent of defendants' fraudulent scheme).

Defendants had full knowledge, including full apprehension of the fraudulent scheme and fraudulent statements made on their behalf.  *Id*. at ¶¶ 110(c), 113, 159, 163, 175(c) and 180 (read together in conjunction with ¶¶ 177 and 207 ("Defendants' conduct was willful and with full knowledge of the fraudulent scheme.")); *see also* ¶ 211 (First Claim, stating, "Documents presented or filed on behalf of defendants in relation to plaintiffs' mortgages or during the course of foreclosure proceedings against plaintiffs were fraudulent.  Such documents were presented or filed under the direction, or with the knowledge, of defendants.  Among other things, such documents repeatedly misrepresented defendants' status as mortgagees and MERS' role in connection with foreclosures."), ¶ 333 (NY fraud), ¶ 350 (MA fraud), and ¶ 365 (MD fraud).

With regard to intent, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. Pro. 9(b).  Here, "[the] concealment was intentional and knowing, and it furthered the concealment of defendants' fraudulent scheme."  SAC at ¶ 180.  Going beyond the standard, the SAC discusses the MERS consent order, which belies the statement on the MERS website in furtherance of defendants' scheme.  SAC at ¶ 178.

Reliance and direct injury are intertwined.  "The [MERS] statement, located on the internet where homeowners were likely to and did read it, is deceptive: it falsely indicates MERS' status and the integrity of all loans registered on MERS, regardless of underlying error or fraud including instances where robo-signers executed material documents without proper authority."  *Id.* at ¶ 172.  The MERS statement and defendants' conduct has impeded plaintiffs' ability to: (1) detect wrongdoing and identify improper assignments and breaks in chains of title before and during foreclosure proceedings; (2) contest foreclosure actions based on lack of standing or other improprieties such as false or misleading assignments, affidavits and other documents; and (3) uncover the extent of defendants' scheme.

In sum, defendants' fraud has impeded the administration of justice and plaintiffs' legal rights throughout.  Simultaneously, defendants' scheme created breaks in chains of title in plaintiffs' former properties, while defendants utilized these deficiencies to expedite foreclosures on plaintiffs' homes and extinguish their mortgages – all based on defendants' misrepresentions.

## III.   Response To Defendants' Supplemental Motions

### A.   PNC

The central premise of PNC's motion to dismiss is that it did not participate in foreclosure proceedings against plaintiffs Benita and William Schriefer.  PNC's Supplemental Memorandum Of Law, docket entry 98 ("PNC Mot."), at 5-6, 7-8 and 10-11.  However, the foreclosure complaint included affidavits by Laura Cauper, an authorized officer of PNC, as attorney in fact for Bank of America.  Exhibit I to Affidavit of David Pittinsky ("Pittinsky Aff."), docket entry 96, at pp. 28-28 and 30-32.  And notices of intent to foreclose attached to the complaint identified PNC as the servicer.  *Id.* at 33-36.

The last known assignment of the Schriefers' mortgage was from "Lawyers Title Services, Inc., A Virginia Corp" on behalf of "FNMC, A Division Of National City Bank" to "National City Mortgage Co., a subsidiary of National City Bank." *See* Exhibit G to Pittinsky Aff. Apparently ownership of the property was not transferred again until the time of foreclosure, at which point it was transferred to Bank of America. *See* Maryland State Department of Assessments & Taxation Real Property Data Search Result, attached as Exhibit M. Accordingly, it appears that PNC, as successor to "FNMC," held the mortgage at the time of foreclosure.

The foreclosure complaint did not comply with applicable law pertaining to this very issue. Rule 14-207(b) of the Maryland Rules provided, in pertinent part, that "[a] complaint or order to docket shall include or be accompanied by: … (4) a copy of any assignment of the lien instrument for purposes of foreclosure or deed of appointment of a substitute trustee supported by an affidavit that it is a true and accurate copy of the assignment or deed of appointment." Maryland Rules, Rule 14-207 (2009). The complaint submitted in the foreclosure proceedings lacks any such affidavit. *See* Exhibit I to Pittinsky Aff. Dismissal is inappropriate on this basis alone, as the underlying facts remain to be resolved.

In any event, the absence of a Rule 14-207(b)(4) affidavit establishes that the foreclosure was improperly accelerated, and the claims survive. As to the RICO claim, it is not dispositive that the Schriefer mortgage did not designate MERS as a nominee. Inclusion of the Schriefer loan in the MERS database is not precluded. Even assuming *arguendo* that the Schriefer mortgage was not listed in MERS, the Schriefer foreclosure followed the same pattern as MERS loans: acceleration of foreclosure based on inadequate or improper documentation, including

faulty assignments.  Further, the foreclosure involved PNC as attorney in fact for Bank of America, which was involved in MERS loans.

PNC's arguments with respect to the Maryland Consumer Practices Act and Maryland common law fraud ignore its involvement in the foreclosure proceedings.  Based on the Cauper affidavits submitted in support of the foreclosure complaint, PNC participated in the foreclosure as an attorney in fact for Bank of America.  Even putting the Cauper affidavits aside, PNC apparently held the mortgage at the time of foreclosure by virtue of the prior assignment to its predecessor in interest FNMC.  Moreover, PNC was the loan servicer during foreclosure.

The claims are within the statute of limitations, as the foreclosure complaint containing the Cauper affidavits was filed on May 7, 2010.  The injuries to the Schriefers included improper acceleration of foreclosure proceedings, which involved the loss of otherwise legal occupancy time, and, ultimately, the loss of their home.  With respect to Rule 9(b), as discussed above with respect to plaintiffs generally, the SAC identifies the relevant universe of documents at issue. There can be no real question that notice to PNC is sufficient to defend against the claims, indeed, PNC submits relevant documents in support of their motion.

### B.  DBNTC

Plaintiffs Gisele Barbosa, George Branch and Matthew Zicaro cross-move to amend the complaint to include Ocwen Loan Servicing, LLC ("OLS").  By correcting this defendant, the amendment will obviate the supplemental memorandum of named defendant Ocwen Financial Corporation ("OFC").

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Pursuant to Fed. R. Civ. Pro. 21, a court "may at any

time, on just terms, add or drop a party."  With respect to Rule 15, as the Supreme Court has held, in the absence of a reason to deny the application such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... futility of amendment, etc.[,] the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)).  Rule 21 analysis involves "'the same standard of liberality afforded to motions to amend under Rule 15.'"  *Newton v. City of New York*, 2010 U.S. Dist. LEXIS 6998, at *5 (S.D.N.Y. Jan. 27, 2010) (quoting *Sly Magazine, LLC v. Weider Publ'ns LLC*, 241 F.R.D. 527, 532 (S.D.N.Y. 2007)).

As a preliminary matter, OLS is a wholly owned subsidiary of OFC, and the distinction between them is not entirely clear.  The OFC website states: "Ocwen is the industry leader in servicing high-risk loans.  Ocwen works with customers in a variety of ways to make their loans worth more, including purchasing of mortgage servicing rights, sub-servicing, special servicing and stand-by servicing."  http://www.ocwen.com/our-company ("2012 © Ocwen Financial Corporation") (last visited August 18, 2013).  Filings with the SEC further establish a high degree of symbiosis between OLS and OFC, if not unity.  *See* OFC 2011 10-K[4], at page 3 ("Ocwen Financial Corporation, through its subsidiaries, is a leading provider of residential and commercial mortgage loan servicing, special servicing and asset management services.  When we use the terms 'Ocwen,' 'OCN,' 'we,' 'us' and 'our,' we are referring to Ocwen Financial Corporation and its consolidated subsidiaries.").

---

[4]  Available at http://www.sec.gov/Archives/edgar/data/873860/000101905612000280/ocn_10k.htm (last visited August 19, 2013).

The basis for dismissal advanced by OFC was not addressed in the pre-motion letters, which were filed before OFC was named as a defendant in this case.  There is no prejudice with regard to notice to OLS, as it is a wholly owned subsidiary of OFC.  Further, there is reason to believe that the companies are closely related based on the degree of symbiosis between OFC and OLS the acquisitions of HomeEq Servicing and Saxon Mortgage Services, Inc., which are discussed in the SAC at ¶ 57.  *See* OFC 2011 10-K at pages 3 and 5 (discussing the HomeEq and Saxon acquisitions and their impact on Ocwen).  Finally, the amendment is not futile for the reasons set forth in our response to defendants' joint motion.

### C.  Deutsche Bank And MortgageIT

The arguments put forward by Deutsche Bank and MortgageIT are addressed in our response to defendants' joint motion.  It bears noting again that MortgageIT's motion fails to address the central point at issue in the pre-motion letters: the assignment of the Lopes mortgage.

### D.  Ally Financial, Inc.

Plaintiffs will stipulate to a dismissal of the claims against Ally Financial, Inc. pursuant to Fed. R. Civ. Pro. 41(a)(2) with each side bearing its own costs.

### IV.    In The Event This Court May Find The Claims Deficient, Plaintiffs Request Leave To Amend The Complaint.

When a party requests leave to amend its complaint, permission should be freely granted. *See, e.g., Foman,* 371 U.S. at 182; Fed. R. Civ. Pro. 15(a)(2); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012).  In the event that the Court should find deficiencies in plaintiffs' allegations, the opportunity to re-plead pursuant to Rule 15(a)(2) is requested.

Plaintiffs believe that the SAC and the proposed amended complaint[5] sufficiently state their claims.  As discussed in our response to defendants' joint motion, the claims are more than adequately presented in the SAC as a matter of law.  Moreover, the broader social context cannot be disregarded.  Although plaintiffs did indeed default on their loan payments, the foreclosure crisis in recent years involved a degree of orchestration among mortgage bankers and a volume of improper or invalid foreclosures on a scale that blows the mind.

This action seeks to remedy the imbalance for plaintiffs.  We have sought to address all the issues raised at the pre-motion conference.  To the extent that the SAC or the proposed amended complaint may remain deficient in any substantive respect, plaintiffs believe that, given the opportunity in light of further guidance, any additional specific concerns can be addressed.  As set forth in the examples in the complaint and the examples discussed in this submission, there are various aspects of each plaintiff's claims that give rise to liability of defendants.

---

[5]  The Proposed Amended Complaint, attached as Exhibit N, is not intended to be a substantive amendment but rather one that addresses a few outstanding administrative issues discussed in this submission or relating to dismissal under Rule 41:

- The addition of new defendant OLS in place of OFC, discussed *supra*.

- The deletion of Ally Financial, Inc. and the related plaintiff Jonathan Thurrott from the instant action until such time as it is appropriate for him to proceed.  This deletion resulted in the renumbering of the complaint paragraphs; a lower average mortgage life, from 33 months to 32 months, *see* Mortgage Duration Table at pp. 26-28; and, the renumbering of the Racketeering Acts, *see* table at pp. 33-55.

- The deletion of Deutsche Bank Trust Company.  *See* docket entry # 109 (order on stipulation of dismissal).  This change also resulted in the renumbering of complaint paragraphs.

## **CONCLUSION**

For the foregoing reasons, defendants' motions to dismiss should be denied, or plaintiffs should be granted leave to cure any deficiency as appropriate.

Dated: August 26, 2013

                        _s/_____

                        Zoe Dolan
                        One of the attorneys for Plaintiffs

KAMBERLAW, LLC
Scott A. Kamber
skamber@kamberlaw.com
100 Wall Street, 23rd Floor
New York, New York 10005
Tel: (212) 920-3072

LAW OFFICES OF ZOE DOLAN
Zoe Dolan
zdolan@gmail.com
154 Grand Street
New York, New York 10013
Tel: (347) 301-5180